RECEIVED FOR FILING
IN CLERK'S OFFICE
HD
2025 APR -4 P 1:00

US COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 25-_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

**In re DZHOKHAR A. TSARNAEV,**
Petitioner.

**REDACTED PETITION FOR WRIT OF MANDAMUS**

David E. Patton, Esq.
Court of Appeals # 1173507
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
Tel.: (212) 763-0883
DPATTON@HECKERFINK.COM

William Fick, Esq.
Court of Appeals # 82686
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
WFICK@FICKMARX.COM

Daniel Habib, Esq.
Court of Appeals # 1173462
Deirdre D. von Dornum, Esq.
Court of Appeals # 11713158
Mia Eisner-Grynberg, Esq.
Court of Appeals # 1186916
FEDERAL DEFENDERS OF NEW
  YORK, INC.
52 Duane Street, 10th Floor
New York, NY 10007
(212) 417-8769
DANIEL_HABIB@FD.ORG
DEIRDRE_VONDORNUM@FD.ORG
MIA_EISNER-GRYNBERG@FD.ORG

*Attorneys for Defendant-Appellant*

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................... i

TABLE OF AUTHORITIES .................................................................................. ii

INTRODUCTION ................................................................................................. 1

STATEMENT OF THE CASE .............................................................................. 3

BACKGROUND ................................................................................................... 4

ARGUMENT ...................................................................................................... 15

    This Court Should Grant Mandamus And Order Recusal ............................. 15

        A.    Standard of Review ................................................................... 16

        B.    Legal Framework ..................................................................... 17

        C.    Judge O'Toole's Public Comments Create An Appearance Of Partiality Requiring Recusal ........................... 22

        D.    Judge O'Toole's Order Denying Recusal Merits No Deference. ................................................................................ 28

        E.    Tsarnaev Satisfies The Other Grounds For Mandamus ........... 31

CONCLUSION .................................................................................................... 33

Case: 25-1335    Document: 00118268883    Page: 2    Date Filed: 04/04/2025    Entry ID: 6711806

# TABLE OF AUTHORITIES

**Cases**

Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813 (1986)............................18

Blakely v. Washington, 542 U.S. 296 (2004).................................27

Comm'r of Internal Revenue v. Monarch Life Ins. Co.,
    114 F.2d 314 (1st Cir. 1940).........................................28

Dall v. Coffin, 970 F.2d 964 (1st Cir. 1992) ........................13

Hathcock v. Navistar Int'l Trans. Corp., 53 F.3d 36 (4th Cir. 1995) ...............22

In re Allied-Signal Inc., 891 F.2d 967 (1st Cir. 1989).......................23

In re Boston's Children First, 244 F.3d 164 (1st Cir. 2001)......................... passim

In re Bulger, 710 F.3d 42 (1st Cir. 2013) ........................... 16, 30, 31

In re Creech, 119 F.4th 1114 (9th Cir. 2024) ........................... 26, 31

In re IBM Corp., 45 F.3d 641 (2d Cir. 1995) ...........................22

In re Murchison, 349 U.S. 133 (1955)...........................3, 18

In re Union Leader Corp., 292 F.2d 381 (1st Cir. 1961) ...........................31

In re United States, 666 F.2d 690 (1st Cir. 1981)...................... 10, 18, 31

In re United States, 441 F.3d 44 (1st Cir. 2006).......................16

Koon v. United States, 518 U.S. 81 (1996) ...........................28

Ligon v. City of New York, 736 F.3d 118 (2d Cir. 2013)...........................22

Liteky v. United States, 510 U.S. 540 (1994) ...........................18

Newburger v. Peterson, 344 F. Supp. 559 (D.N.H. 1972)...........................28

Rippo v. Baker, 580 U.S. 285 (2017) (per curiam) ...........................19

Rushen v. Spain, 464 U.S. 114 (1982) (per curiam)...........................30

Tanner v. United States, 483 U.S. 107 (1987)...........................13

United States v. Chantal, 902 F.2d 1018 (1st Cir. 1990)...........................17

United States v. Cooley, 1 F.3d 985 (10th Cir. 1995) ........................... 21, 22, 23

United States v. French, 12 Cr. 160 (JAW) (D. Me.)...........................13

United States v. French, 977 F.3d 114 (1st Cir. 2020) ...........................13

United States v. Kepreos, 759 F.2d 961 (1st Cir. 1985)...........................13

United States v. Mehanna, 09 Cr. 10017 (GAO) (D. Mass.)...................................6

United States v. Microsoft Corp., 253 F.3d 34 (D.C. Cir. 2001) ......... 20, 22, 23, 29

United States v. Snyder, 235 F.3d 42 (1st Cir. 2000) ........................... 18, 22

United States v. Tsarnaev, 968 F.3d 24 (1st Cir. 2020)................................... 3, 4, 5

United States v. Tsarnaev, 595 U.S. 302 (2022) ...........................3

United States v. Tsarnaev, 96 F.4th 441 (1st Cir. 2024) ............................... passim

Williams v. Pennsylvania, 579 U.S. 1 (2016)...........................19

**Statutes**

28 U.S.C. § 455(a) ........................................................ passim

Case: 25-1335    Document: 00118268883    Page: 3    Date Filed: 04/04/2025    Entry ID: 6711806

Case: 25-1335    Document: 00118268883    Page: 4    Date Filed: 04/04/2025    Entry ID: 6711806

28 U.S.C. § 455(e) ............................................................... 12, 15, 30
42 U.S.C. § 1983 ....................................................................26

**Other Authorities**

Am. Bar Ass'n, Model Code of Judicial Conduct R. 2.11 cmt.5 ............................30
Code of Conduct for United States Judges, Canon 3(A)(6) ........................... passim
Code of Conduct for United States Judges, Canon 3(A)(6) cmt ...........................19
Code of Conduct for United States Judges, Canon 3(C)(1)...................................17
Criminal, "Did We Get It Right?" (May 12, 2023),
    https://tinyurl.com/2abb4xyx ...............................................................9
Flint McColgan, Boston Marathon Bomber Dzhokhar Tsarnaev's Lawyers Want
    Judge To Recuse Himself From Case, Boston Herald (Oct. 12, 2024),
    available at https://tinyurl.com/us3rfprm.....................................................31
H.R. Rep. 93–1453, 1974 U.S.C.C.A.N. 6351 .......................................................18
Phillip Martin, Tsarnaev Trial Judge Revisits Issues of Race, the Death Penalty,
    and Fairness, WGBH.org (April 7, 2016), https://tinyurl.com/nhadt736..... 4, 6, 8
Shelley Murphy, Boston Marathon Bomber Seeks New Judge For Juror Bias
    Inquiry, Boston Globe (Oct. 11, 2024),
    available at https://tinyurl.com/mta9xbb9 .........................................................31
U.S. Courts, Knowledge Seminar—An Inside Look at Jury Trials, (Nov. 17, 2016)
    https://tinyurl.com/2sxwzrkj ......................................................................8

**Rules**

D. Mass. Local Rule 40.1(*l*)(2) ....................................................... 11, 14

# INTRODUCTION

Dzhokhar Tsarnaev petitions for a writ of mandamus ordering Judge O'Toole to recuse himself from conducting the investigation into potential juror bias ordered by this Court. Carrying out this Court's order requires probing whether two seated jurors lied under oath during voir dire about their social media use. That task demands a district judge open to the possibility that Tsarnaev's death sentence is infirm because the jury that returned it included two dishonest and biased members whom the judge should never have empaneled. In this case of profound local and national concern, the handling of Tsarnaev's constitutional claims must be—and, just as important, must appear to be—scrupulously impartial.

Judge O'Toole cannot satisfy those requirements because he has made repeated extrajudicial public statements praising the jurors, and defending the process that he used to select them, during the pendency of Tsarnaev's appeal. Judge O'Toole has commended the seated jurors' "public-spiritedness." He has prejudged the question whether the jurors complied with his instructions concerning social media use, assuring audiences that he heard of no "breach of duty" in this regard. And he has opined that, because the jurors were so carefully chosen and so faithful in discharging their duties, Tsarnaev received a "fully fair" trial. These are the exact issues before the district court on remand.

1

Case: 25-1335   Document: 00118268883   Page: 6   Date Filed: 04/04/2025   Entry ID: 6711806

As this Court has admonished, a judge's public comments convey "[t]wo messages"—the "words actually spoken" and "the judge's expressive conduct in deliberately making the choice to appear" in a public forum to discuss a pending case at all. In re Boston's Children First, 244 F.3d 164, 169 (1st Cir. 2001). Judge O'Toole's comments—not to mention his choice to speak at length on a true crime podcast in 2023, shortly after the second oral argument before this Court— "unmistakably conveyed an uncommon interest and degree of personal involvement in the subject matter." Id. "[W]ith such public attention to a matter, even ambiguous comments"—and these comments, which bore on the issues at the heart of the remand proceedings, were anything but—"may create the appearance of impropriety" that triggers the obligation to recuse. Id. at 170.

So, when this case returned to the district court on remand, Tsarnaev moved Judge O'Toole either to reassign the case or recuse himself. The judge did neither. He denied the motion by electronic docket entry, explaining that recusal would be "at odds with" this Court's remand opinion—even though the question of recusal and the relevant facts weren't before this Court. He failed to address with particularity any of the comments identified as grounds for disqualification, instead dismissing Tsarnaev's argument with a single conclusory sentence. And he rebuffed outright the defense's modest request to complete the evidentiary record by disclosing any other public comments that he had made.

Judge O'Toole's extrajudicial public comments concerning the merits of this case contravened Canon 3(A)(6) of the Code of Conduct for United States Judges. They ran afoul of <u>Boston's Children First</u>, which granted mandamus and held that far more innocuous comments compelled disqualification under 28 U.S.C. § 455(a). And they violated the constitutional command that a judge—especially one presiding over a capital prosecution—satisfy the appearance of impartiality. <u>In re Murchison</u>, 349 U.S. 133, 136 (1955); U.S. Const. amends. V, VIII. This Court should grant mandamus and order recusal.

## STATEMENT OF THE CASE

Following a jury trial in the United States District Court for the District of Massachusetts, Tsarnaev was convicted of 30 offenses arising from the 2013 Boston Marathon bombing and sentenced to death. D. Ct. DE.1618.[1] This Court vacated the death sentence and remanded for a new penalty phase. <u>United States v. Tsarnaev</u>, 968 F.3d 24 (1st Cir. 2020). The Supreme Court reversed. <u>United States v. Tsarnaev</u>, 595 U.S. 302 (2022). On remand, this Court concluded that the district court had not adequately investigated Tsarnaev's claims of bias with respect to two seated jurors. <u>United States v. Tsarnaev</u>, 96 F.4th 441, 447 (1st Cir. 2024). This Court "vacate[d] ... the district court's ruling denying Tsarnaev's

---

[1] Entries on the district court docket, <u>United States v. Tsarnaev</u>, 13 Cr. 10200 (GAO) (D. Mass.) are cited "D. Ct. DE." Exhibits to this Petition are cited "Exh."

motion to strike for cause Jurors 138 and 286, and ... remand[ed] this case to the district court ... to conduct an appropriate investigation of the potential bias suggested by the apparent discrepancies between the answers of Jurors 138 and 286 to the court's inquiries in jury selection and the information contained in their social media communications." Id. at 475. The panel "retain[ed] jurisdiction to conclude the appeal after the district court on remand has ruled on the motion to strike." Id. On remand, before the district court began its inquiry, Tsarnaev moved for recusal in light of the district judge's public comments about the case. Exhs. E, G. Six months later, the district court denied the motion. Exh. A.

## BACKGROUND

1.    Tsarnaev was tried for his part in the Boston Marathon bombing, a notorious crime that generated pretrial publicity "unrivaled in American legal history." 968 F.3d at 42. In the 20 months between the bombing and jury selection, Massachusetts residents were saturated with accounts of "the carnage-filled terror scene—with the sights and sounds of the wounded and dying in full display." Id. at 42–43. They heard stories of "the lives and deaths of Krystle Campbell, Lingzi Lu, Martin Richard, and Sean Collier—touchingly describing the pain borne by their families," and the opinions of "everyday people in the area" that Tsarnaev was "a 'monster,' a 'terrorist,' [and] a 'scumbag.'" Id. Choosing an

4

impartial jury in a "city [that] had been the location of such a horrific event," 96 F.4th at 461, necessitated a "searching voir-dire inquiry," 968 F.3d at 61.

During jury selection, the defense moved to strike Jurors 138 and 286 for cause, or in the alternative, for further voir dire, on the basis of discrepancies between the jurors' social media posts and their voir dire responses. See 96 F.4th at 452, 460–61. Specifically, the defense showed that Juror 138 falsely "deni[ed] that any of his Facebook friends was 'commenting about this trial'" even though, as he waited to be questioned, "they told him to play the part to get on the jury, avoid a mistrial, and send Tsarnaev to be taken care of." Id. at 455. Likewise, the defense showed that Juror 286 falsely denied having "commented on this case" online or "sheltered in place," despite publishing Twitter posts "referring to Tsarnaev as a 'piece of garbage,'" "repeatedly invoking the 'Boston Strong' spirit," and describing being "'locked down'" with her family. Id. at 461. The district court denied the motions to strike and refused to conduct further voir dire of either juror. See id. at 452, 461. The jury convicted Tsarnaev and sentenced him to death. Tsarnaev filed a notice of appeal on January 29, 2016. D. Ct. DE.1628.

2.    While the appeal was pending, Judge O'Toole discussed the case in several public appearances.  After diligent research, the defense identified and adduced in support of its recusal motion the following three events:[2]

April 6, 2016.  Judge O'Toole participated in a public panel discussion at Boston College Law School.  See Phillip Martin, Tsarnaev Trial Judge Revisits Issues of Race, the Death Penalty, and Fairness, WGBH.org (April 7, 2016), https://tinyurl.com/nhadt736.  Drawing on his experiences in this case and in United States v. Mehanna, 09 Cr. 10017 (GAO) (D. Mass.), he addressed "issues regarding the trial management that arise in what we might call high-profile cases, and particularly issues affecting jury management."  See Exh. E, at E28.  Judge O'Toole prefaced his remarks by stating: "I'm not going to talk about the merits of the Mehanna or the Tsarnaev cases.  With respect to the latter in particular, I will not address the merits of any of the legal issues in the case.  As you know, the case is in the very early stages of an appeal, and it would be very inappropriate for me to make any comments about any potential appellate issues."  Exh. E, at E27–28.

But he went on to do just that.  Judge O'Toole explained "how," in his view, "we managed the mechanics and logistics of the trials to assure that the defendant,

---

[2] The defense identified a fourth public event featuring Judge O'Toole but was not able to obtain a transcript or recording: a November 7, 2017 presentation at the Harvard Club of Boston entitled "Current Issues Being Presented to the Judiciary for Decision."  See Exh E, at E10 n.1.

Case: 25-1335     Document: 00118268883     Page: 11     Date Filed: 04/04/2025     Entry ID: 6711806

in each case, was given what the Sixth Amendment guarantees, a public trial that is fully fair." Exh. E, at E28 (emphasis added). After describing this case's jury selection in detail (Exh. E, at E30–32), Judge O'Toole turned to the issue that is the focus of the remand investigation—the jurors' fitness to serve, in particular in light of their exposure to prejudicial information on social media.

He began with effusive praise for the jurors in this specific case: "I have to say, by the way, I'll just take this opportunity to say, the public-spiritedness of these jurors was remarkable throughout, both the ones who were selected and the ones who were not." Exh. E, at E32 (emphases added). As to social media, Judge O'Toole observed: "[J]urors' use of social media is a concern for courts everywhere. There is a danger that jurors will either do independent research on issues, or people, in the case, or that they will be involuntarily subjected by others, like Facebook friends, to improper information, which they shouldn't have." Exh. E, at E32 (emphasis added). This is the precise circumstance that prompted the defense's motion to strike Juror 138 and this Court's remand order. Social media use was also central to the defense's motion to strike Juror 286, and to this Court's decision to remand. See supra Background § 1; 96 F.4th at 449–62.

Yet Judge O'Toole told the audience that no jurors in this case engaged in problematic social media activity: "I have no doubt that the parties were at least spot-checking social media sites to watch for any indication of breach of duty, and

we heard of none." Exh. E, at E33. Judge O'Toole expressed confidence in the jurors' compliance with his instructions: "We ask them to do their duty, and I think they do." Exh. E, at E33. At the conclusion of Judge O'Toole's remarks, during a question-and-answer session, he "was asked if he has any lingering questions or doubts about the Boston Marathon Bombing trial outcome. He said no. He had moved on." Martin, supra.[3]

November 17, 2016. Judge O'Toole participated in a panel discussion sponsored by the Administrative Office of the United States Courts. U.S. Courts, Knowledge Seminar—An Inside Look at Jury Trials (Nov. 17, 2016), https://tinyurl.com/2sxwzrkj. He was introduced as having handled "many cases, but very prominently, the Tsarnaev Marathon bomber case." Id. at 00:37–00:47. Once again, Judge O'Toole expressed faith in jurors' compliance with his instructions to avoid exposure to information on social media: "[W]e impress upon them the need not to do any independent investigation, not to Google things, not to go on social media ... with respect to issues in the case. ... And by and large my experience has been jurors take their responsibility seriously and they try to do, to live by those guidelines." Id. at 35:00–35:38 (emphasis added). He voiced sympathy for the jurors in this case, who "were exposed to some gruesome

---

[3] The defense was not able to obtain a transcript or recording of the full program on April 6, 2016, only the audio clips and the account in the above-cited article.

evidence and it was very powerful and very emotional." Id. at 45:50–46:00.

Although "[b]y and large they handled it well," the judge recounted that he had

taken the unusual step of "enter[ing] an administrative order continuing their

service as jurors after the verdict had been rendered and they were formally

discharged ... for a period of 90 days so that they would be eligible to take part in

our Employee Assistance Program and to seek counseling and help if they needed

it." Id. at 46:00–46:32. See D. Ct. DE.1426.

May 12, 2023. A few months after this Court heard oral argument for the

second time on appeal—an argument during which the sole issue discussed was

Tsarnaev's juror-misconduct claim—Judge O'Toole appeared as a guest on the

popular "Criminal" podcast, in an episode entitled "Did We Get It Right?"

https://tinyurl.com/2abb4xyx. He was introduced as having "presided over the trial

of Dzhokhar Tsarnaev, one of the two brothers who placed bombs near the finish

line of the Boston Marathon." Exh. E, at E39. As in his prior public appearances,

Judge O'Toole vouched for jurors' compliance with his instructions to avoid

extraneous information: "[M]ostly, they take their work very seriously. And when

we say that this is really important that you [confine] yourself only to what you've

heard here in the courtroom and not on any private investigation you've done, any

comments that other people have made, tell your family members you just can't

talk about it. And they do. They follow through on it." Exh. E, at E39 (emphases

9

added).  Judge O'Toole also agreed with the host's observation that the jurors in this case "ha[d] really been through the [w]ringer," and once again touted his 90-day counseling order, explaining: "Because of the emotional impact of the evidence that they'd seen and because we expected that when they no longer had each other, the jurors, they might be home by themselves and have memories of awful images that they've had .... we wanted to allow those people who thought it would be helpful to them to have some counseling about how to handle their emotions and their memories." Exh. E, at E41–42.

3.    These extrajudicial expressions of affinity, praise, and solicitude for the Tsarnaev jurors align with Judge O'Toole's actions and statements made in court.  See In re United States, 666 F.2d 690, 697 (1st Cir. 1981) (in case of "widespread" public interest, "tak[ing] one additional step and look[ing] at the judge's conduct at trial to see whether it reveals any grounds that might cause an observer to doubt his impartiality").  For example, after the parties had exercised their peremptory challenges but before the jury had been sworn, the judge met ex parte with the selected jurors and alternates and told them: "You and I are in this together.  We're on the same side here." D. Ct. DE.1133, at 20.  The judge said: "[T]he Supreme Court of the United States has a very interesting tradition. Before they go out on the bench to hear argument and before they conference a case, they

Case: 25-1335      Document: 00118268883      Page: 14      Date Filed: 04/04/2025      Entry ID: 6711806

all shake hands with each other, and I thought we'd do that because we're now teammates." D. Ct. DE.1133, at 22. Judge O'Toole then shook each juror's hand.

At the oral imposition of sentence, the district court praised the seated jurors and alternates, by this point discharged, who had returned for the imposition of the death sentence at his <u>ex parte</u> "invitation." <u>See</u> D. Ct. DE.1476, at 3 (Judge O'Toole's acknowledgment that he "talk[ed] informally" with jurors after verdict). The court "[took] this occasion again to thank the now-former jurors for their exceptional service. ... [W]e asked them, as they acted to perform their high duty, to be utterly fair and impartial in their deliberations. Their careful verdict satisfies me that they did what they were asked to do." D. Ct. DE.1476, at 4. The court continued: "That they performed their duty so well and faithfully came as no surprise to me. ... I had no doubt that we could select a jury for this case that would accept and perform their high duty conscientiously and justly. The proof is in the pudding"—that is, the jurors' verdict convicting Tsarnaev and sentencing him to death. D. Ct. DE.1476, at 4.

4.    After this Court remanded for an investigation into Jurors 138 and 286—but before the district court had done anything other than schedule a status conference—the defense raised the issue of recusal. On August 2, 2024, the defense suggested that D. Mass. Local Rule 40.1(*l*)(2) called for the district court

11

to reassign the case,[4] but noted that if the court did not, "we intend to file a separate motion for the Court to recuse itself pursuant to 28 U.S.C. § 455(a)." Exh. B, at B1–B2. When the district court ruled at an August 21, 2024 status conference that it would not reassign the case, the defense moved for recusal pursuant to § 455(a) and the Fifth and Eighth Amendments. See Exh. D, at D4–D6; Exhs. E, G. In a motion filed on September 3, 2024 and fully briefed on September 27, 2024, the defense argued that Judge O'Toole's public comments about the case could cause a reasonable observer to question whether he could impartially investigate and adjudicate the question of the jurors' bias on remand. In the alternative, the defense sought disclosure of all of the judge's public comments about the case—including any made at the November 7, 2017 event or during the unrecord portions of the April 6, 2016 event, see supra nn.2–3—as well as any ex parte communications with the jurors, including those made during the post-verdict meeting that the judge acknowledged had occurred, see supra Background § 3. Exh. E, at E1 (citing 28 U.S.C. § 455(e)).

---

[4] Local Rule 40.1(*l*)(2) provides that in "all" cases "in which the mandate of the appellate court requires further proceedings in this court" other than a new trial, "such proceedings shall not be conducted before the district judge before whom the prior proceedings were conducted unless the terms of the remand require that further proceedings be conducted before the original judge or unless the judge determines that there will result a substantial saving in the time of the whole court and that there is no reason why, in the interest of justice, further proceedings should be conducted before another judge."

Case: 25-1335    Document: 00118268883    Page: 17    Date Filed: 04/04/2025    Entry ID: 6711806





6.    On March 28, 2025, the district court denied, by electronic docket entry, recusal and disclosure. Exh. A. First, citing Local Rule 40.1(*l*)(2), the court determined: "It is apparent that the Court of Appeals intended that this Court investigate the potential bias of the two jurors at issue. The instruction was plainly directed to this district judge. Recusal would be at odds with the direction of the Court of Appeals." Exh. A, at A1–A2.

Next, the district court ruled that Tsarnaev "has not met the high threshold required for recusal" under § 455(a). Without specifically addressing any of the comments the motion identified as grounds for recusal, the court concluded: "Contrary to the defendant's characterizations and excerpted quotes, a review of the comments as a whole and in context supports the conclusion that an objective, knowledgeable member of the public would not find a reasonable basis for doubting my ability to follow my oath to faithfully apply the law, including the

14

Case: 25-1335    Document: 00118268883    Page: 19    Date Filed: 04/04/2025    Entry ID: 6711806

instructions of the First Circuit, and impartially preside over an investigation into the voir dire answers and potential bias of the jurors." Exh. A, at A2.

Finally, the district court refused the defense's request for disclosure of other public comments or ex parte communications with the seated jurors. The court did not say that there was nothing to disclose. Instead, the court dismissed the proposition that it "has an obligation to respond to a party's discovery requests, even where they are not in connection with any waiver." Id. (citing § 455(e)). Then, citing its April 6, 2016 disclaimer, see supra Background § 2, the court maintained that it had not "inappropriately addressed contested issues that [Tsarnaev] had raised on his then-pending appeal." Exh. A, at A2. And in the court's view, "[n]one of any other public discussions of high-profile criminal cases or of broadly applicable management of jury trials have any bearing on the task the Court of Appeals established in its limited pending remand." Exh. A, at A2. The court did not mention its ex parte conversations with the jurors.

## ARGUMENT

### This Court Should Grant Mandamus And Order Recusal.

This Court remanded for an investigation into whether Jurors 138 and 286 lied during voir dire about their social media communications, whether they harbored disqualifying bias against Tsarnaev, and whether Tsarnaev's death sentence resulted from a fundamentally unfair trial. Judge O'Toole has already

15

expressed strong opinions about each of those issues in extrajudicial public comments during the pendency of this appeal. He has vouched for the "public-spiritedness" of the "selected" jurors, which "was remarkable throughout." He has assured audiences that he knew of no "breach of duty" involving social media. And he has averred that Tsarnaev got a "fully fair" trial, leaving him with no "lingering questions or doubts" about the outcome. The "unusual," "unwise," and worst of all, unnecessary, choice to make these remarks in this high-profile, emotionally charged case, see Boston's Children First, 244 F.3d at 169, 171, creates at least the appearance of partiality necessitating recusal under § 455(a) and the Fifth and Eighth Amendments.

A.    Standard of Review

Under this Court's precedents, the relief that Tsarnaev seeks is available to correct "the rare error that might arise from ... a [judge's] good-faith failure to recognize how a reasonable member of the public would perceive [his] relation to the case." In re Bulger, 710 F.3d 42, 46 (1st Cir. 2013) (Souter, J.). This Court has granted interlocutory petitions for mandamus and required district judges to recuse themselves prior to trial. E.g., id. at 49 (granting writ; requiring recusal before federal criminal trial on defendant's petition); In re United States, 441 F.3d 44, 68 (1st Cir. 2006) (same; government's petition); Boston's Children First, 244 F.3d at 164–65 (same; plaintiffs' petition in civil case).

16

This Court reviews a district judge's decision declining to recuse for abuse of discretion. <u>Bulger</u>, 710 F.3d at 45. On mandamus review, the petitioner must further "'satisfy the burden of showing that [his] right to issuance of the writ is clear and indisputable.'" <u>Id.</u> (quoting <u>Cheney v. U.S. Dist. Court for Dist. of Columbia</u>, 542 U.S. 367, 381 (2004)). "A petitioner for mandamus relief must also demonstrate that he has no other adequate source of relief; that is, he must show 'irreparable harm.'" <u>Id.</u> (quoting <u>In re Vazquez-Botet</u>, 464 F.3d 54, 57 (1st Cir. 2006)). And he must demonstrate that "on balance, the equities favor issuance of the writ." <u>Id.</u> "Applying the mandamus standard to the substantive recusal standard thus requires a doubly deferential review: relief for the defendant is only warranted if it is 'clear and indisputable' that no reasonable reading of the record supports a refusal to recuse." <u>Id.</u> at 45–46.

B.    <u>Legal Framework</u>

Section § 455(a) provides: "Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." <u>See</u> Code of Conduct for United States Judges, Canon 3(C)(1) (same). Section 455(a) "is automatic, mandatory, and self-executing." <u>United States v. Chantal</u>, 902 F.2d 1018, 1023 (1st Cir. 1990). Disqualification under § 455(a) is "appropriate" "when the charge is supported by a factual basis, and when the facts asserted 'provide what an objective,

17

Case: 25-1335    Document: 00118268883    Page: 22    Date Filed: 04/04/2025    Entry ID: 6711806

knowledgeable member of the public would find to be a reasonable basis for doubting the judge's impartiality.'" Boston's Children First, 244 F.3d at 167 (quoting In re United States, 666 F.2d at 695). Impartiality is "evaluated on an objective basis, so that what matters is not the reality of bias or prejudice but its appearance." Liteky v. United States, 510 U.S. 540, 548 (1994). "This general standard is designed to promote public confidence in the impartiality of the judicial process by saying, in effect, if there is a reasonable factual basis for doubting the judge's impartiality, he should disqualify himself and let another judge preside over the case." H.R. Rep. 93–1453, 1974 U.S.C.C.A.N. 6351, 6355. District courts have discretion in deciding whether to recuse, but "should exercise that discretion with the understanding that, 'if the question of whether § 455(a) requires recusal is a close one, the balance tips in favor of recusal.'" Boston's Children First, 244 F.3d at 167; see also United States v. Snyder, 235 F.3d 42, 46 (1st Cir. 2000) ("[The] duty to recuse and the duty to sit do not exert equal pull; in close cases, 'doubts ordinarily ought to be resolved in favor of recusal.'" (quoting In re United States, 158 F.3d 26, 30 (1st Cir. 1998))).

Likewise, the Fifth Amendment requires not just actual impartiality but also the appearance of impartiality. "The Due Process Clause 'may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high

18

function in the best way, justice must satisfy the appearance of justice.'" Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 825 (1986) (quoting Murchison, 349 U.S. at 136). The Eighth Amendment applies this constitutional command with particular rigor to capital cases. See, e.g., Rippo v. Baker, 580 U.S. 285, 287 (2017) (per curiam) (in capital case, "the Due Process Clause may sometimes demand recusal even when a judge 'ha[s] no actual bias'" (quoting Aetna, 475 U.S. at 825)); Williams v. Pennsylvania, 579 U.S. 1, 14 (2016) (judge's role as prosecutor in earlier stage of capital case "gave rise to an unacceptable risk of actual bias" that "so endangered the appearance of neutrality that his participation in the case 'must be forbidden if the guarantee of due process is to be adequately implemented'" (quoting Withrow v. Larkin, 421 U.S. 35, 47 (1975))).

When it comes to the precise issue here—public comments about a pending case—the canons and this Court's precedent impose even tighter restrictions. Canon 3(A)(6) provides: "A judge should not make public comment on the merits of a matter pending or impending in any court," except that "[t]he prohibition on public comment on the merits does not extend to public statements made in the course of the judge's official duties, to explanations of court procedures, or to scholarly presentations made for purposes of legal education." The "admonition against public comment about the merits of a pending or impending matter continues until the appellate process is complete." Canon 3(A)(6) cmt. Where, as

19

here, "the public comment involves a case from the judge's own court, the judge should take particular care so that the comment does not denigrate public confidence in the judiciary's integrity and impartiality." Id. Canon 3(A)(6) is "straightforward and easily understood." United States v. Microsoft Corp., 253 F.3d 34, 112 (D.C. Cir. 2001).

In Boston's Children's First, this Court, applying § 455(a) and Canon 3(A)(6), granted mandamus and required a district court to recuse itself based on comparatively anodyne public comments. In that case, which arose from a lawsuit asserting a race-based challenge to Boston's elementary school student assignment process, plaintiffs' counsel made "provocative" statements to the Boston Herald criticizing the district judge's views on plaintiffs' standing and plaintiffs' pending motion for class certification. 244 F.3d at 165–66. Responding to what she believed to be "inaccuracies" in the Herald's article, the district judge explained, in an interview with the Herald, that the issue of standing was "more complex" in the instant case than in another case cited by plaintiffs' counsel, where the same judge had found standing and certified a class. Id. at 166. The judge denied the plaintiffs' recusal motion, characterizing her statements as "explanatory and educational" "attempts to correct a record suffering from gross misrepresentations" by plaintiffs' counsel. Id. at 166, 168 n.8.

20

Case: 25-1335    Document: 00118268883    Page: 25    Date Filed: 04/04/2025    Entry ID: 6711806

This Court granted mandamus and ordered recusal. This Court observed that "[j]udges are generally loath to discuss pending proceedings with the media," that doing so was "'an unusual thing for a judge to do,'" and cautioned that "when a judge makes public comments to the press regarding a pending case, he or she invites trouble." Id. at 169 (quoting United States v. Cooley, 1 F.3d 985, 995 (10th Cir. 1995)), 171. This Court then concluded that recusal was necessary in light of three factors, all present here. First, "the Boston school assignment program is a matter of significant local concern," and "in newsworthy cases where tensions may be high, judges should be particularly cautious about commenting on pending litigation." Id. at 169–70. That is because "[w]ith such public attention to a matter, even ambiguous comments may create the appearance of impropriety that § 455(a) is designed to address. In fact, the very rarity of such public statements, and the ease with which they may be avoided, make it more likely that a reasonable person will interpret such statements as evidence of bias." Id. at 170. Second, the district judge's comments "were sufficiently open to misinterpretation so as to create the appearance of partiality," because a "reasonable person" might have construed them "as a preview of a ruling on the merits of [the plaintiffs'] motion for class certification." Id. And third, the judge's comments "might be interpreted as a defense of her procedural approach to this litigation," implicating

21

the concern that "a judge's defense of her own orders, prior to the resolution of appeal, may create the appearance of partiality." Id. at 170.

Numerous decisions accord with <u>Boston's Children First</u> and require § 455(a) recusal based on judges' public comments about pending cases. See, e.g., <u>Ligon v. City of New York</u>, 736 F.3d 118 (2d Cir. 2013); <u>Hathcock v. Navistar Int'l Trans. Corp.</u>, 53 F.3d 36 (4th Cir. 1995); <u>Microsoft Corp.</u>, 253 F.3d at 107–118; <u>In re IBM Corp.</u>, 45 F.3d 641 (2d Cir. 1995); <u>Cooley</u>, 1 F.3d 985.

C.    <u>Judge O'Toole's Public Comments Create An Appearance Of Partiality Requiring Recusal.</u>

In numerous public settings during the pendency of Tsarnaev's appeal, Judge O'Toole has opined, in detail and at length, about the very matters that are the subject of the remand proceedings and had been a key focus of pre-trial litigation—whether seated jurors gave honest or dishonest answers during voir dire, whether they followed or disobeyed his instructions to avoid prejudicial information on social media, whether they honored their oath to decide this case impartially or suffered from disqualifying bias, and whether Tsarnaev received a fair or an unfair trial. These comments contravened Canon 3(A)(6) and the binding guidance in <u>Boston's Children First</u>, and they created an appearance of partiality sufficient to require disqualification under § 455(a) and the Fifth and Eighth Amendments. At a minimum, the question is "close" enough that this Court should "resolve" any "doubts ... in favor of recusal." <u>Snyder</u>, 235 F.3d at 46.

1.   Putting the substance of the remarks aside, Judge O'Toole "invite[d]" trouble" by choosing to discuss this highest of high-profile cases in public. Boston's Children First, 244 F.3d at 171.  Reasonable observers "might well consider [his] actions as expressing an undue degree of interest in the case."  Id. at 170.  Indeed, "[i]t has been argued that any 'public comment by a judge concerning the facts, applicable law, or merits of a case that is sub judice in his court ... would raise grave doubts about the judge's objectivity and his willingness to reserve judgment until the close of the proceeding.'"  Microsoft, 253 F.3d at 114.  Not only was the district judge's choice uncommon, see Boston's Children First, 244 F.3d at 170 (noting the "rarity of such public statements"), but each instance was also avoidable.  Cf. In re Allied-Signal Inc., 891 F.2d 967, 971 (1st Cir. 1989) (Breyer, J.) ("[O]ther things being equal, the more common a potentially biasing circumstance and the less easily avoidable it seems, the less that circumstance will appear to a knowledgeable observer as a sign of partiality.").  Judge O'Toole was not correcting misrepresentations by counsel, as in Boston's Children First, or addressing provocative actions by a litigant, as in Cooley.  Nor were his remarks necessary to the disposition of the case.  Cf. Allied Signal Inc., 891 F.2d at 972 ("[O]ther things being equal, the greater the extent to which the potentially disqualifying circumstance facilitates the just and efficient resolution of a case, the less likely a knowledgeable observer will consider it a sign of judicial

23

Case: 25-1335    Document: 00118268883    Page: 28    Date Filed: 04/04/2025    Entry ID: 6711806

partiality."). It was "no excuse that the Judge may have intended to 'educate' the public about the case"—an excuse that Judge O'Toole did not give in his docket entry denying recusal—because "he could have held his tongue until all appeals were concluded." Microsoft, 253 F.3d at 112.

2.    The remarks themselves reflect, or at the very least could to a reasonable observer suggest, views on the merits of the remand issues that create the appearance of prejudgment inconsistent with the obligation of impartiality. With full knowledge of the factual and legal bases for Tsarnaev's juror-misconduct claim (see D. Ct. DE.1100), Judge O'Toole opined that the "public-spiritedness of [the] jurors ... who were selected" "was remarkable throughout." He had "heard of no[]" "indication of [jurors'] breach of duty" to avoid extraneous information on social media, and thus was confident that the jurors had "follow[ed] through" on their duty and had "take[n] their responsibility seriously." He made these comments even though the defense had brought to his attention significant concerns about Jurors 138 and 286's social media exposure and use—concerns so serious that, this Court held, they compelled inquiry, 96 F.4th at 462, 468. And the judge said that he had no "lingering questions or doubts" about the trial's outcome.

These comments, made on several occasions over the course of many years, are far more indicative of prejudgment than the district judge's single observation, in Boston's Children First, that the standing issue in that case was "more complex"

24

than the standing issue in another case. An objective observer could take Judge O'Toole's fulsome praise for the "public-spiritedness" of the seated jurors "as a preview of a ruling on the merits" (244 F.3d at 170) of the remand question whether those same jurors lied and suffered from disqualifying bias—especially since the judge knew of the allegations of misconduct when he delivered that praise. Moreover, the judge's discussion and justification of his jury selection procedures—"custom-designed" to "assure" that Tsarnaev got a "fully fair" trial, Exh. E, at E28, E31—as well as the bona fides of the jurors, could be viewed as an anticipatory "defense of [his] own order" denying the motion to strike and refusing further voir dire "prior to the resolution of appeal." 244 F.3d at 170. Such comments "may create the appearance of partiality." Id.

Granted, Judge O'Toole prefaced his April 6, 2016 remarks with the disclaimer that he was "not going to talk about the merits of ... the Tsarnaev case[]." See supra Background § 2; see also Exh. A, at A2. But he did. He opined that Tsarnaev had received a "fully fair" trial, such that the judge had no "lingering questions or doubts about the ... outcome." As to any seated jurors' "breach[es] of duty" involving social media, Judge O'Toole said that he had "heard of none." The jurors, he "th[ought]," "do their duty." An objective observer could perceive these statements as opinions on the merits or as indicia of apparent partiality on the key issues now before the court on remand—whether this trial was "fully fair," or

25

whether Jurors 138 and 286 instead "breach[ed] their duty" by lying during voir dire, concealing expressions of bias against Tsarnaev, and improperly engaging with case-related social media posts. See Boston's Children First, 244 F.3d at 168, 170 (requiring recusal even though "it [was] not at all clear that [the district judge] was commenting on the merits," because "the comments were sufficiently open to misinterpretation so as to create the appearance of partiality").

The Ninth Circuit's recent decision granting a capital defendant's mandamus petition and requiring recusal is illustrative. In re Creech, 119 F.4th 1114 (9th Cir. 2024). There, a death-sentenced state prisoner brought a 42 U.S.C. § 1983 action alleging that the state prosecutor's office introduced fabricated and misleading evidence at his state clemency hearing. Id. at 1116. He sought recusal of the federal district judge hearing the § 1983 suit because she acknowledged a close friendship with the state prosecutor in public comments. The Ninth Circuit concluded that recusal was required because the judge's public praise of the prosecutor—whom the judge had described as "a consummate professional"—could cause an objective observer to question whether the judge could impartially adjudicate the prisoner's claims of prosecutorial misconduct. Id. at 1123. "[The prisoner's] allegations of prosecutorial misconduct are in tension with [the judge's] laudatory comments on [the prosecutor's] professionalism. A reasonable observer could question [the judge's] impartiality in a case that may

Case: 25-1335    Document: 00118268883    Page: 30    Date Filed: 04/04/2025    Entry ID: 6711806

challenge [the prosecutor's] professional and ethical reputation." Id.  So too here.

Judge O'Toole has lavished fulsome public compliments on the jurors who sat in

this case.  Those comments, too, stand "in tension with" Tsarnaev's claim that

these selfsame jurors committed misconduct by lying during voir dire—a claim

that the district judge knew had been lodged when he spoke.  So a "reasonable

observer could question" whether Judge O'Toole can now "impartially" decide a

misconduct claim against jurors whose "public-spiritedness" he has applauded.

3.    Judge O'Toole's statements and actions in the courtroom buttress the

claim for recusal.  As trial began, he told the jurors, ex parte, that he and they were

"in this together," "on the same side," and "teammates."  That figurative (and

literal) handshake was not consistent with the constitutional design.  "There is not

one shred of doubt ... about the Framers' paradigm for criminal justice: ... limited

state power accomplished by strict division of authority between judge and jury."

Blakely v. Washington, 542 U.S. 296, 313 (2004).  As he imposed the death

sentence, the judge said that the jurors had been "utterly fair and impartial" and

their service "exceptional." ██████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

D.    Judge O'Toole's Order Denying Recusal Merits No Deference.

The district court denied Tsarnaev's motion for recusal in an electronic

docket entry that merits no deference. At the threshold, the court committed legal

error by stating that "[r]ecusal would be at odds with the direction of the Court of

Appeals." Exh. A, at A2. To the contrary, this Court's remand opinion expressed

no view on the issue of recusal, for the simple reason that the issue wasn't before

this Court. This Court said that it had "no doubt that the able district court judge"

could "form a considered opinion about the sufficiency of the jurors' explanations"

for their inaccurate voir dire answers "once those explanations are given and

explored." 96 F.4th at 464. But that statement cannot reasonably be read as

issuing any "direction" as to recusal because this Court was not aware of the

factual or legal grounds for recusal. "'The language used in an opinion must be

read in light of the issues presented.'" Comm'r of Internal Revenue v. Monarch

Life Ins. Co., 114 F.2d 314, 325 (1st Cir. 1940) (quoting Sinclair v. United States,

279 U.S. 749, 767 (1929)). It was unsound for the district court to interpret this

language as pertinent to a matter that this Court had no way of knowing would

arise. See Newburger v. Peterson, 344 F. Supp. 559, 561 (D.N.H. 1972) (Coffin,

J., for three-judge court) (discussing "the judicial mandate of construing words and

phrases with some sensitivity to the point the Court was trying to make, what was

before it and what was not before it, and its underlying concern"). Giving the

Case: 25-1335　　Document: 00118268883　　Page: 33　　Date Filed: 04/04/2025　　Entry ID: 6711806

opinion any weight with respect to a then-unknown issue was an error of law and thus an abuse of discretion.  See Koon v. United States, 518 U.S. 81, 100 (1996).

Moreover, the district court's order gave no meaningful consideration to the substance of the public comments tendered as grounds for recusal, dismissing all of them with a single conclusory sentence.  Exh. A, at A2.  But the court's public comments had direct bearing on the matters central to the remand investigation and were far more suggestive of partiality than the innocuous statement held to require recusal in Boston's Children First.  The district court gave no reason at all for charting the "unusual" course of speaking not just to a law school audience but to a general-interest podcast about a "newsworthy case[] where tensions may be high" while the appeal was pending.  Boston's Children First, 244 F.3d at 169–70.  Nor did the district court discuss Canon 3(A)(6)'s "straightforward and easily understood" bar on public comment.  See Microsoft, 253 F.3d at 112.  In a different section of the order, discussing disclosure, the court invoked its April 6, 2016 disclaimer.  Exh. A, at A2.  The judge's own words belie the disclaimer.  And the assertion that "none" of the court's other comments "have any bearing on the task the Court of Appeals established in its limited pending remand," Exh. A, at A2,  is clearly erroneous.  Both the comments and the remand pertain to the same topics—the adequacy of voir dire, the jurors' bias, their compliance with their instructions and oaths, and the fairness of Tsarnaev's death sentence.

29

Finally, the district court's treatment of Tsarnaev's request for disclosure does nothing to assure the public of the court's impartiality. Just the opposite. Tsarnaev made specific requests based on concrete evidence. He sought information concerning the unrecorded portions of the April 6, 2016 panel, the November 7, 2017 presentation, and the judge's ex parte communications with the jurors. Exh. E, at E22–23. We know that each of these events occurred. Yet the district court handled Tsarnaev's request not by disclosing or attesting that there was nothing to disclose. Instead, the district court rejected § 455(e) as a basis for "discovery," ignoring the other authorities that Tsarnaev had identified. E.g., Am. Bar Ass'n, Model Code of Judicial Conduct R. 2.11 cmt.5 ("A judge should disclose on the record information that the judge believes the parties or their lawyers might reasonably consider relevant to a possible motion for disqualification, even if the judge believes there is no basis for disqualification."); Rushen v. Spain, 464 U.S. 114, 119 (1982) (per curiam) ("When an ex parte communication [between judge and juror] relates to some aspect of the trial, the trial judge should disclose the communication to counsel for all parties."). In a situation where transparency would have been easy to supply, the judge withheld it. That was hardly the way to foster public confidence in his impartiality.

E.    Tsarnaev Satisfies The Other Grounds For Mandamus.

Tsarnaev has shown that it is "clear that a reasonable person might question [Judge O'Toole's] ability to remain impartial in hearing the case." Bulger, 710 F.3d at 46. He has also satisfied the other requisites for mandamus. As for irreparable harm, "we can leave aside any question of harm personal to the defendant and concentrate on damage to the judicial system," which makes it "imperative to act promptly to preclude any reasonable question" as to "the fairness of the judicial branch." Bulger, 710 F.3d at 49. This Court holds that "the issue of judicial disqualification presents an extraordinary situation suitable for the exercise of mandamus jurisdiction." In re United States, 666 F.2d at 694. Where, as here, "the issue of partiality has been broadly publicized,"[5] "the claim of bias cannot be labelled as frivolous and deferred to final appeal." Id. Rather, "public confidence in the courts may require that such a question be disposed of at the earliest opportunity." In re Union Leader Corp., 292 F.2d 381, 384 (1st Cir. 1961).

In addition, the equities, as well as judicial economy, favor immediate review. The gravity of the public comments "take this case out of the category of the heckler's veto." Bulger, 710 F.3d at 49. And Tsarnaev has not sought "delay."

---

[5] E.g., Shelley Murphy, Boston Marathon Bomber Seeks New Judge For Juror Bias Inquiry, Boston Globe (Oct. 11, 2024), available at https://tinyurl.com/mta9xbb9; Flint McColgan, Boston Marathon Bomber Dzhokhar Tsarnaev's Lawyers Want Judge To Recuse Himself From Case, Boston Herald (Oct. 12, 2024), available at https://tinyurl.com/us3rfprm.

Id. The defense developed the factual basis for this motion with diligence and raised it at the first opportunity on remand, then filed this petition within a week of the district court's refusal to recuse. Moreover, "[e]ven when an appeal may be available at the conclusion of the district court proceedings, the appeal itself may be tainted," for example, because "the judge whose recusal is sought has compiled the record being reviewed by the court of appeals." Creech, 119 F.4th at 1125.

████████████████████████████████████████████████████████

If this Court defers review, then later concludes that recusal was warranted, a second post-trial hearing could be necessary.

Case: 25-1335 Document: 00118268883 Page: 37 Date Filed: 04/04/2025 Entry ID: 6711806

## CONCLUSION

This Court should grant mandamus and order recusal.

Dated: April 4, 2025

Respectfully submitted,

David E. Patton, Esq.
Court of Appeals # 1173507
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
Tel.: (212) 763-0883
DPATTON@HECKERFINK.COM

William Fick, Esq.
Court of Appeals # 82686
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
WFICK@FICKMARX.COM

/s/ Daniel Habib, Esq.
Daniel Habib, Esq.
Court of Appeals # 1173462
Deirdre D. von Dornum, Esq.
Court of Appeals # 11713158
Mia Eisner-Grynberg, Esq.
Court of Appeals # 1186916
FEDERAL DEFENDERS OF NEW
    YORK, INC.
52 Duane Street, 10th Floor
New York, NY 10007
(212) 417-8769
DANIEL_HABIB@FD.ORG
DEIRDRE_VONDORNUM@FD.ORG
MIA_EISNER-GRYNBERG@FD.ORG

*Attorneys for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE

1.     This petition complies with the type-volume limit of Fed. R. App. P. 21(d)(1) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this petition contains **7,797** words.

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using **Microsoft Word** in **14-point font** in **Times New Roman** type style.

Dated:  April 4, 2025          <u>/s/ Daniel Habib, Esq.</u>
                                       Attorney for Defendant-Appellant
                                       **Dzhokhar Tsarnaev**

---

## CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2025, I served copies of the foregoing document and attached exhibits by hand delivery and email on counsel for the government, Nadine Pellegrini (nadine.pellegrini@usdoj.gov), and on the district court, Hon. George A. O'Toole, via courtroom clerk John Fleming (john_fleming@mad.uscourts.gov) and docket clerk Flaviana de Oliveira (flaviana_deoliveira@mad.uscourts.gov).

Dated:  April 4, 2025          <u>/s/ Daniel Habib, Esq.</u>
                                         Attorney for Defendant-Appellant
                                        **Dzhokhar Tsarnaev**

**EXHIBITS**

Exhibit A:    Electronic Order Denying Motion to Recuse (March 28, 2025)

Exhibit B:    Defendant's Letter re. Local Rule 40.1(*l*)(2) (Aug. 2, 2024)

Exhibit C:    Government's Letter re. Local Rule 40.1(*l*)(2) (Aug. 5, 2024)

Exhibit D:    Transcript (Aug. 21, 2024)

Exhibit E:    Defendant's Motion for Recusal and Disclosure (Sept. 3, 2024)

Exhibit F:    Government's Response to Defendant's Motion for Recusal and Disclosure (Sept. 17, 2024)

Exhibit G:    Defendant's Reply in Support of Motion for Recusal and Disclosure (Sept. 27, 2024)



Case: 25-1335     Document: 00118268883     Page: 40     Date Filed: 04/04/2025     Entry ID: 6711806

# Exhibit A

**Electronic Order Denying Motion to Recuse
(March 28, 2025)**

| | |
|---|---|
| **From:** | ECFnotice@mad.uscourts.gov |
| **To:** | CourtCopy@mad.uscourts.gov |
| **Subject:** | Activity in Case 1:13-cr-10200-GAO USA v. Tsarnaev Order on Motion for Recusal |
| **Date:** | Friday, March 28, 2025 4:21:39 PM |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

**United States District Court**

**District of Massachusetts**

**Notice of Electronic Filing**

The following transaction was entered on 3/28/2025 at 4:19 PM EDT and filed on 3/28/2025

| | |
|---|---|
| **Case Name:** | USA v. Tsarnaev |
| **Case Number:** | 1:13-cr-10200-GAO |
| **Filer:** | |
| **Document Number:** | 1829(No document attached) |

**Docket Text:**
**Judge George A. OToole, Jr: ELECTRONIC ORDER entered.**

**The defendant has submitted a motion "for recusal and for disclosure." (Mot. for Recusal and for Disclosure (dkt. no. [1814]).) The parties have fully briefed the motion.**

**First, Local Rule 40.1(l) ("Proceedings after Appeal") is pertinent:**

> **(1) When an appellate court remands a case to this court for a new trial, the case shall be reassigned to a district judge other than the judge before whom the first trial was held.**
> **(2) In all other cases in which the mandate of the appellate court requires further proceedings in this court, such proceedings shall not be conducted before the district judge before whom the prior proceedings were conducted unless the terms of the remand require that further proceedings be conducted before the original judge or unless the judge determines that there will result a substantial saving in the time of the whole court and that there is no reason why, in the interest of justice, further proceedings should be conducted before another judge. If the judge before whom the prior proceedings were conducted does not retain the case for further proceedings, that judge shall return it to the clerk for reassignment.**

**A1**

Paragraph (1) does not apply in this circumstance; paragraph (2) applies. It is apparent that the Court of Appeals intended that this Court investigate the potential bias of the two jurors at issue. The instruction was plainly directed to this district judge. Recusal would be at odds with the direction of the Court of Appeals.

As to recusal under 18 U.S.C. § 455(a), the defendant has not met the high threshold required. Contrary to the defendant's characterizations and excerpted quotes, a review of the comments as a whole and in context supports the conclusion that an objective, knowledgeable member of the public would not find a reasonable basis for doubting my ability to follow my oath to faithfully apply the law, including the instructions of the First Circuit, and impartially preside over an investigation into the voir dire answers and potential bias of the jurors.

As to the defendant's request "for disclosure": The defendant's motion intimates that this Court has an obligation to respond to a party's discovery requests, even where they are not made in connection with any waiver. See 18 U.S.C. § 455(e). Put that aside. He offers as an example a transcript of a talk this Court gave to students and faculty of a local law school on April 6, 2016. He proposes that this Court inappropriately addressed contested issues that he had raised on his then-pending appeal. To the contrary, in its remarks, this Court did the opposite: "I will not address the merits of any of the legal issues in the case. As you know, the case is in the very early stages of an appeal, and it would be very inappropriate for me to make any comments about any potential appellate issues. As to any of those matters, I have said what I have to say about them in my rulings. You can find them online if you want to understand the reasoning for any of my decisions." (Mem. of Law in Supp. of Mot. for Recusal and for Disclosure Ex. A (dkt. no. 1815-1).) None of any other public discussions of high-profile criminal cases or of broadly applicable management of jury trials have any bearing on the task the Court of Appeals established in its limited pending remand.

The defendant's pending motion is therefore denied.

(FGD)

---

**1:13-cr-10200-GAO-1 Notice has been electronically mailed to:**

Nadine Pellegrini    nadine.pellegrini@usdoj.gov, Eric.McCarthy@usdoj.gov, USAMA.ECF@usdoj.gov, usama.ecf@usdoj.gov

William D. Weinreb    billweinreb@quinnemanuel.com, anastaciacates@quinnemanuel.com

Timothy G. Watkins    Timothy_Watkins@fd.org

William W. Fick    wfick@fickmarx.com, william.fick@gmail.com

Mark T. Quinlivan     mark.quinlivan@usdoj.gov, usama.ecf@usdoj.gov

Aloke Chakravarty     aloke.chakravarty@saul.com, litigationdocketing@saul.com, theresa.parker@saul.com

Jason A. Casey     jason.casey2@usdoj.gov

Matthew Segal     msegal@aclu.org, anunez@aclum.org, waltshuler@aclum.org

Judy Clarke     JudyClarke@cjtrlaw.com, sean_bolser@fd.org

David I. Bruck     bruckd@wlu.edu

Emma D. Hall     emma.hall@morganlewis.com, BOCalendarDepartment@morganlewis.com

Brendan T. Mockler     brendan.mockler@usdoj.gov, CaseView.ECF@usdoj.gov, usama.ecf@usdoj.gov, usama.flu@usdoj.gov

David E Patton     dpatton@heckerfink.com, docketing@heckerfink.com

Jonathan M. Albano     jonathan.albano@morganlewis.com

Deirdre von Dornum     deirdre_vondornum@fd.org

Mia Eisner-Grynberg     mia_eisner-grynberg@fd.org

Daniel Habib     daniel_habib@fd.org

Jeffrey Bradford Kahan     jeffrey.kahan@usdoj.gov

**1:13-cr-10200-GAO-1 Notice will not be electronically mailed to:**

Miriam Conrad
Federal Public Defender Office
51 Sleeper Street
Fifth Floor
Boston, MA 02210

Steven D. Mellin
United States Department of Justice
Capital Case Section
1331 F Street, N.W.
Washington, DC 20530

Case: 25-1335    Document: 00118268883    Page: 44    Date Filed: 04/04/2025    Entry ID: 6711806

# Exhibit B

**Defendant's Letter re. Local Rule 40.1(*l*)(2)**

**(Aug. 2, 2024)**

Entry ID: 671806

Date Filed: 04/04/2025     Page: 45     Document: 0011826883     Case: 25-1335

# Federal Defenders
## OF NEW YORK, INC.

Eastern District
One Pierrepont Plaza -16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1204 Fax: (718) 855-0760

Tamara Giwa
*Executive Director and*
*Attorney-in-Chief*

*Eastern District of New York*
Michelle A. Gelernt
*Attorney-in-Charge*

August 2, 2024

By ECF
Honorable George A. O'Toole, Jr.
U.S. District Judge
District of Massachusetts
1 Courthouse Way
Boston, Massachusetts 02210

   Re: United States v. Dzhokhar Tsarnaev, No. 13-CR-10200-GAO

   On behalf of Dzhokhar Tsarnaev, we write in advance of the upcoming status conference to inquire whether the Court intends to return this case to the clerk for reassignment, pursuant to Local Rule 40.1(*l*)(2).

   The First Circuit's March 21, 2024 order directed: "The district court's ruling denying Dzhokhar[] Tsarnaev's motion to strike for cause Jurors 138 and 286 is vacated, and matter is remanded to the district court for further proceedings consistent with the opinion issued this day." Order, United States v. Tsarnaev, No. 16–6001 (1st Cir. March 21, 2024).

   It is our understanding that the First Circuit's remand order triggered D. Mass. Local Rule 40.1(*l*) ("Proceedings after Appeal") (formerly codified at Local Rule 40.1(k)), which provides:

   (1) When an appellate court remands a case to this court for a new trial, the case shall be reassigned to a district judge other than the judge before whom the first trial was held.

   (2) In all other cases in which the mandate of the appellate court requires further proceedings in this court, such proceedings shall not be conducted before the district judge before whom the prior proceedings were conducted unless the terms of the remand require that further proceedings be conducted before the original judge or unless the judge determines that there will result a substantial saving in the time of the whole court and that there is no reason why, in the interest of justice, further proceedings should be conducted before another judge. If the judge before whom the prior proceedings were conducted does not retain the case for further proceedings, that judge shall return it to the clerk for reassignment.

Where, as here, the First Circuit's order "require[s] further proceedings in this court," there is a "presumption of reassignment" on remand. Kimmel v. United States, 2024 WL 1558483, at *1 (D. Mass. April 10, 2024). And where none of the exceptions in the rule applies, reassignment is proper. See In re Volkswagen and Audi Warranty Extension Litigation, 898 F. Supp. 2d 346, 347 (D. Mass. Oct. 10, 2012) (after appellate vacatur and remand of award of attorneys' fees, returning case to clerk for reassignment because none of the exceptions was met); see also, e.g., In re PHC, Inc. Shareholder Litigation, 894 F.3d 419, 425–26 (1st Cir. 2018) (noting that after appellate vacatur of summary judgment and remand, case was reassigned from this Court to another judge); Hudson v. Mici, 2023 WL 2333498, at *2 (D. Mass. March 2, 2023) (advising parties that case would be reassigned following appellate remand); In re One Star Class Sloop Sailboat Built in 1930 with Hull Number 721, Named "Flash II", 517 F. Supp. 2d 546, 549 (D. Mass. 2007) (noting that case was reassigned following appellate remand).

Here, because none of Local Rule 40.1(*l*)(2)'s exceptions apply, it is our understanding that the case should be returned to the Clerk for reassignment.

If this Court is not inclined to refer the case for reassignment, we wish to advise the Court that we intend to file a separate motion for the Court to recuse itself pursuant to 28 U.S.C. § 455(a), and we would request a briefing schedule for that motion. If a recusal motion is necessary, we would also request that this Court refrain from issuing any rulings concerning the evidentiary hearing pending the disposition of that motion.

Respectfully submitted,
DZHOKHAR TSARNAEV
by his attorneys:

/s/ Deirdre D. von Dornum
Deirdre D. von Dornum, Esq.
Mia Eisner-Grynberg, Esq.
Federal Defenders of New York, Inc.
One Pierrepont Plaza, 16th Floor

**B2**

Brooklyn, NY 11201
(718) 330-1210
Deirdre_vondornum@fd.org
Mia_eisner-grynberg@fd.org

David Patton, Esq.
*Pro Hac Vice*
Hecker Fink LLP
350 5th Avenue, 63rd Floor
New York, NY 10118
(212) 763-0883
dpatton@heckerfink.com

### Certificate of Service

I hereby certify that this document and any attachments filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on August 2, 2024.

/s/ *Deirdre D. von Dornum*
Deirdre D. von Dornum, Esq.
Federal Defenders of New York, Inc.
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201
(718) 330-1210
Deirdre_vondornum@fd.org

Case: 25-1335     Document: 00118268883     Page: 47     Date Filed: 04/04/2025     Entry ID: 6711806

Case: 25-1335    Document: 00118268883    Page: 48    Date Filed: 04/04/2025    Entry ID: 6711806

# Exhibit C

**Government's Letter re. Local Rule 40.1(*l*)(2)**

**(Aug. 5, 2024)**

Case: 25-1335    Document: 00118268883    Page: 49    Date Filed: 04/04/2025    Entry ID: 6711806

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | ) Case No. 13-cr-10200-GAO |
| DZHOKHAR A. TSARNAEV, | ) |
| | ) |
| Defendant | ) |
| | ) |

### RESPONSE TO DEFENSE COUNSEL'S LETTER
### DATED AUGUST 2, 2024

The United States of America, by and through its undersigned counsel, respectfully files this response to the letter to the Court from counsel for the Defendant, Dzhokhar A. Tsarnaev, dated August 2, 2024.   In the letter, counsel state that they were writing to "inquire whether the Court intends to return this case to the clerk for reassignment, pursuant to Local Rule 40.1(l)(2)," and go on to assert that "[i]t is our understanding that the First Circuit's remand order triggered D. Mass. Local Rule 40.1(l)," and that "because none of Local Rule 40.1(l)(2)'s exceptions apply, it is our understanding that the case should be returned to the Clerk for reassignment."   As discussed below, counsel's understanding of these issues is mistaken.   Local Rule 40.1(l) has not been triggered, and there is no basis for judicial reassignment.

1.     On March 21, 2024, the First Circuit issued its Opinion in this case in which, although finding no merit to three of four outstanding issues that had been raised by the Defendant, it remanded the case to this Court to determine whether Jurors 138 or 286 should have been stricken for cause on account of bias.   *See United States v. Tsarnaev*, 96 F.4th 441, 447-75 (1st Cir. 2024).   In doing so, the First Circuit specified that the proceedings on remand be conducted

1

**C1**

by this Court, as it stated: "In this case, we have no doubt that *the able district court judge* can do what judges regularly do – form a considered opinion about the sufficiency of the jurors' explanations once those explanations are given and explored." *Id.* at 464 (emphasis added). Significantly, in an accompanying Order of Court, the First Circuit vacated the ruling denying the Defendant's motion to strike Jurors 138 and 286 for cause and "remanded to the district court for further proceedings consistent with the opinion issued this day," and further ordered that it "retains jurisdiction *to conclude this appeal* after the district court on remand has ruled on the motion to strike." Order of Court, *United States v. Dzhokar A. Tsarnaev*, No. 16-6001, dated March 21, 2024 (emphasis added) (attached). The First Circuit's Opinion and accompanying Order of Court thus are essentially interlocutory in nature, as the court did not issue a final judgment disposing of the Defendant's appeal, nor was a formal mandate issued.

      2.      Contrary to counsel's understanding, the First Circuit's Opinion of March 21, 2024, did not trigger Local Rule 40.1(l). That rule provides:

(l)      **Proceedings after Appeal.**

    (1)    When an appellate court remands a case to this court for a new trial, the case shall be reassigned to a district judge other than the judge before whom the first trial was held.

    (2)    In all other cases in which the mandate of the appellate court requires further proceedings in this court, such proceedings shall not be conducted before the district judge before whom the prior proceedings were conducted unless the terms of the remand require that further proceedings be conducted before the original judge or unless the judge determines that there will result a substantial saving in the time of the whole court and that there is no reason why, in the interest of justice, further proceedings should be conducted before another judge. If the judge before whom the prior proceedings were conducted does not retain the case for further proceedings, that judge shall return it to the clerk for reassignment.

Case: 25-1335    Document: 00118268883    Page: 50    Date Filed: 04/04/2025    Entry ID: 6711806

Case: 25-1335     Document: 00118268883     Page: 51     Date Filed: 04/04/2025     Entry ID: 6711806

In this case, Local Rule 40.1(l)(1) was not triggered because the First Circuit did not remand for a new trial, and Local Rule 40.1(l)(2) was not triggered because there is no "mandate of the appellate court requir[ing] further proceedings in this court[.]"   To the contrary, and as just discussed, the First Circuit's Opinion and accompanying Order of Court are essentially interlocutory in nature because the court did not finally dispose of the Defendant's appeal.   Indeed, courts of appeals that have issued similar orders have likewise made clear that they are essentially interlocutory in nature. *See, e.g., United States v. Finley*, 56 F.4th 1159, 1169 (8th Cir. 2023) ("The district court is ordered to disclose the completed questionnaires no later than 14 days from the filing of this opinion and enter a supplemental order addressing the matter discussed herein in due course.   We retain jurisdiction over the appeal during this limited remand.   Once the district court's supplemental order is entered, *the clerk is directed to return the case to this panel for disposition of Somerville's appeal*.") (emphasis added).   Thus, and as also just discussed, the First Circuit did not issue a final judgment disposing of the Defendant's appeal nor did it issue a formal mandate.   *See generally* Fed. R. App. P. 41(a) (specifying that "[u]nless the court directs that a formal mandate issue, the mandate consists of a certified copy of the judgment, a copy of the court's opinion, if any, and any direction about costs.").   Absent a mandate from the First Circuit, Local Rule 40.1(l)(2) plainly does not apply.

    3.     Even if this Court were to assume *arguendo* that Local Rule 40.1(l)(2) was triggered in this case, reassignment under that rule would not be required for two reasons.   *First*, the First Circuit stated unequivocally that the proceedings on remand would be conducted by this Court when it said that 'we have no doubt that the able district court judge can do what judges regularly do – form a considered opinion about the sufficiency of the jurors' explanations once

Case: 25-1335   Document: 00118268883   Page: 52   Date Filed: 04/04/2025   Entry ID: 6711806

those explanations are given and explored." 96 F.4th. at 464. The First Circuit also ordered that the case be "remanded to the district court for further proceedings consistent with the opinion issued this day." Order of Court, *United States v. Dzhokar A. Tsarnaev*, No. 16-6001, dated March 21, 2024. Hence, the terms of the First Circuit's remand necessarily "require that further proceedings be conducted before the original judge." Local Rule 40.1(l)(2).

*Second*, given this Court's extensive experience presiding over this case, including the lengthy voir dire process, this Court could and should determine that "there will result a substantial saving in the time of the whole court and that there is no reason why, in the interest of justice, further proceedings should be conducted before another judge." For these reasons, even if Local Rule 40.1(l) was triggered, this case should remain with this Court.

4.      Counsel also state in the letter that if this case is not reassigned, "we wish to advise the Court that we intend to file a separate motion for the Court to recuse under 28 U.S.C. § 455(a), and we would request a briefing schedule on that motion," and further request that this Court "refrain from issuing any rulings concerning the evidentiary hearing pending the disposition of that motion." Counsel have not conferred with the government regarding the filing of any potential recusal motion, *see* Local Rule 7.1(a)(2), which in any event would appear to be meritless, and this Court should reject the entreaty to "refrain" from taking further action in this case based on a motion that has yet to be filed.

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

By:   /s/ Mark T. Quinlivan
NADINE PELLEGRINI
JASON A. CASEY
MARK T. QUINLIVAN
Assistant U.S. Attorneys
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3606
mark.quinlivan@usdoj.gov

Dated:   August 5, 2024

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

By:   /s/ Mark T. Quinlivan
MARK T. QUINLIVAN
Assistant U.S. Attorney

Date:   August 5, 2024

# United States Court of Appeals
## For the First Circuit

———————

No. 16-6001

UNITED STATES OF AMERICA,

Appellee,

v.

DZHOKHAR A. TSARNAEV,

Defendant, Appellant.

———————

Before

Kayatta, Howard, and Thompson,
<u>Circuit Judges</u>.

———————

ORDER OF COURT
Entered: March 21, 2024

This cause came on to be heard on appeal from the United States District Court for the District of Massachusetts and was argued by counsel.

The district court's ruling denying Dzhokhara Tsarnaev's motion to strike for cause Jurors 138 and 286 is vacated, and matter is remanded to the district court for further proceedings consistent with the opinion issued this day.

This court retains jurisdiction to conclude the appeal after the district court on remand has ruled on the motion to strike. <u>See</u> Fed. R. App. P. 12.1. The parties shall notify the Clerk of this court when the district court has decided the motion on remand in accordance with Fed. R. App. P. 12.1(b).

By the Court:

Maria R. Hamilton, Clerk

cc: Hon. George A. O'Toole, Robert Farrell, Clerk, United States District Court for the District of Massachusetts, Judy Clarke, Gail K. Johnson, Deirdre von Dornum, Daniel Habib, David Patton, Clifford Gardner, Ginger D. Anders, Mia Alyssa Eisner-Grynberg, Donald Campbell Lockhart, Joseph Francis Palmer, Nadine Pellegrini, William A. Glaser, Steven D. Mellin, Matthew R Segal,

C6

Jonathan M. Albano, Emma D. Hall, John Remington Graham, David A. Ruhnke, Michael J. Iacopino, Benjamin Silverman, Megan Wall-Wolff, George H. Kendall III, Timothy P. O'Toole, Jason Kapinos

Case: 25-1335    Document: 00118268883    Page: 55    Date Filed: 04/04/2025    Entry ID: 6711806

Case: 25-1335　　　Document: 00118268883　　　Page: 56　　　Date Filed: 04/04/2025　　　Entry ID: 6711806

# Exhibit D

**Transcript**

**(Aug. 21, 2024)**

                    UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,        )
                                 )
vs.                              )  Criminal Action
                                 )
DZHOKHAR A. TSARNAEV,            )  No. 13-10200-GAO
                Defendant        )
                                 )
                                 )
                                 )


BEFORE:  THE HONORABLE GEORGE A. O'TOOLE


                    STATUS CONFERENCE




         John Joseph Moakley United States Courthouse
                      Courtroom No. 22
                     1 Courthouse Way
                     Boston, MA 02210


                      August 21, 2024
                       11:07 a.m.






                    Valerie A. O'Hara
                   Official Court Reporter
         John Joseph Moakley United States Courthouse
                     1 Courthouse Way
                     Boston, MA 02210
                 E-mail: vaohara@gmail.com

**D1**

APPEARANCES:

For The United States:

    United States Attorney's Office, by NADINE PELLEGRINI,
ASSISTANT UNITED STATES ATTORNEY, MARK T. QUINLIVAN,
ASSISTANT UNITED STATES ATTORNEY, and JASON A. CASEY,
ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way,
Suite 9200, Boston, Massachusetts 02110;

For the Defendant:

    DEIRDRE VON DORNUM, ATTORNEY, One Pierrepont Plaza
16th Floor, Brooklyn, New York 11201;

    Fick & Marx LLP, by WILLIAM W. FICK, ESQ.,
24 Federal Street, 4th Floor, Boston, Massachusetts 02110;

    Federal Defenders of New York, Inc., by DANIEL HABIB,
ESQ., 52 Duane Street, 10th Floor, New York, New York 10007.

**D2**

<u>PROCEEDINGS</u>

1
2          THE CLERK:  All rise for the Honorable Court.  Your
3  Honor, this is the Criminal Matter of 13-cr-10200,
4  United States of America vs. Tsarnaev.
5          Would the parties identify themselves beginning with
6  the government, please.
7          MS. PELLEGRINI:  Good morning, your Honor,
8  Nadine Pellegrini for the United States.
9          MR. QUINLIVAN:  Good morning, your Honor,
10 Mark Quinlivan also for the United States.
11         MR. CASEY:  Jason Casey for the United States.
12 Good morning, your Honor.
13         MS. VON DORNUM:  Good morning, your Honor,
14 Deirdre von Dornum, Bill Fick, and Daniel Habib for the
15 defense.
16         THE COURT:  Good morning.  This will be brief.  After
17 the Supreme Court ruling in this case a couple of years ago,
18 the Court of Appeals then proceeded to address four appellate
19 issues that had not been resolved by the initial appellate
20 opinion.
21         Earlier this year, the Court of Appeals chose three of
22 those issues and has remanded a remaining unsolved issue to
23 this Court for our consideration, while explicitly retaining
24 appellate jurisdiction to review whatever action may be taken
25 at this level concerning that issue.

**D3**

1        Today's session does not involve any substantive

2 consideration of the issues. Today's session is simply to

3 begin planning for further proceedings as appropriate in this

4 court in accordance with the remand.

5        As I say, in its second opinion, the Court of Appeals

6 specifically retained appellate jurisdiction and remanded the

7 case, quotes, "to the District Court only to conduct a

8 appropriate investigation" concerning this Court's denial of a

9 pretrial motion by the defendant to strike for cause two jurors

11:09AM 10 from the trial jury.

11        That issue had been raised in the initial appeal, but

12 the Court of Appeals determined that given its original ruling,

13 it was not necessary to address that issue.

14        The defense has submitted a letter to this Court

15 suggesting that I should recuse from further proceedings of the

16 Court. The language of the remand order by the Court of

17 Appeals makes it plain that that court intended that the

18 appropriate investigation would be conducted by this Court.

19        Apart from the expression of intention by the Court of

11:09AM 20 Appeals, the applicable local rules are clear concerning when

21 and whether a district judge must or may recuse after appellate

22 proceedings.

23        The applicable rule concerning the reassignment of

24 cases after appeal is Local Rule 40.1(l), Subsection L, and

25 that subsection of the local rule reads as follows:

Case: 25-1335   Document: 00118268883   Page: 60   Date Filed: 04/04/2025   Entry ID: 6711806

1      Caption, "Proceedings After Appeal."

2      "When an appellate court remands a case to this Court

3  for a new trial, the case shall be assigned to a District Judge

4  other than the one, the Judge before whom the first trial was

5  held.  That's a circumstance when a new trial is called for."

6      Subsection 2.  "In all other cases in which the

7  mandate of the appellate court requires further proceedings in

8  this court, such proceedings shall not be conducted before the

9  district judge before whom the prior proceedings were conducted

11:10AM 10  unless the terms of remand require that further proceedings be

11  conducted before the original Judge or unless the Judge

12  determines that there would result a substantial saving in the

13  time of the whole court and that there is no reason why in the

14  interests of justice further proceedings should be conducted by

15  another Judge.  If the Judge before whom the prior proceedings

16  were conducted does not remand the case for further

17  proceedings, the Judge shall refer it to the clerk for

18  assignment."

19      So that rule, I think, makes it perfectly clear that,

11:11AM 20  1, the Court of Appeals has not instructed otherwise; and, 2,

21  the particular provision that there would be a substantial

22  savings in time and effort if the Judge experienced with the

23  case retains the ability to rule.

24      Additionally, there is a general recusal statute

25  applicable generally to district judges, Section 455(a) of

Case: 25-1335   Document: 00118268883   Page: 61   Date Filed: 04/04/2025   Entry ID: 6711806

Title 28, which requires a Judge, quote, "to disqualify himself
in any proceeding in which his impartiality might reasonably be
questioned," and that provision does not apply in this
circumstance.

If the Court of Appeals thought otherwise, it is plain
that the court would certainly have said so.

MS. VON DORNUM:  Your Honor, may I be heard just on
that last part?

THE COURT:  Go ahead.

MS. VON DORNUM:  Thank you.  As your Honor noted, we
have suggested in our letter that the case might be appropriate
for reassignment under the local rule, and I hear your decision
on that.  We had asked in the alternative for the Court to set
a briefing schedule on a full motion to recuse under the
statute you just mentioned, 18 U.S.C. 455(e), and we would
reiterate that request.  We've not yet had the opportunity to
present the grounds for that motion either to you or to the
circuit, so I don't think the circuit has weighed in on that.

The grounds, simply put, would be your Honor's public
comments on the case during the pendency of the appeal
including on a podcast and at various public events, and those
remarks, you know, in keeping with the circuit's opinion in
*Boston Children's First*, we believe might lead a reasonable
person to question the court's impartiality.

That's not a suggestion, your Honor, of actual bias,

but, of course, of the public appearance that the circuit has been so concerned about particularly in high profile cases.

Given those public remarks, we would ask your Honor before any decisions are made as to the evidentiary hearing to allow the parties to fully brief a motion to recuse so that you may have the opportunity and the government may have the opportunity to review those factual bases.

We've already collected -- I assume your Honor would want to move expeditiously, so we've already collected to the best of our ability the public information on those remarks, but I think there are some other public appearances that we haven't yet been able to find transcripts or recordings of, so as the government did in *Sampson*, we would also ask as part of the briefing schedule that the Court make full disclosure of comments about the case during the pendency of appeal pursuant to 455(e).

And as we also said in our letter, we would ask that the Court not make rulings as to the evidentiary hearing for now, as Mr. Quinlivan I think himself requested in *Sampson*, we ask just that out of prudence and thoroughness and trying to make sure that everything is fully fleshed out and that there can be no suggestion that the rulings your Honor may make before the evidentiary hearing before the motion to recuse is fully briefed and resolved would need to be redone or reconsidered or present other appearance questions, so,

Case: 25-1335    Document: 00118268883    Page: 64    Date Filed: 04/04/2025    Entry ID: 6711806

1  respectfully, and I know it's a sensitive matter, your Honor,

2  we would ask for a briefing schedule, and we're prepared to

3  move expeditiously.

4      THE COURT:  Ms. Pellegrini.

5      MS. PELLEGRINI:  Your Honor, we were made aware of

6  this issue earlier this week, however, we have had time to

7  confer amongst ourselves.  While we do not oppose a briefing

8  schedule related to this issue, and while we have limited

9  insight into all of the factors that might be considered, we

11:15AM 10  have enough right now to be able to say that we believe that

11  this motion is meritless, and I also believe that the briefing

12  schedule should not stop the Court from continuing to schedule

13  matters related to the evidentiary hearing or whatever type of

14  hearing the Court is going to hold on the issue that is before

15  the Court.

16      THE COURT:  All right.  Do what you think you should

17  do, and we'll address it.  With respect to the appointment of

18  counsel, I'm shifting a little bit, but on the same topic,

19  Mr. Fick has submitted a motion for himself to be appointed as

11:16AM 20  well as reappointment of the New York counsel who have handled

21  the case in the original appeal, and that motion is granted.

22      MS. VON DORNUM:  Thank you, your Honor.

23      THE COURT:  I think it's 28, 30005, I'm going from my

24  memory that it is suggested that the federal defender for this

25  district be consulted, but I think that consultation has

1    already happened.

2            MS. VON DORNUM:  It has, your Honor, thank you.

3            THE COURT:  It's not necessary to go through.

4            MS. VON DORNUM:  We consulted with Oscar Cruz, who is

5    the interim federal defender, as you know, and he approved this

6    plan subject, of course, to your Honor's approval.

7            THE COURT:  We will issue further orders or directions

8    regarding how to proceed on the issues that are presented.

9    From here on out, all proceedings, all filings are to be done

11:17AM 10    under seal unless otherwise noted.  It's very important that

11    that there be no external things happening that could disturb

12    the integrity of the process.

13            MS. VON DORNUM:  Yes, your Honor.  On that, I just

14    want to make sure I understand, also as to the recusal motions,

15    those should also be under seal?

16            THE COURT:  I think everything for the time being, for

17    the exercise of caution, we'll start there, and if it appears

18    things may be shared with the public, then that's appropriate.

19            MS. VON DORNUM:  Yes, your Honor.  Would you like us

11:18AM 20    to confer with the government and propose a briefing schedule

21    on the motion to recuse?

22            THE COURT:  I think you should proceed promptly.

23            MS. VON DORNUM:  Yes, of course.

24            THE COURT:  All right.  The other matter is this

25    involves, will involve perhaps some intrusion on the private

Case: 25-1335    Document: 00118268883    Page: 65    Date Filed: 04/04/2025    Entry ID: 6711806

1   lives of the two jurors in question, and so it is my order to

2   everybody that no one, no one is to contact the jurors in

3   question.

4         The lawyers in the case obviously know who they are.

5   There should be no explanation to the wider world as to who

6   they are.  They're citizens, and they deserve to be respected

7   until otherwise noted.

8         MS. VON DORNUM:  Yes, your Honor, on that note, I

9   would say, just confirm as soon as the Court of Appeals's order

11:19AM 10   came out, we conferred with the government, and we all agreed

11   that we would have no contact whatsoever directly or through

12   the agents with the jurors, and we've held to that.

13         THE COURT:  So I think we should dispose of any

14   further recusal question promptly.

15         MS. VON DORNUM:  Yes, your Honor.

16         THE COURT:  Would you suggest a time frame?

17         MS. VON DORNUM:  Yes, your Honor, we would be prepared

18   to file our motion by September 3rd, if that's amenable to the

19   Court.

11:19AM 20         THE COURT:  That's fine.

21         MS. VON DORNUM:  We may include in that or if your

22   Honor would prefer, we could provide this first, a request for

23   disclosure from your Honor under 455(e) of public comment, just

24   to be sure we're covering the full terrain, but we can

25   certainly argue brief the public statements we're aware of by

**D10**

1    September 3rd.

2         THE COURT:  I don't know that I can answer your

3    question.

4         MS. PELLEGRINI:  I think there are two questions

5    there.

6         MS. VON DORNUM:  I can put it in writing, so it's much

7    clearer.

8         THE COURT:  I don't know what it might have been in

9    your category of public comment, I'm not sure.

11:20AM 10         MS. PELLEGRINI:  Your Honor, we are a bit in the dark

11    as well as to that, so we would need some time.

12         THE COURT:  A couple of weeks?

13         MS. PELLEGRINI:  Probably, yeah, a couple weeks would

14    be fine, your Honor.

15         THE COURT:  So, whatever, the 17th I guess would be

16    14 days from the 3rd.

17         MS. PELLEGRINI:  Okay.

18         THE COURT:  I want to dispose of that issue

19    immediately one way or the other.

11:21AM 20         MS. PELLEGRINI:  Understood.

21         MS. VON DORNUM:  Yes, your Honor.

22         THE COURT:  All right.  That concludes today's

23    business.

24         MS. VON DORNUM:  Thank you, your Honor.

25         MS. PELLEGRINI:  Thank you, your Honor.

**D11**

1    THE CLERK:  All rise for the Honorable Court.

2    (Whereupon, the hearing was adjourned at 11:21 a.m.)

3    C E R T I F I C A T E

4

5    UNITED STATES DISTRICT COURT )

6    DISTRICT OF MASSACHUSETTS ) ss.

7    CITY OF BOSTON )

8

9    I do hereby certify that the foregoing transcript,

10    Pages 1 through 12 inclusive, was recorded by me

11    stenographically at the time and place aforesaid in Criminal

12    Action No. 13-cr-10200-GAO, UNITED STATES of AMERICA vs.

13    DZHOKHAR A. TSARNAEV and thereafter by me reduced to

14    typewriting and is a true and accurate record of the

15    proceedings.

16    Dated this August 26, 2024.

17

18    s/s Valerie A. O'Hara

19    _____

20    VALERIE A. O'HARA

21    OFFICIAL COURT REPORTER

22

23

24

25

**D12**

Case: 25-1335   Document: 00118268883   Page: 69   Date Filed: 04/04/2025   Entry ID: 6711806

# Exhibit E

**Defendant's Motion for Recusal and Disclosure**

**(Sept. 3, 2024)**

Entry ID: 6711806     Date Filed: 04/04/2025     Page: 70     Document: 00118268883     Case: 25-1335

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 13-cr-10200-GAO |
| | FILED UNDER SEAL |
| DZHOKHAR TSARNAEV | |

**DEFENDANT DZHOKHAR TSARNAEV'S MOTION
FOR RECUSAL AND FOR DISCLOSURE**

On behalf of Dzhokhar Tsarnaev, we move that this Court: (i) recuse itself; and (ii) if it

declines to do so on the basis of the record currently available to the defense, disclose the dates,

circumstances, and substance of all public comments that Your Honor has made about this case,

as well as the dates, circumstances, and substance of all <u>ex parte</u> communications with the jurors,

pursuant to 28 U.S.C. §§ 455(a) and 455(e), the Fifth Amendment's Due Process Clause, and the

Eighth Amendment's Cruel and Unusual Punishments Clause. The reasons for the motion are set

forth in the accompanying memorandum of law and exhibits.

Respectfully submitted,

DZHOKHAR TSARNAEV

by his attorneys:

<u>/s/ Deirdre von Dornum</u>

Deirdre D. von Dornum, Esq.
Mia Eisner-Grynberg, Esq.
Daniel Habib, Esq.
Federal Defenders of New York, Inc.
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201
(718) 330-1200
deirdre_vondornum@fd.org

1

**E1**

mia_eisner-grynberg@fd.org
daniel_habib@fd.org

David Patton, Esq.
*Pro Hac Vice*
350 5th Avenue, 63rd Floor
New York, NY 10118
(212) 763-0883
dpatton@heckerfink.com

William Fick, Esq.
Fick & Marx, LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
wfick@fickmarx.com

**E2**

Entry ID: 6711806

Date Filed: 04/04/2025     Page: 72     Document: 00118268883     Case: 25-1335

## Certification Pursuant to D. Mass. Local Rule 7.1

Pursuant to D. Mass Local Rule 7.1(a)(2), I certify that counsel for Mr. Tsarnaev has conferred with counsel for the government and attempted in good faith to resolve or narrow the issue. The government opposes the motion.

> /s/ *Deirdre von Dornum*
> Deirdre D. von Dornum, Esq.
> Federal Defenders of New York, Inc.
> One Pierrepont Plaza, 16th Floor
> Brooklyn, NY 11201
> (718) 330-1200
> deirdre_vondornum@fd.org

## Certificate of Service

I hereby certify that this document and the accompanying memorandum of law and exhibits will be served by email on counsel for the government on **September 3, 2024.**

> /s/ *Deirdre von Dornum*
> Deirdre D. von Dornum, Esq.
> Federal Defenders of New York, Inc.
> One Pierrepont Plaza, 16th Floor
> Brooklyn, NY 11201
> (718) 330-1200
> deirdre_vondornum@fd.org

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

DZHOKHAR TSARNAEV

No. 13-cr-10200-GAO

FILED UNDER SEAL

**DEFENDANT DZHOKHAR TSARNAEV'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR RECUSAL AND FOR DISCLOSURE**

On behalf of Dzhokhar Tsarnaev, the defense submits this memorandum of law in

support of its motion for recusal and disclosure. This Court should: (i) recuse itself; and (ii) if it

declines to do so on the basis of the record currently available to the defense, disclose the dates,

circumstances, and substance of all public comments that Your Honor has made about this case,

as well as the dates, circumstances, and substance of all <u>ex parte</u> communications with the jurors,

pursuant to 28 U.S.C. §§ 455(a) and 455(e), the Fifth Amendment's Due Process Clause, and the

Eighth Amendment's Cruel and Unusual Punishments Clause.

Over the past eight years, during the pendency of Mr. Tsarnaev's appeal, Your Honor has

made multiple public statements about this case. These statements have come in various settings

(for example, panel discussions and a podcast), and have concerned matters with direct relevance

to the remand proceedings, including the adequacy of the jury selection process, the seated

jurors' compliance with this Court's instructions, their ultimate fitness to serve, and the

fundamental fairness of this capital prosecution. Among other remarks, Your Honor has praised

the seated jurors' "remarkable" "public-spiritedness," assured audiences that Mr. Tsarnaev

received a "fully fair" trial, and said that Your Honor has no "lingering questions or doubts"

about the "trial outcome"—a death sentence. These statements contravened Canon 3(A)(6) of the

Entry ID: 671806    Date Filed: 04/04/2025    Page: 73    Document: 00118268883    Case: 25-1335

Entry ID: 671806    Date Filed: 04/04/2025    Page: 74    Document: 00118268883    Case: 25-1335

Code of Conduct for United States Judges, which generally bars "public comment on the merits of a matter pending or impending in any court." They ran afoul of In re Boston's Children First, 244 F.3d 164 (1st Cir. 2001), which granted mandamus and held that comments far more innocuous than these compelled disqualification under § 455(a). And they violated the constitutional imperative that a judge—especially one presiding over a capital case—satisfy the appearance of impartiality. See, e.g., In re Murchison, 349 U.S. 133, 136 (1955). This Court should therefore recuse itself.

If the Court declines to recuse itself on the existing record available to the defense, this Court should provide to the parties the dates, circumstances, and substance of any other public comments that Your Honor has made about this case, as well as any ex parte communications with the jurors, pursuant to § 455(e), which "requires full disclosure by the judge" of potential bases for disqualification. United States v. Sampson, 148 F. Supp. 3d 75, 116 (D. Mass. 2015). Disclosure is necessary so that the parties can make a fully informed assessment of the need for recusal, so that Mr. Tsarnaev is assured a constitutionally adequate opportunity to litigate this issue, and so that the public can have "confidence in the integrity of the judicial process" in this case. Liljeberg v. Health Services Acquisition Corp., 486 U.S. 847, 858 n.7 (1988).

## RELEVANT BACKGROUND

1.      Mr. Tsarnaev was charged with 30 offenses arising from the 2013 Boston Marathon bombing. DE.58. During jury selection, the defense moved to strike Jurors 138 and 286 for cause, or in the alternative, for further voir dire, on the basis of discrepancies between the jurors' social media posts and their voir dire responses. See United States v. Tsarnaev, 96 F.4th 441, 452, 460–61 (1st Cir. 2024). This Court denied the motions and seated both jurors. See id.

Entry ID: 6711806    Date Filed: 04/04/2025    Page: 75    Document: 00118268883    Case: 25-1335

at 452, 461. The jury convicted Mr. Tsarnaev and sentenced him to death. See id. at 446. He filed a notice of appeal on January 29, 2016. DE.1628.

    2.      While the appeal was pending, Your Honor discussed the case in several public appearances. After diligent research, the defense has identified the following:

April 6, 2016. Your Honor participated in a panel discussion at Boston College Law School attended by the public and the media. See Phillip Martin, Tsarnaev Trial Judge Revisits Issues of Race, the Death Penalty, and Fairness, WGBH.org (April 7, 2016), https://www.wgbh.org/news/local/2016-04-07/tsarnaev-trial-judge-revisits-issues-of-race-the-death-penalty-and-fairness. Drawing on this Court's experience in this case and United States v. Mehanna, No. 09-cr-10017-GAO (D. Mass.), Your Honor addressed "issues regarding the trial management that arise in what we might call high-profile cases, and particularly issues affecting jury management." See Exh. A (April 6, 2016 Tr.), at 2. Specifically, Your Honor explained "how in the two cases we managed the mechanics and logistics of the trials to assure that the defendant, in each case, was given what the Sixth Amendment guarantees, a public trial that is fully fair." Id. at 2 (emphasis added). Your Honor described jury selection in detail, including the layout and seating arrangements in the main and overflow courtrooms; issuing summonses to prospective jurors and having them complete questionnaires; and conducting individual voir dire sufficient to yield 75 provisionally qualified jurors. See id. at 4–6.

    Your Honor then turned to issues that have now taken center stage—the jurors' fitness to serve, in particular in light of their exposure to prejudicial information on social media. Your Honor began with effusive praise for the jurors in this case: "I have to say, by the way, I'll just take this opportunity to say, the public-spiritedness of these jurors was remarkable throughout, both the ones who were selected and the ones who were not." Id. at 6 (emphases added). As to

Case: 25-1335    Document: 00118268883    Page: 76    Date Filed: 04/04/2025    Entry ID: 6711806

social media, Your Honor observed: "[J]urors' use of social media is a concern for courts everywhere. There is a danger that jurors will either do independent research on issues, or people, in the case, <u>or that they will be involuntarily subjected by others, like Facebook friends, to improper information, which they shouldn't have.</u>" <u>Id.</u> (emphasis added). This is the very circumstance that prompted the defense's motion to strike Juror 138, as well as the First Circuit's remand order: Juror 138 falsely stated that none of his Facebook friends had been "commenting about this trial" when, in fact, one of them had urged him: "Play the part so u get on the jury then send him to jail where he will be taken care of." <u>Tsarnaev</u>, 96 F.4th at 451, 458. Similarly, social media use was central to the defense's motion to strike Juror 286, and to the Circuit's decision to remand. Among other things, she falsely denied having viewed, tweeted, and retweeted Twitter posts about the bombings, one of which called Mr. Tsarnaev a "piece of garbage." <u>Id.</u> at 459–62.

Yet Your Honor told the Boston College Law School audience that this Court had ensured that no jurors in this case engaged in problematic social media activity: "We simply tell [the jurors] the importance of limiting their information that will be the basis for their verdict to what is formally offered in the trial. ... Every morning, we asked if they had avoided extraneous information, whether sought out or imposed by someone else. And every evening we reminded them of their commitment to abide by their duty. <u>By the way, I have no doubt that the parties were at least spot-checking social media sites to watch for any indication of breach of duty, and we heard of none.</u>" Exh. A, at 6–7 (emphasis added). Your Honor expressed confidence in the jurors' compliance with its instructions: "[B]eyond exhortation and constant reminders and maybe check-ups, appeals to their better natures, I'm not sure much can be done. <u>We ask them to do their duty, and I think they do.</u>" <u>Id.</u> at 7 (emphasis added).

**E7**

According to the WGBH.org article about the event (which does not include audio of this portion of the event), at the conclusion of Your Honor's prepared remarks, during a question-and-answer session, Your Honor "was asked if he has any lingering questions or doubts about the Boston Marathon Bombing trial outcome. He said no. He had moved on." Martin, <u>supra</u>.

To be sure, Your Honor prefaced Your Honor's remarks by stating: "I'm not going to talk about the merits of the <u>Mehanna</u> or the <u>Tsarnaev</u> cases. With respect to the latter in particular, I will not address the merits of any of the legal issues in the case. As you know, the case is in the very early stages of an appeal, and it would be very inappropriate for me to make any comments about any potential appellate issues." Exh. A, at 1–2. However, as just shown, Your Honor did discuss the merits of the issues now up for adjudication on remand. Your Honor opined that Mr. Tsarnaev had received a "fully fair" trial, such that Your Honor had no "lingering questions or doubts about the ... outcome." As to any seated jurors' "breach[es] of duty" involving exposure to prejudicial information on social media, Your Honor said that it had "heard of none. " The jurors, Your Honor "think[s]," "do their duty." Their "public-spiritedness" was "remarkable." At the very least, a reasonable person could understand these statements as opinions on the merits or as indicia of apparent partiality on the key issues of whether the jurors in question in fact "breach[ed] their duty" by falsely answering questions during voir dire, concealing expressions of bias against the defendant, and improperly engaging with case-related social media posts. <u>See</u> <u>Boston's Children First</u>, 244 F.3d at 168, 170 (requiring recusal even though "it [was] not at all clear that [the district judge] was commenting on the merits," because "the comments were sufficiently open to misinterpretation so as to create the appearance of partiality"); <u>infra</u> § I.B.

<u>November 17, 2016</u>. Your Honor participated in a panel discussion sponsored by the Administrative Office of the United States Courts. U.S. Courts, Knowledge Seminar—An Inside

**E8**

Entry ID: 6711806

Date Filed: 04/04/2025

Page: 78

Document: 00118268883

Case: 25-1335

Look at Jury Trials, https://www.youtube.com/watch?v=OEudQAY9c6Q. Your Honor was introduced as having handled "many cases, but very prominently, the Tsarnaev Marathon bomber case." Id. at 00:37–00:47. Once again, Your Honor expressed faith in jurors' compliance with the Court's instructions to avoid exposure to prejudicial information on social media: "[W]e impress upon them the need not to do any independent investigation, not to Google things, not to go on social media ... with respect to issues in the case. ... I often tell them they are actually being unfair not only to the parties but to each other if they go beyond the scope of the evidence. And by and large my experience has been jurors take their responsibility seriously and they try to do, to live by those guidelines." Id. at 35:00–35:38 (emphasis added). Your Honor also voiced sympathy for the seated jurors in this case, who "were exposed to some gruesome evidence and it was very powerful and very emotional." Id. at 45:50–46:00. Although "[b]y and large they handled it well," Your Honor recounted that this Court had taken the unusual step of "enter[ing] an administrative order continuing their service as jurors after the verdict had been rendered and they were formally discharged ... for a period of 90 days so that they would be eligible to take part in our Employee Assistance Program and to seek counseling and help if they needed it." Id. at 46:00–46:32. See also DE.1426. One of the other panelists noted that Your Honor had "gotten positive national attention for being so aware that these individuals who are doing a great service to the country and to Massachusetts needed that extra help. ... [I]t's something that the court system really needs to start paying attention to." Id. at 47:02–47:20.

May 12, 2023. A few months after the First Circuit heard oral argument for the second time on appeal—an argument during which the sole issue discussed was Mr. Tsarnaev's juror-misconduct claim—Your Honor appeared as a guest on the "Criminal" podcast, in an episode entitled "Did We Get It Right?" https://thisiscriminal.com/episode-218-did-we-get-it-right-5-12-

2023/. Your Honor was introduced as having "presided over the trial of Dzhokhar Tsarnaev, one

of the two brothers who placed bombs near the finish line of the Boston Marathon." Exh. B (May

12, 2023 Tr.), at 4. As in Your Honor's prior public appearances, Your Honor vouched for

jurors' compliance with instructions to avoid extraneous information: "[M]ostly, they take their

work very seriously. And when we say that this is really important that you [confine] yourself

only to what you've heard here in the courtroom and not on any private investigation you've

done, any comments that other people have made, tell your family members you just can't talk

about it. And they do. They follow through on it." Id. (emphases added). Your Honor also

reprised the theme of the emotional impact of the evidence in this case on the jurors, noting the

"autopsy pictures" of Martin Richard, which had been admitted because "the jury really had an

obligation to understand the horror of the events." Id. at 6. Your Honor agreed with the host's

observation that the jurors "ha[d] really been through the [w]ringer," and once again noted the

90-day counseling order, explaining: "Because of the emotional impact of the evidence that

they'd seen and because we expected that when they no longer had each other, the jurors, they

might be home by themselves and have memories of awful images that they've had .... And so

we wanted to allow those people who thought it would be helpful to them to have some

counseling about how to handle their emotions and their memories." Id. at 6–7.[1]

---

[1] Despite diligent efforts, the defense has not been able to obtain a transcript or recording of the full program on April 6, 2016, at Boston College Law School, only the audio clips available in the above-cited article, which do not include all of the question-and-answer session. Likewise, we have identified at least one other public presentation by Your Honor for which we not been able to obtain any transcript or recording: a November 7, 2017 presentation at the Harvard Club of Boston entitled "Current Issues Being Presented to the Judiciary for Decision." See https://www.harvardclub.com/wp-content/uploads/2017/10/November-Bulletin-2017-FINAL-Digital.pdf (p.6). These gaps in the evidentiary record, as well as the possible existence of other presentations or public comments of which we are not aware, form the basis for our request for additional disclosure. See infra § II.

7

**E10**

Entry ID: 6711806    Date Filed: 04/04/2025    Page: 80    Document: 00118268883    Case: 25-1335

3.        These extraordinary extrajudicial public expressions of affinity, praise, and solicitude align with actions and statements made in court. See, e.g., In re United States, 666 F.2d 690, 697 (1st Cir. 1981) (in case of "widespread" public interest, "tak[ing] one additional step and look[ing] at the judge's conduct at trial to see whether it reveals any grounds that might cause an observer to doubt his impartiality"); infra n.2. On March 3, 2015, after the parties had exercised their peremptory challenges but before the jury had been sworn, Your Honor met ex parte with the selected jurors and alternates and told them: "You and I are in this together. We're on the same side here." DE.1133, at 20. Your Honor said: "[T]he Supreme Court of the United States has a very interesting tradition. Before they go out on the bench to hear argument and before they conference a case, they all shake hands with each other, and I thought we'd do that because we're now teammates." DE.1133, at 22. Your Honor then shook the jurors' hands.

On May 15, 2015, after the jury returned the penalty-phase verdict of death, this Court praised the jurors: "The seriousness and responsibility with which you have performed your service as jurors should stand as a model for future juries." DE.1661, at 17. This Court continued: "Your service as jurors in this case has been the very antithesis of mob law. The issues have been thoroughly presented to you, and you have thoughtfully resolved them. Obviously, the facts and circumstances of this case arouse powerful emotions, but on behalf of a community seriously aggrieved, you have demonstrated convincingly that even in such circumstances, men and women of honesty and goodwill can set aside emotions and make careful, rational and solemn judgments about guilt or innocence and life or death. You can, you should, be justly proud of your service." DE.1661, at 17. And as Your Honor mentioned in two of the above-discussed appearances, this Court took the atypical step of continuing the jurors' service for 90 days so that they could receive counseling at federal expense.

On June 24, 2015, at the oral imposition of sentence, this Court again praised those seated jurors and alternates, by this point discharged, who had returned to court at Your Honor's invitation. This Court "[took] this occasion again to thank the now-former jurors for their exceptional service. ... [W]e asked them, as they acted to perform their high duty, to be utterly fair and impartial in their deliberations. Their careful verdict satisfies me that they did what they were asked to do." DE.1476, at 4. This Court continued: "That they performed their duty so well and faithfully came as no surprise to me. ... I had no doubt that we could select a jury for this case that would accept and perform their high duty conscientiously and justly. The proof is in the pudding"—i.e., the verdict convicting Mr. Tsarnaev and sentencing him to death. DE.1476, at 4.

## ARGUMENT

### I.     This Court Should Recuse Itself.

#### A.     Legal Framework

28 U.S.C. § 455(a) provides: "Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." See Code of Conduct for United States Judges, Canon 3(C)(1) (same). Section 455(a) "is automatic, mandatory, and self-executing." United States v. Chantal, 902 F.2d 1018, 1023 (1st Cir. 1990). Disqualification under § 455(a) is "appropriate" "when the charge is supported by a factual basis, and when the facts asserted 'provide what an objective, knowledgeable member of the public would find to be a reasonable basis for doubting the judge's impartiality.'" Boston's Children First, 244 F.3d at 167 (quoting In re United States, 666 F.2d at 695). Impartiality under § 455(a) is "evaluated on an objective basis, so that what matters is not the reality of bias or prejudice but its appearance." Liteky v. United States, 510 U.S. 540, 548 (1994) (emphasis in original); see also Chantal, 902 F.2d at 1023 (§ 455(a) "attacks the

appearance of bias, not just bias in fact"). "This general standard is designed to promote public

confidence in the impartiality of the judicial process by saying, in effect, if there is a reasonable

factual basis for doubting the judge's impartiality, he should disqualify himself and let another

judge preside over the case." H.R. Rep. 93–1453, 1974 U.S.C.C.A.N. 6351, 6355. District courts

have discretion in deciding whether to recuse, but "should exercise that discretion with the

understanding that, 'if the question of whether § 455(a) requires recusal is a close one, the

balance tips in favor of recusal.'" Boston's Children First, 244 F.3d at 167 (quoting Nichols v.

Alley, 71 F.3d 347, 352 (10th Cir. 1995)); see also United States v. Snyder, 235 F.3d 42, 46 (1st

Cir. 2000) ("[The] duty to recuse and the duty to sit do not exert equal pull; in close cases,

'doubts ordinarily ought to be resolved in favor of recusal.'" (quoting In re United States, 158

F.3d 26, 30 (1st Cir. 1998))).

Similarly, the Fifth Amendment requires not just actual impartiality but the appearance of

impartiality. "The Due Process Clause 'may sometimes bar trial by judges who have no actual

bias and who would do their very best to weigh the scales of justice equally between contending

parties. But to perform its high function in the best way, justice must satisfy the appearance of

justice.'" Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 825 (1986) (quoting Murchison, 349 U.S.

at 136). The Eighth Amendment applies this constitutional imperative with particular rigor in

capital cases. See, e.g., Rippo v. Baker, 580 U.S. 285, 287 (2017) (per curiam) (in capital case,

reiterating that "the Due Process Clause may sometimes demand recusal even when a judge

'ha[s] no actual bias'" (quoting Aetna, 475 U.S. at 825)); Williams v. Pennsylvania, 579 U.S. 1,

14 (2016) (judge's personal involvement as prosecutor in earlier stage of capital case "gave rise

to an unacceptable risk of actual bias" that "so endangered the appearance of neutrality that his

Entry ID: 6711806    Date Filed: 04/04/2025    Page: 83    Document: 00118268883    Case: 25-1335

participation in the case 'must be forbidden if the guarantee of due process is to be adequately implemented'" (quoting <u>Withrow v. Larkin</u>, 421 U.S. 35, 47 (1975))).

That is the general rule. When it comes to the precise issue here—Your Honor's public comments about this case—the canons and First Circuit precedent impose even tighter restrictions. Canon 3(A)(6) provides: "A judge should not make public comment on the merits of a matter pending or impending in any court," except that "[t]he prohibition on public comment on the merits does not extend to public statements made in the course of the judge's official duties, to explanations of court procedures, or to scholarly presentations made for purposes of legal education." The "admonition against public comment about the merits of a pending or impending matter continues until the appellate process is complete." Canon 3(A)(6) cmt. Moreover, where, as here, "the public comment involves a case from the judge's own court, the judge should take particular care so that the comment does not denigrate public confidence in the judiciary's integrity and impartiality, which would violate Canon 2(A)." <u>Id.</u> Canon 3(A)(6) is "straightforward and easily understood." <u>United States v. Microsoft Corp.</u>, 253 F.3d 34, 112 (D.C. Cir. 2001). "[T]he Canon is clear in indicating that a judge never may discuss the merits of a pending case in a non-judicial forum, especially when he has reason to know that the parties to the litigation may appear before him again for further judgment in the case. Indeed, ... this principle is so straightforward and unequivocal under the Code of Conduct that its breach will almost always give rise to a legitimate claim for disqualification under section 455(a)." <u>In re Barry</u>, 946 F.2d 913, 917 (D.C. Cir. 1991) (Edwards, J., dissenting).

In <u>Boston's Children's First</u>, the First Circuit, applying § 455(a) and Canon 3(A)(6), granted mandamus and required a district court to recuse itself based on comparatively anodyne public comments about a pending case. In that case, which arose from a lawsuit asserting a race-

based challenge to Boston's elementary school student assignment process, plaintiffs' counsel made "provocative" statements to the <u>Boston Herald</u> criticizing the district judge's views on plaintiffs' standing and plaintiffs' pending motion for class certification. 244 F.3d at 165–66. Responding to what she believed to be "inaccuracies" in the <u>Herald</u>'s article, the district judge gave her own interview to the newspaper, in which she explained that the issue of standing was "more complex" in the instant case than in another case cited by plaintiffs' counsel, where the same judge had found standing and certified a class. <u>Id.</u> at 166. The plaintiffs moved to recuse on the basis of the district judge's comments in the interview, but the judge denied the motion, characterizing her statements as "explanatory and educational" "attempts to correct a record suffering from gross misrepresentations" by plaintiffs' counsel. <u>Id.</u> at 166, 168 n.8.

The First Circuit granted mandamus and ordered recusal. At the outset, the Circuit observed that "[j]udges are generally loath to discuss pending proceedings with the media," that doing so was "'an unusual thing for a judge to do,'" and admonished that "when a judge makes public comments to the press regarding a pending case, he or she invites trouble." <u>Id.</u> at 169 (quoting <u>United States v. Cooley</u>, 1 F.3d 985, 995 (10th Cir. 1995)), 171. Following <u>Cooley</u>, the Circuit explained that a judge's public comments convey "'[t]wo messages'"—the "'words actually spoken'" and "the judge's expressive conduct in deliberately making the choice to appear'" in a public forum to address a pending matter at all. <u>Id.</u> at 169 (quoting <u>Cooley</u>, 1 F.3d at 995). "'Together, these messages unmistakably conveyed an uncommon interest and degree of personal involvement in the subject matter.'" <u>Id.</u> (quoting <u>Cooley</u>, 1 F.3d at 995).

The Circuit then concluded that recusal was necessary in light of three factors, all present in this case. First, "the Boston school assignment program is a matter of significant local concern," and "in newsworthy cases where tensions may be high, judges should be particularly

cautious about commenting on pending litigation." Id. at 169–70. That is because "[w]ith such public attention to a matter, even ambiguous comments may create the appearance of impropriety that § 455(a) is designed to address. In fact, the very rarity of such public statements, and the ease with which they may be avoided, make it more likely that a reasonable person will interpret such statements as evidence of bias." Id. at 170. Second, the district judge's comments "were sufficiently open to misinterpretation so as to create the appearance of partiality," because a "reasonable person" might have construed them "as a preview of a ruling on the merits of [the plaintiffs'] motion for class certification." Id. And third, the judge's comments "might be interpreted as a defense of her procedural approach to this litigation," implicating the concern that "a judge's defense of her own orders, prior to the resolution of appeal, may create the appearance of partiality." Id. at 170.

Numerous decisions accord with Boston's Children First and require § 455(a) recusal based on judges' public comments about pending cases. See, e.g., Ligon v. City of New York, 736 F.3d 118 (2d Cir. 2013); Hathcock v. Navistar Int'l Trans. Corp., 53 F.3d 36, 41 (4th Cir. 1995); Microsoft Corp., 253 F.3d at 107–118; In re IBM Corp., 45 F.3d 641 (2d Cir. 1995); Cooley, 1 F.3d 985; see also, e.g., United States v. South Fla. Water Mgmt. Dist., 290 F. Supp. 2d 1356, 1359–61 (S.D. Fla. 2003). As one judge has put it: "The integrity of the judicial process would be seriously doubted if judges were free to air their views on pending cases outside of the appropriate judicial forum. Whenever such an occurrence arises, a judge should recuse himself to protect the sanctity of the judicial process." Barry, 946 F.2d at 917 (Edwards, J., dissenting).

B.    This Court's Public Comments Create An Appearance Of Partiality Requiring Recusal.

"Public comment bearing specifically on pending or impending litigation is an activity that jurists should ordinarily scrupulously avoid." Flamm, Judicial Disqualification § 62.3, at 976

(Banks & Jordan 3d ed. 2017); see also United States v. Haldeman, 559 F.2d 31, 134 (D.C. Cir. 1976). Nonetheless, in numerous public settings during the pendency of Mr. Tsarnaev's appeal, Your Honor has opined, in detail and at length, about the very matters that are the subject of the remand proceedings—whether seated jurors Jurors 138 and 286 gave honest or dishonest answers during voir dire, whether they followed or disobeyed this Court's instructions to avoid prejudicial information on social media, whether they honored their oath to decide this case impartially or suffered from disqualifying bias, and whether Mr. Tsarnaev received a fair or an unfair trial. See Tsarnaev, 96 F.4th at 475 (remanding for "an appropriate investigation of the potential bias suggested by the apparent discrepancies between the answers of Jurors 138 and 286 to the court's inquiries in jury selection and the information contained in their social media communications"). These comments contravened Canon 3(A)(6) and the binding guidance in Boston's Children First, and they created an appearance of partiality sufficient to require disqualification under § 455(a) and the Fifth and Eighth Amendments. At a minimum, the question is "close" enough that this Court should "resolve" any "doubts ... in favor of recusal." Snyder, 235 F.3d at 46; see also Boston's Children First, 244 F.3d at 167.

First, putting the substance of the remarks aside, Your Honor "invite[d] trouble" by choosing to discuss this highest of high-profile cases in public at all. Boston's Children First, 244 F.3d at 171. Reasonable observers "might well consider [this Court's] actions as expressing an undue degree of interest in the case." Id. at 170; see also Cooley, 1 F.3d at 995 (public comment was "an unusual thing for a judge to do" and it "conveyed an uncommon interest and degree of personal involvement in the subject matter"). Indeed, "[i]t has been argued that any 'public comment by a judge concerning the facts, applicable law, or merits of a case that is sub judice in his court ... would raise grave doubts about the judge's objectivity and his willingness to reserve

Case: 25-1335    Document: 00118268883    Page: 87    Date Filed: 04/04/2025    Entry ID: 6711806

judgment until the close of the proceeding.'" Microsoft, 253 F.3d at 114 (quoting Ross,

Extrajudicial Speech: Charting the Boundaries of Propriety, 2 Geo. J. Legal Ethics 589, 598

(1989)). Not only was this Court's choice uncommon, see Boston's Children First, 244 F.3d at

170 (noting the "rarity of such public statements"), but it was also avoidable. Cf. In re Allied-

Signal Inc., 891 F.2d 967, 971 (1st Cir. 1989) (Breyer, J.) ("[O]ther things being equal, the more

common a potentially biasing circumstance and the less easily avoidable it seems, the less that

circumstance will appear to a knowledgeable observer as a sign of partiality."). This Court was

not correcting misrepresentations by counsel, as in Boston's Children First, or addressing

provocative actions by a litigant, as in Cooley. Nor were Your Honor's remarks necessary to the

disposition of the case. Cf. Allied Signal Inc., 891 F.2d at 972 ("[O]ther things being equal, the

greater the extent to which the potentially disqualifying circumstance facilitates the just and

efficient resolution of a case, the less likely a knowledgeable observer will consider it a sign of

judicial partiality."). It was "no excuse that the Judge may have intended to 'educate' the public

about the case" because "he could have held his tongue until all appeals were concluded."

Microsoft, 253 F.3d at 112. Thus in Microsoft, the government declined "'to defend the District

Judge's decision to discuss this case publicly while it was pending on appeal.'" Id. at 108.

Second, the remarks themselves reflect, or at the very least could to a reasonable observer

suggest, views on the merits of the remand issues that create the appearance of prejudgment

inconsistent with the obligation of impartiality. With full knowledge of the factual and legal

bases for Mr. Tsarnaev's juror-misconduct claim (see DE.1100), Your Honor said that the

"public-spiritedness of [the] jurors ... who were selected" "was remarkable throughout." Your

Honor had "heard of no[]" "indication of [jurors'] breach of duty" to avoid extraneous

information on social media, and thus was confident that the jurors had "follow[ed] through" on

Entry ID: 671806    Date Filed: 04/04/2025    Page: 88    Document: 00118268883    Case: 25-1335

their duty and had "take[n] their responsibility seriously." This was notwithstanding that the defense had brought to the Court's attention significant concerns about Jurors 138 and 286's social media exposure and use, before they were sworn, and the Court had refused to voir dire them further. Your Honor emphasized that Your Honor had no "lingering questions or doubts" about the trial's outcome. These comments, made on several occasions over the course of many years, are far more indicative of prejudgment than the district judge's single observation, in Boston's Children First, that the standing issue in that case was "more complex" than the standing issue in another case. An objective observer could take Your Honor's fulsome praise for the "public-spirited[]" seated jurors "as a preview of a ruling on the merits" (244 F.3d at 170) of the remand question whether those same jurors "suffered from a disqualifying bias" (Tsarnaev, 96 F.4th at 475)—especially since this Court knew of the allegations of misconduct when it delivered that praise. Moreover, as highlighted in Boston's Children First, Your Honor's extended discussion and justification of its jury selection procedures—"custom-designed" to "assure that the defendant ... was given ... a public trial that is fully fair," Exh. A, at 2, 5—as well as the bona fides of the jurors, could be viewed as an anticipatory "defense of [its] own order" denying the motion to strike and refusing further voir dire "prior to the resolution of appeal." 244 F.3d at 170. Such comments, the First Circuit squarely stated, "may create the appearance of partiality." Id. In high-profile, emotionally charged cases such as this, "even ambiguous comments may create the appearance of impropriety that § 455(a) is designed to address." Id. And Your Honor's comments were far from ambiguous.

16

**E19**

Third, this Court's statements and actions in the courtroom buttress the case for recusal.[2] As trial began, this Court told the jurors, <u>ex parte</u>, that he and they were "in this together," "on the same side," and "teammates." That figurative (and literal) handshake was not consistent with the constitutional design. "There is not one shred of doubt ... about the Framers' paradigm for criminal justice: ... limited state power accomplished by strict division of authority between judge and jury." <u>Blakely v. Washington</u>, 542 U.S. 296, 313 (2004); <u>see also</u>, <u>e.g.</u>, <u>United States v. Mehanna</u>, 735 F.3d 32, 50 (1st Cir. 2013) (discussing "the distinct roles of judge and jury in our system of justice"). As trial ended, this Court told the "model" jurors that they had performed their service with "seriousness and responsibility" before affording them three months of counseling. And at sentencing, this Court said that their service had been "exceptional."

In court and out, in words and actions, Your Honor has time and again demonstrated extraordinary solicitude for these "remarkabl[y]" "public-spirited[]" jurors—the Court's "teammates"—who had given no "indication" of "breach of duty" and had rendered "exceptional service," performing their "high duty conscientiously and justly." An objective observer could reasonably question whether this Court, having "invite[d] trouble" by taking these "unusual" public steps, can now impartially decide whether two of these jurors lied in order to sentence Mr. Tsarnaev to death. The question is at least close, so § 455(a) and due process demand recusal.

---

[2] To be clear, the defense contends that Your Honor's public comments, standing alone, suffice for disqualification. However, this Court's in-court comments and actions also support this result. <u>See</u> <u>In re United States</u>, 666 F.2d at 697 (considering both extrajudicial and in-court actions); <u>IBM</u>, 45 F.3d at 645 (explaining, post-<u>Liteky</u>, that judicial actions "can surely" "warrant recusal ... when accompanied by extrajudicial actions"). Thus, this is not a case, like <u>Liteky</u>, where the sole basis for recusal is in-court conduct. Moreover, this Court's comments, although occurring in the courtroom, were not rulings or judicial actions integral to the trial. One occurred <u>ex parte</u> before the jurors were sworn, another occurred after the jury returned its verdict and was polled, and another occurred after the jurors had been discharged.

**E20**

## II.    If This Court Does Not Recuse Itself, It Should Disclose All Public Comments That It Has Made About This Case And The Substance Of Any Ex Parte Communications With The Jurors.

A.    Legal Framework

Section 455(e) provides: "Where the ground for [a judge's] disqualification arises only under subsection (a), waiver [from the parties] may be accepted provided it is preceded by a full disclosure on the record of the basis for disqualification." Although the statute "does not ... provide for discovery," it does "require[] full disclosure by the judge" of any potential bases for recusal. Sampson, 148 F. Supp. 3d at 116; see also, e.g., Canon 3(D) (noting that a judge disqualified on the ground that his "impartiality might reasonably be questioned" "may," in lieu of withdrawal, "disclose on the record the basis of disqualification" and allow the parties to consider waiving disqualification); Am. Bar Ass'n, Model Code of Judicial Conduct R. 2.11 cmt.5 ("A judge should disclose on the record information that the judge believes the parties or their lawyers might reasonably consider relevant to a possible motion for disqualification, even if the judge believes there is no basis for disqualification."); Williams, 579 U.S. at 13–14 (discussing "the utility of professional codes of conduct" such as the ABA's Model Code).

Thus, in Sampson, the district judge disclosed that he had participated in a film screening and panel discussion with a potential defense witness on issues generally relevant to the capital retrial over which the judge was presiding. See Lobby Conf. Tr. 6–7, United States v. Sampson, No. 01-cr-10384-MLW (D. Mass. June 19, 2015), DE.1978; see also Hr'g Tr. 4–5, ibid., DE.1984. Based on that disclosure, the government sought and obtained, directly from the district judge, fulsome information concerning the event, including video of the film and the panel discussion, the substance of the judge's comments that were not captured on video, and information concerning the judge's private communications with the witness and other judges in

18

E21

Entry ID: 6711806     Date Filed: 04/04/2025     Page: 90     Document: 00118268883     Case: 25-1335

attendance. See Gov't Resp., ibid. (D. Mass. June 22, 2015), DE.1980 (government's request to question judge about event); Hr'g Tr., supra, 14–15, 17, 25–26, 30–31 (government requesting judge's remarks at screening, video of event, copy of film, substance of judge's private communications with witness, information concerning how witness came to participate in event, and substance of judge's private communications with other judges who attended event); Order, ibid., DE.1983 (furnishing parties with partial video of event and disclosing substance of judge's unrecorded remarks); see also Sampson, 148 F. Supp. 3d at 81 (judge "obtained and provided to the parties the ... film and a video of the panel that did not include all of my opening remarks, and conducted two hearings"). On the basis of these disclosures, the government moved to recuse under § 455(a). See id. at 79. The same judicial transparency is appropriate here.

B.    This Court Should Disclose All Its Public Comments About This Case And The Substance Of Any Ex Parte Communications With The Jurors.

As noted above (supra n.1), the defense has undertaken diligent efforts to identify all of this Court's public comments about this case, but our information is incomplete. We believe that the public comments of which we are aware require recusal under § 455(a). However, we cannot determine whether any public comments of which we are unaware (for example, those made during the question-and-answer session at the April 6, 2016 event at Boston College Law School) also require recusal, absent further information from this Court. See § 455(e); see also Canon 3(D); R. 2.11 cmt.5. Accordingly, we move for disclosure of the dates, circumstances, and substance of all comments that this Court has made about this case, including—but not limited to—any transcripts, recordings, or notes relating to the April 6, 2016 event at Boston College Law School, and the November 7, 2017 event at the Harvard Club of Boston.

In addition, this Court should disclose the dates, circumstances, and substance of all ex parte communications with the jurors. Here, we are aware that this Court engaged in one ex parte

conference with the jurors after they were selected (the "teammates" conference, <u>see</u> <u>supra</u>

Background § 3), and at least one more after they returned their verdict. <u>See</u> DE.1476, at 3

(sentencing) (this Court acknowledging presence of jurors who were "here at my invitation," and

explaining that "[i]t is my practice, after a verdict in every criminal trial, to talk informally with

the discharged jurors, principally to thank them again personally for their service"). The defense

does not know if there were other such colloquies. During trial, "<u>ex parte</u> communications

between the judge the jury may raise concerns under Federal Rule of Criminal Procedure 43(a)

and the Fifth and Sixth Amendments." <u>United States v. Rivera-Rodriguez</u>, 617 F.3d 581, 603

(1st Cir. 2010). "When an <u>ex parte</u> communication relates to some aspect of the trial, the trial

judge generally should disclose the communication to counsel for all parties." <u>Rushen v. Spain</u>,

464 U.S. 114, 119 (1982) (<u>per curiam</u>). Moreover, the post-trial private conversation that

occurred here may have direct bearing on this recusal motion. Accordingly, this Court should

divulge it, and all others.

<b>CONCLUSION</b>

    This Court should recuse itself. If not, this Court should disclose all public comments that

it has made about this case, as well as all <u>ex parte</u> communications with the jurors.

               Respectfully submitted,

               DZHOKHAR TSARNAEV

               by his attorneys:

               <u>/s/ *Deirdre von Dornum*</u>

               Deirdre D. von Dornum, Esq.
               Mia Eisner-Grynberg, Esq.
               Daniel Habib, Esq.
               Federal Defenders of New York, Inc.
               One Pierrepont Plaza, 16th Floor

20

Case: 25-1335   Document: 00118268883   Page: 92   Date Filed: 04/04/2025   Entry ID: 6711806

Entry ID: 6711806

Date Filed: 04/04/2025    Page: 93

Document: 00118268883

Case: 25-1335

Brooklyn, NY 11201
(718) 330-1200
deirdre_vondornum@fd.org
mia_eisner-grynberg@fd.org
daniel_habib@fd.org

David Patton, Esq.
*Pro Hac Vice*
350 5th Avenue, 63rd Floor
New York, NY 10118
(212) 763-0883
dpatton@heckerfink.com

William Fick, Esq.
Fick & Marx, LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
wfick@fickmarx.com

Entry ID: 6711806

Date Filed: 04/04/2025

Page: 94

Document: 00118268883

Case: 25-1335

**Certificate of Service**

I hereby certify that this document and the attached exhibits will be served by email on counsel for the government on **September 3, 2024.**

/s/ *Deirdre von Dornum*
Deirdre D. von Dornum, Esq.
Federal Defenders of New York, Inc.
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201
(718) 330-1200
deirdre_vondornum@fd.org

Case: 25-1335    Document: 00118268883    Page: 95    Date Filed: 04/04/2025    Entry ID: 6711806

# EXHIBIT A

Entry ID: 671806    Date Filed: 04/04/2025    Page: 96    Document: 0011826883    Case: 25-1335

Counsel for Mr. Tsarnaev have prepared this transcript of Your Honor's remarks on April 6, 2016 at Boston College Law School from the audio recording linked in the WGBH.org article. See Phillip Martin, Tsarnaev Trial Judge Revisits Issues of Race, the Death Penalty, and Fairness, WGBH.org (April 7, 2016), https://www.wgbh.org/news/local/2016-04-07/tsarnaev-trial-judge-revisits-issues-of-race-the-death-penalty-and-fairness. The audio recording itself is available at http://cdn-news.wgbh.org/s3fs-public/JUDGE%20GEORGE%20OTOOLE%20FULL%20SPEECH.mp3.

**MODERATOR:**

George A. O'Toole, Jr. was appointed United States District Court for the District of Massachusetts by President Clinton on May 26, 1995. During his tenure on the court, he has served variously as judicial liaison to the magistrate judges, the pretrial services office, the civil pro bono and pro se office, and the media.

On the national level, Judge O'Toole served as a member of the Security and Facilities Committee and the Judicial Security Committee of the Judicial Conference of the United States. He is currently a member of the Judicial Conference Committee on the Administration of the Magistrate Judge System.

Prior to joining the federal bench, Judge O'Toole served as an associate justice of both the Massachusetts Superior Court and the Boston Municipal Court. Before that, he was engaged in the private practice of law as a litigator with the Boston firm of Hale and Dorr, now known as Wilmer Hale.

He's a 1972 graduate of the Harvard Law School. More importantly from the perspective of many here, he earned his baccalaureate degree from Boston College in 1969, and it is my pleasure to welcome him here to speak to you today. Please give him a round of applause.

**JUDGE O'TOOLE:**

Thank you. I have to get close to this. Thank you, Professor, for your kind introduction.

Very happy to be here at the invitation of Dean Rougeau to share some thoughts and experiences relative to maintaining and managing high-profile criminal trials in the age of the Internet. Speaking of Dean Rougeau, who I'm sorry can't be here, let me diverge just a moment to tell you a little vignette. When I had lunch last fall with the Dean, I mentioned that one of my classmates in law school was a fellow named Weldon Rougeau, and given the name similarity, I wondered if he was in a relationship. "He was my father," the Dean said. Kind of cool, don't you think? I have to say that I am not 25 years older than the dean. His father had been out of school and returned to law school after some time in the business world, so we weren't exactly the same age.

Before I tell you what I'm going to talk about, let me tell you what I'm not going to talk about. I'm not going to talk about the merits of the Mehanna or the Tsarnaev cases. With respect to the latter in particular, I will not address the merits of any of the legal issues in the case. As you know, the case is in the very early stages of an appeal, and it would be very inappropriate for me

1

**E27**

Case: 25-1335    Document: 00118268883    Page: 97    Date Filed: 04/04/2025    Entry ID: 6711806

to make any comments about any potential appellate issues. As to any of those matters, I have said what I have to say about them in my rulings. You can find them online if you want to understand the reasoning for any of my decisions. With respect to the Mehanna case, although the appeal is over and cert has been denied, it is still best to let the existing record speak for itself. Additionally, Mehanna has recently filed a petition for postconviction relief, which is pending. The other panelists, of course, are not subject to that limitation. They will, I'm sure, express views about substantive issues in the case, but I will not. And if they do, you shouldn't infer anything from my failure to participate in the discussion. I hope you'll understand.

What I will talk about is some issues regarding the trial management that arise in what we might call high-profile cases, and particularly issues affecting jury management, such as how in the two cases we managed the mechanics and the logistics of the trials to assure that the defendant, in each case, was given what the Sixth Amendment guarantees, a public trial that is fully fair.

So before turning to any nuts and bolts of trial management, though, I think it will be useful to recall some fundamental principles to which we must always be faithful in making pragmatic trial practice decisions.

Most basic of all, of course, is the criminal defendant's right to a public trial by a jury. One should not underestimate the importance that the Founders accorded to the right of trial by jury in criminal cases. It is expressed twice, first in the main body of the Constitution in Article III, Section 2, Clause 3, and then again with a little more specificity in the Sixth Amendment. In his commentaries to the Constitution, Story explicitly traces the modern right back to Magna Carta's famous provision that "no man shall be arrested, nor imprisoned, nor banished, nor deprived of life, et cetera, but by the judgment of his peers or by the law of the land."

Indeed, Article 12 of the Massachusetts Declaration of Rights from 1780, of which John Adams was a principal author, uses strikingly similar language to Magna Carta: "No subject shall be arrested, imprisoned, despoiled, or deprived of his property, immunity, or privileges, put out of the protection of the law, or deprived of his life, liberty, or estate, but by the judgment of his peers or the law of the land." Among the grievances against King George, enumerated in the Declaration of Independence, was "depriving us in many cases of the benefit of trial by jury."

The founders regarded the right of trial by jury not simply as a fair and just mechanism or device for resolving accusations of criminal conduct, but more fundamentally as an attribute of their very liberty as free people, as an institution implicit in and essential to the very notion of self-government. As much as a jury trial is a judicial institution, Tocqueville quite accurately observed it is also a political institution, "an eminently Republican institution." And the American jury system Tocqueville said is as much "a consequence of the dogma of the sovereignty of the people as universal suffrage. It is the means by which the people themselves administer criminal justice."

Nevertheless, until the middle years of the 20th century, neither Congress nor the federal courts had paid particular attention to how federal juries were to be constituted. Rather, federal juries were selected the way juries were selected in whatever state the court sat in. Starting with the 1940 case of Smith v. Texas, however, the Supreme Court articulated the principle that a jury

should be, "a body truly representative of the community from which it is drawn." Variously invoking the Sixth Amendment, the Fourteenth Amendment, and the Court's general supervisory authority, in a series of cases, the Court established the principle that a jury should be drawn from "a fair cross-section of the community." Selection methods that excluded from juries identifiable groups, notably African-Americans and women, did not satisfy the fair cross-section requirement.

But aside from the group exclusions, there was another widespread practice that thwarted the selection of a fair cross-section known as the key man system. In brief, under that system, the local jury commissioners, in a given locale, would consult with the "key men" of the community and receive suggestions about which citizens would make worthy jurors. Those recommended would then be added to the list of eligible jurors. There's no need to tell a contemporary audience why that was not such a good idea, or why it was guaranteed to fail the fair cross-section test.

To eliminate both the invidious discrimination and the skewing effects of the key man system, Congress finally established requirements for selecting federal juries in the Jury Selection and Service Act of 1968, which declares that "[i]t is the policy of the United States that all litigants in federal courts, entitled to trial by jury, will have the right to grand and petit juries selected at random from a fair cross-section of the community in the district or division where the court convenes." The statute embodied the fair cross-section standard that the court had been announcing.

Please note the phrase "selected at random." The more random the selection, the more likely it is that a fair cross-section has been achieved. It should also be noted that this standard applies only to the selection of the broad venire from which the actual grand and petit juries will be drawn. Neither the statute nor case law requires that individual juries represent a fair cross-section. That is probably impossible as a statistical matter, but there are other reasons as well, of course, jurors who are unsuited to serve on a particular case because of interest, bias, inconvenience, and the like have to be non-randomly selected off. And that's what the voir dire process achieves.

There's one last background principle to touch on, and that is publicity. The Sixth Amendment guarantees a criminal defendant a public trial. The First Amendment guarantees the public and the press access to criminal trials. These separate rights are often aligned, but they sometimes also conflict. Indeed, in <u>Richmond Newspapers v. Virginia</u> in 1980, the Supreme Court noted that conflicts between publicity and a defendant's right to a fair trial "are almost as old as the Republic." In that case, the court held that the trial court's holding of a closed hearing on a suppression motion in order to protect the defendant's right to a fair trial did not offend the First Amendment.

As a practical matter, in my own experience, and I think it is one shared widely by trial judges, jurors will give more candid answers to voir dire questions if they sense that their privacy interests are protected to some degree by on the record, but out of the earshot of the public, setting, such as sidebar conferences.

3

**E29**

Entry ID: 6711806    Date Filed: 04/04/2025    Page: 99    Document: 00118268883    Case: 25-1335

So with that preamble of background principles, let me now turn to some nuts and bolts. Let me start with what we did to assure as much as possible a public trial for those with First Amendment concerns and also to the defendant.

With respect to the <u>Tsarnaev</u> trial, let me start by describing the physical arrangements of the courthouse. The trial courtroom seats about 110 people in the public gallery. Because we knew that there would be more people who would want to observe the trial than that, we established so-called overflow courtrooms elsewhere in the building. It was an overflow courtroom reserved for the victims of the bombing, one for the media, and at least one for the general public.

The trial proceedings from the trial courtroom were transmitted in real time to those other courtrooms, both video and audio. Inside the trial courtroom, we divided the seating among several interested constituencies, which included the defense team and the defendant's family and supporters, the prosecution team and members of law enforcement, victims and their advocates, the media and the general public. We allocated what were a limited number of courtroom seats available for media representatives to those outlets that we expected to cover the trial on a daily basis, such as the local papers and electronic media. We allowed others to share seats on a rotating basis throughout the trial. The seats for the general public were allocated on a first-come, first-served basis. On some occasions, people started lining up for entry into the courthouse building before dawn.

With respect to the <u>Mehanna</u> trial, we simply did not have a similarly large number of people wanting access. But we did have one overflow courtroom in addition to this seating in the trial courtroom.

My normal voir dire practice is to ask questions of the potential jurors—the venire—in open court, take note of those who answer any of the questions affirmatively. Questions typically ask whether there's anything in the juror's experience or beliefs that would counsel against participation in this particular case. If we get affirmative answers, we'll then follow up with each responding juror at the side of the bench, with counsel and with the defendant, if he wishes, but out of the hearing of the general public. This is a long-standing tradition in the courts.

We followed essentially that same procedure in the <u>Mehanna</u> case, except that instead of conducting the sidebar portion of the case, literally at the sidebar, we conducted it in the jury room, which is behind the courtroom. So out of the view of the public in the courtroom. The defendant was present in the jury room with the rest of us during the voir dire and the jurors, as were all counsel and a few personnel, but the general public was not. Because the defendant had a right to a public trial, we obtained his consent to the procedure as a substitute for the more typical sidebar conference in the courtroom, and he gave his consent to that procedure. It is not unusual for defendants to prefer that procedure than to have the sidebars conducted in the open court.

In the last decade or so, there have been several cases, both at the Supreme Court and at the First Circuit level, addressing the so-called closure of portions of the trial to the public, including portions of voir dire. The five cases that I can think of all have addressed the defendant's Sixth Amendment right to an open hearing.

There is an older case from the Supreme Court in 1984, Press-Enterprise, that holds that there is a First Amendment right to press or public access to the voir dire, as well as other parts of the trial. In the Mehanna case, no First Amendment issue was raised with respect to the procedure that we followed, conducting part of the voir dire outside the courtroom.

Again, in my experience, in almost every case, voir dire occurs at the sidebar, out of the hearing of the public, and again, the defendant is always invited to be present if he wishes. Sometimes he chooses to do so, sometimes not.

I don't know if anyone has argued that there is a First Amendment right, analogous to the defendant's Sixth Amendment right, to hear the sidebar as it transpires, as opposed, for example, to getting a transcript of it later. I think it is open to question whether there is a substantial, constitutionally significant difference between a "sidebar," which keeps what is said from the general public, and an in-camera voir dire, which does the same. The only difference is that in the former, you can see the people that you can't hear, while in the latter, you can neither see nor hear them. Perhaps there is an argument that the difference has constitutional significance, we'll have to see.

In Tsarnaev, we custom-designed the jury selection process, including the voir dire. In this, I followed a template that the trail had been blazed for me by my colleague, Judge Casper, when she conducted the trial in the Whitey Bulger case. So, I give her the credit for the design of this.

First of all, we knew that there would be a very large venire, for many reasons. Let me just give you some of the numbers. Beginning, so the trial was scheduled to begin on January 5th [2015]. Beginning in early to mid-November [2014], our jury clerk mailed out 3,000 summonses, of which approximately 2,800 were returned. Now, the typical process is to mail out summons with a questionnaire which asks for certain information from the juror, including information that might disqualify the juror for participation. For example, the jury statute excludes certain kinds of employment, people employed in certain kinds of professions, from jury service.

So, the responses came in, and that was about 2,800. About half of that number were later summoned to come to the courthouse to begin the actual process of empanelment, beginning on January 5th, which was the date set for the beginning of the trial. So, approximately 1,400, a few less than 1,400 people responded. We didn't have them all at once. We had them in six sessions over three days, morning and afternoon. And in each session, there were approximately 225 or 230 people. So, in each day, we addressed approximately 450 people.

After giving them an introduction to the case and urging them to their high duty, we gave them questionnaires, blank questionnaires, to fill out, giving us much of the kind of information you would get in a run-of-the-mill case, in perhaps half an hour of voir dire questions. Our questionnaire, I think, was something like 28 pages long and over 100 questions. And it touched on all sorts of areas, jurors' backgrounds, experiences, where they got their news, how they had been affected, if at all, by the events of the Marathon bombing, what their attitudes were towards the death penalty, particularly, and so on.

The jurors were each given on those mornings and afternoons. They were each given a copy of the questionnaire and told to fill it out then and there, and when they filled it out, they left. After we collected all the questionnaires, we transferred the data to disk, and the lawyers received the disks. The lawyers then had several days to go over the disks, and they produced a joint list of people they agreed should be excused for cause, and we did that.

Then we began the individual voir dire process on January 15th by calling people in sequence, in accordance with their juror numbers, to come to the courthouse to be individually voir dired. We had 21 days of individual voir dire, completing the task, which we began on January 15th, on February 25th. You may recall the winter of 2015. We lost six days to snow cancellations. Slowed us down a bit.

At the end of that process, we had ... Let me back up for a minute. The strategy of voir dire is to have enough jurors who have been cleared of any cause objection that we can proceed with the peremptory challenge process with enough jurors that we can account for seating a full jury on the assumption that the parties will also exhaust all their peremptory challenges.

So the numbers in this case worked out as follows. We had 12 sitting jurors and six alternates for a total of 18 empaneled jurors. In a death penalty case, unlike other prosecutions, each side has 20 peremptory challenges, and each side gets an additional one for each two alternate jurors. So there's 23 on each side, or a total of 46 for peremptory challenges. So we needed 18 for the box, plus 46 for the peremptory, so our total of 64 cleared for cause jurors. We stopped clearing when we got to 75, because we wanted a margin of error, which ultimately we didn't need, which was a testament.

I have to say, by the way, I'll just take that opportunity to say, the public-spiritedness of these jurors was remarkable throughout, both the ones who were selected and the ones who were not.

One of the features of the modern age, you know well much better than I, is the use of social media. And obviously jurors' use of social media is a concern for courts everywhere. There is a danger that jurors will either do independent research on issues, or people, in the case, or that they will be involuntarily subjected by others, like Facebook friends, to improper information, which they shouldn't have. For example, just going to their Facebook page might expose them to a news feed that carried extraneous information about the case that the jurors should not be exposed to. So we have to urge them to refrain from what they normally would be doing. And particularly in a lengthy trial, it's a difficult thing to ask people to do.

In my view, the best approach is a straightforward one. We simply tell them the importance of limiting their information that will be the basis for their verdict to what is formally offered in the trial. We emphasize that it is important that all jurors have reference to the same fund of information, and that privately investigating issues is a disservice both to the parties, but also to their fellow jurors. And then we hound them. Every morning, we asked if they had avoided extraneous information, whether sought out or imposed by someone else. And every evening, we reminded them of their commitment to abide by their duty.

By the way, I have no doubt that the parties were at least spot-checking juror social media sites to watch for any indication of breach of duty, and we heard of none.

But beyond exhortation and constant reminders and maybe check-ups, appeals to their better natures I'm not sure much can be done. We ask them to do their duty, and I think they do.

Lastly, let me turn to a matter, perhaps a little more substantive, that will commonly arise in terrorism cases. And that is how to deal with emotionally powerful evidence. Under the Federal Rules of Evidence, any evidence that is relevant to an issue in the case is admissible. Evidence is relevant if it tends to make a fact more or less probable than it otherwise would be without the evidence. But there's also a safety valve. The court may exclude evidence that is relevant in this sense. If the probative value or the probative force of the evidence is in the circumstances outweighed by, among other things, a danger of unfair prejudice or confusing or misleading the jury or is simply cumulative of other evidence already in the case. Evidence likely to engender strong emotional responses from the jury is often objected to by defendants on the ground that it presents an unfair danger or a danger of unfair prejudice. In litigators' shorthand, this is referred to as a Rule 403 objection after the applicable evidentiary rule.

In both the <u>Mehanna</u> and the <u>Tsarnaev</u> cases, the government offered graphic and violent images that would be disturbing to any person of ordinary sensibilities. In both cases, the defense raised Rule 403 objections to instances of this sort of evidence and some of those objections were sustained and the evidence excluded, and in some instances the objections were overruled.

Relevant legal principles are rather easy to state, if often rather less easy to apply. The court should employ Rule 403 to exclude evidence that is unfairly prejudicial to the defendant. As the First Circuit has pointed out, evidence presented by the government in a criminal case is always prejudicial to the defendant. If it were not, the prosecution would not be offering it. Put another way, the government is entitled to put in a forceful case. The court is not required to scrub the trial clean of all evidence that may have an emotional impact, where that evidence can be justified as a legitimate part of the government's narrative. On the other hand, the evidence may be deemed unfairly prejudicial and therefore excludable under Rule 403 if it tends to suggest that the jury decide the case on improper basis, such as an emotional appeal rather than a rational assessment.

Another possibility to exclusion is to control the way or the form in which the evidence is presented. For example, in <u>Mehanna</u>, the government wanted to offer a video which graphically showed the remains of dead American soldiers. The government wanted the video admitted to rebut claims by the defendant that his moderate beliefs prevented him from attacking Americans. On the defendant's objection, I excluded the video itself because of its graphic nature, but permitted a government witness to testify in more or less general terms to what the video depicted. So the government had its point, but without the full potentially unfair, unfairly prejudicial emotional impact that the video images would have produced.

Another class of cases from terrorism where very disturbing visual images are typically offered in evidence by the government involved charges of child pornography. These cases typically require evidence very difficult for ordinary citizens, jurors and judges alike, to observe and

Case: 25-1335    Document: 00118268883    Page: 103    Date Filed: 04/04/2025    Entry ID: 6711806

absorb. The government is entitled to put in at least some number of such images before the jury in order to prove its case. The common judicial response is to admit a limited number of images from the likely many that exist to give the jurors a picture of what the defendant was collecting without overwhelming and disgusting them with redundant and therefore potentially unfairly prejudicial repetition.

So one potential source for prejudice is the unnecessary accumulation of disturbing evidence. And Rule 403 specifically authorizes the exclusion of relevant evidence if it is unnecessarily cumulative of other evidence. And as they say in the child pornography cases, as in terrorism cases, it can be addressed by committing the government to admit a representative sample, but not what may be thousands of images that are available stored on a computer. On the other hand, there's always another hand, the evidence of an obsessive accumulation of materials might well be highly probative of motive and intent.

The Circuit opinion in Mehanna expressed the limitation, the dilemma. "There is a line"—this is the Court—"There's a line past which the government's introduction of relevant evidence for the legitimate advancement of its case goes too far. When that line is crossed, fair play morphs into piling on, but that line is hard to draw and there is no mathematically precise way to plot it."

So here's where perhaps Chief Justice Roberts's, famous simile of the judge as umpire, calling the balls and strikes, has some traction. Did that slider nip the corner of the plate or not? A judgment call is made in the heat and pace of the action. Partisans of the contesting sides will have vividly different views. We have to make a call as we see it.

The appellate courts have recognized this and accordingly such judgment calls are reviewed deferentially. In Mehanna, the Circuit put it this way: "Only rarely and in extraordinarily compelling circumstances will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighting of probative value and unfair effect." A wise rule in my humble opinion.

Typically, in my experience, the defendants think the court has not drawn the line soon enough on cumulative evidence and the government thinks the court has drawn it too soon. Sometimes the fact that with your ruling you've made both sides unhappy is a sign that you've made a pretty good call.

So let me stop there and we'll have perhaps more opportunity to discuss some of these issues in our questions.

8

**E34**

Entry ID: 6711806

Date Filed: 04/04/2025

Page: 104

Document: 00118268883

Case: 25-1335

# EXHIBIT B

Case: 25-1335    Document: 00118268883    Page: 105    Date Filed: 04/04/2025    Entry ID: 6711806



*Copyright © 2023 Criminal Productions. All rights reserved. This text may not be published online or distributed without written permission. Transcripts are generated using a combination of speech recognition software and human transcribers, and may contain errors. Please check the corresponding audio before quoting in print.*

### Episode 218: "Did we get it right?"
### Air Date: May 12, 2023

1

**Vox Media | Episode 218: Did we get it right?**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**PHOEBE JUDGE:** This episode contains descriptions of violence. Please use discretion.

What happens if I get a jury summons and I say, "I'm not going"?

**PAMELA WOOD:** LAUGHS]

**PHOEBE JUDGE:** "I don't want to do this." "I'm busy."

**PAMELA WOOD:** In North Carolina, I don't know what happens. In many jurisdictions, quite possibly nobody-- nothing will happen. In Massachusetts, we will pursue you and we will prosecute you criminally if we can't get you to either show us that you're disqualified or get you to do your service. So, and that's very well-known that we do this. That's very well-known within Massachusetts. So I will get calls from frantic people saying, I was on my way to the courthouse and I got a flat tire and I didn't make it. And I don't want to be arrested, you know, please, please don't arrest me. And we're like, calm down, you know, you're a long, long, long way from anything like that happening.

So if you just miss it or if you say, I don't want to go, 10 days after, you don't show up, you're going to get a failure to appear notice. And at that point, you may be like, oh, these people aren't going away. You know, you're going to have to go in one way or another. You're not going to be able to avoid us.   LAUGHS]

**PHOEBE JUDGE:** I'm Phoebe judge. This is *Criminal*.

MUSIC PLAYING]

Pamela Wood is the jury commissioner for the state of Massachusetts.

I had never heard of a jury commissioner.

**PAMELA WOOD:** I hadn't either until I became the jury commissioner. The jury commissioner is the head of the office that's responsible for primarily for creating diversing representative summoning lists, making sure to include everybody who might be eligible to serve and sending out the summonses and making sure that the right number of people show up in the right courts on the right days.

**PHOEBE JUDGE:** I've never been called for jury duty.

**PAMELA WOOD:** That's just wrong.

**PHOEBE JUDGE:** LAUGHS] I don't-- and I'm confused by it.

**PAMELA WOOD:** In Massachusetts, we surely would have found you because we have arguably the best master juror list, master source list in the country which is that we have an annual municipal census. So every year, the 351 cities and towns submit the names and addresses, the contact information of all their residents, including college students and military and things like that. Most jurisdictions use voter registration lists and driver registration lists, and they may dip into things like hunting licenses and permits that you've pulled for construction and anywhere they can get that kind of information.

Entry ID: 6711806    Date Filed: 04/04/2025    Page: 107    Document: 00118268883    Case: 25-1335

So we don't use those lists because they're not inclusive. So not everybody registers to vote, not everybody has a car. People who are marginalized or low income may be more likely to be left off the list. So that's why we're very happy to have the census to create our juror lists from.

**PHOEBE JUDGE:** And how do you determine who will get a summons for jury duty?

**PAMELA WOOD:** Well, I don't. It's all random. It's computerized.

**PHOEBE JUDGE:** And in the same way that the selection is random, what cases those who have been selected will hear is also completely random. You're not trying to match.

**PAMELA WOOD:** Absolutely not. No, we're just sending-- what our goal is to send a representative and diverse group of people to every court on the days that they need jurors. And what that means much to some people's consternation is you might live at one end of a very large county down the street from a courthouse, and we send you a summons saying we want you to go to jury service at the other end of the county and it may be a long drive through rush hour traffic. And people say, why can't I just walk down the street? And the answer to that is that we want a random distribution of the population of that county to appear at every courthouse. So we don't have all farmers appearing in the rural counties and all urban dwellers appearing in the cities. So that's how they've defined a jury of your peers, is a random selection of people who live in your county.

**PHOEBE JUDGE:** In Massachusetts, if you're called for jury duty, you'll be shown a video that explains what's expected of you. It also tells you a little bit about the history of jury duty in the state. The video notes that women couldn't serve on juries until 1950.

**NARRATOR 1 (ORIENTATION VIDEO):** As recently as the 1980s, all categories of citizens were exempted from service including legislators, parents of young children, clergy, teachers, firefighters, lawyers, and many others. As a result, juries were not necessarily very representative of the community.

**PAMELA WOOD:** They'll show the video. That's the orientation video, it's required to be shown to jurors before they serve. A judge will come and greet them and that's really up to the judge. And judges make their own greetings. They can do something about the history of juries or their own personal feelings about the jury system which of course are always positive. Or it can be very practical about we'll get you out of here as soon as we can, we've got a very important case today, whatever they want to say.

And then when they actually go to an impanelment, they'll get a lot more detail about the case they're going to sit on, what type of case is it they'll-- they'll be asked to look at the defendant or parties-- plaintiff and defendant if it's a civil case. And the attorneys, to see if they know them. They'll be asked if they've heard anything about the case. They'll be read a list of witnesses and asked if they recognize any of those names.

And then they'll be asked a series of questions. Do you know any of these people? Do you have any interest in the outcome of the case? Have you seen any publicity about it? And if people put up their cards and say, yes, that's me, they'll be called up to speak privately with the judge and the attorneys to hear more about why they feel that they had to answer a question affirmatively. And it may be something very simple like, oh this is a case against IBM and my father worked for IBM when I was a child for a couple of years. And everybody may say, well, that's fine. We don't care about that. But if they say, oh I went to high school with the plaintiff, you know and we were best friends, then they will be excused from that case.

**E38**

**WOMAN:** Once a jury has been selected, the trial can begin. Jury members must remain impartial and open-minded throughout the trial. At the trial, the judge will give you detailed instructions about your duties. Here are important rules that must be followed in all cases. During the trial, you may not discuss any aspect of the case with anyone, including family, friends, or trial participants.

**PAMELA WOOD:** The idea being if I go home and talk to my husband about what the police officer said about the crime, then my husband may say, wow, you know, that guy must be guilty. And I might say, yeah, it sort of seems that way. I agree with you, you know. And then I come back to court the next day with that in mind. And I haven't kept an open mind. I've brought somebody else into the process.

**GEORGE O'TOOLE, JR.:** So one thing we do to check on it is just about every morning before we begin, I will say, have you all abided by my instructions not to listen to any news broadcasts or talk to anybody about the facts of the case? They all nod.

**PHOEBE JUDGE:** Judge George O'Toole Jr.

**GEORGE O'TOOLE, JR.:** You know, I never know whether somebody cheated or not. But mostly, they take their work really seriously. And when we say this is really important that you can find yourself only to what you've heard here in the courtroom and not on any private investigation you've done, any comments that other people have made, tell your family members you just can't talk about it. And they do. They follow through on it.

**PHOEBE JUDGE:** Judge O'Toole became a judge in 1982 and has been a federal judge since 1995. In 2015, he presided over the trial of Dzhokhar Tsarnaev, one of the two brothers who placed bombs near the finish line of the Boston Marathon. Jury selection was complicated because so many people had connections to the victims or first responders. The bombs were homemade, made with pressure cookers, and went off seconds apart. Three people were killed: Krystle Campbell, 29; Lu Lingzi, 23; and Martin Richard, who was 8. More than 260 people were injured, 17 people lost their legs.

Governor Deval Patrick described the search for Dzhokhar Tsarnaev as a massive manhunt and said, "we are asking people to shelter in place."

Tsarnaev was charged with 30 federal crimes, 17 of which carried the death penalty as a potential sentence, including the use of a weapon of mass destruction and conspiracy. 1,373 prospective jurors filled out screening questionnaires. People wrote about neighbors and friends who'd been injured.

Another difficulty in selecting jurors was that because some of the crimes carried the death penalty as a potential sentence, each member of the jury had to be willing to consider it. Selecting the jury took two months. The trial began in March of 2015.

**GEORGE O'TOOLE, JR.:** There was huge international press coverage of the case. And we just didn't want to have the jurors arriving individually by themselves at the courthouse and maybe having to make their way through a crowd both of the general public and perhaps of people from media. So we arranged with the Marshal Service for the jurors all to assemble at a remote location every morning. And then a bus would bring them over, they'd come into the garage of the building, and go straight up to the jury room in an elevator and not through any of the public parts of the building. And we'd reverse that in the evening. They'd go down the elevator, get on the bus, be brought back to their spot of departure first thing in the morning. So that was partly to keep them insulated from demonstrations, for example. But also just the physical anxiety of having to pass through a large number of people who are assembled at the courthouse to listen to the case.

**PHOEBE JUDGE:** Do you remember if any of the jurors who were chosen asked to be let go when they realized what type of graphic evidence was going to be shown?

**GEORGE O'TOOLE, JR.:** So we go through a very-- in this case, we did go through a very extensive examination of the jurors as they were being selected. And sure, there are people who had strong views already and didn't think they could put them aside. But there are also people who really understand what the system is about and why we need people who are open-minded. And that's what we do during the selection process, what we call the voir dire. We try to get at that kind of intellectual commitment to do the job they're being asked to do. And if they say they can't do it, then we don't let them stay. They can move along and maybe get another case that might not have the same pressures. We spend a long time in paneling the jury.

**PHOEBE JUDGE:** The jurors heard testimony from 154 witnesses.

**GEORGE O'TOOLE, JR.:** So there were different categories of witnesses. So there were law enforcement people who could tell you what they did and saw. A lot of the people who had been injured in the bombing testified. Some had lost legs, some had been injured in other ways, some had been emotionally harmed. And of course, there were the family members of the deceased. So their families and friends testified. And it was a very graphic testimony.

**PHOEBE JUDGE:** Do you find yourself in cases like these at the end of the day just kind of going back to your chambers and wanting to lie down or just be quiet for a moment?

**GEORGE O'TOOLE, JR.:** I think the latter, yes. It's very-- I mean, I have a lot of experience with it but it's not by any means that I'm indifferent to it in any way. So yeah, it's very emotional. But it's my job to keep it under control.

**PHOEBE JUDGE:** Four days after the bombings, Dzhokhar Tsarnaev and his brother, Tamerlan Tsarnaev, were found in Watertown, Massachusetts. They threw pipe bombs and shot at the police. And the police shot back. According to the police, Tamerlan started coming towards them while firing his gun. And after he ran out of ammunition, officers tackled him. Dzhokhar got into a stolen SUV and drove toward the police officers, hitting his brother in the process. Tamerlan Tsarnaev was pronounced dead about an hour later. Dzhokhar Tsarnaev drove away.

**GEORGE O'TOOLE, JR.:** He then escaped and he was gone for quite a while. And at some point, a homeowner in Watertown went out to his backyard where he had a boat and it had canvas covering it to protect the interior of the boat from getting rained on and so on. And there was something odd about it so he notified the police and they came in. And the defendant was actually hiding in the boat, but they had also been-- and I'm not quite clear as I think back on it, the precise sequence, but there was a fusillade of bullets fired at the boat. And I think it was the defense strategy perhaps to encourage some sympathy for the defendant that law enforcement overdid the armed assault on the boat.

So they wanted the boat to be brought in so the jurors could see the number of bullet holes in the boat and the blood that was inside. So I think it was-- I think it was something the defense wanted the jurors to understand, how he had been apprehended and what that might mean. So we made arrangements for an open space, a warehouse in South Boston that was not far from the courthouse. We had the boat towed down and brought into that warehouse. And the jurors were brought down by bus on day and were able to walk around the boat and ask-- they didn't ask any questions but they could sort of interrogate the boat by looking at it closely. And then we went back to the courthouse and resumed the trial in the courtroom.

Entry ID: 6711806

Date Filed: 04/04/2025

Page: 110

Document: 00118268883

Case: 25-1335

**PHOEBE JUDGE:** Judge O'Toole says that over the course of the trial, he kept a close eye on the jury, trying to take what he called their emotional temperature. They were shown photographs that the rest of the courtroom didn't see.

**GEORGE O'TOOLE, JR.:** The worst thing was autopsy pictures. So you have a young boy who was whose body was really torn apart, but it was part of the government's case to put that into evidence. We kept it very minimal so that it was not extended at all but just it's-- the jury really had an obligation to understand the horror of the events.

**PHOEBE JUDGE:** When the state's chief medical examiner described how the eight-year-old victim Martin Richard died, a reporter for the *New York Times* wrote that "some members of the jury hung their heads in their hands. At least three were crying. Two or three looked as if they were staring into the abyss."

MUSIC PLAYING]

Do you sometimes-- do you ever do you ever think to yourself, well, I wish they didn't have to see just as another human being kind of look down at the jury and think, well, this is a lot for-- this is a lot for the day. These jurors have really been through the ringer today.

**GEORGE O'TOOLE, JR.:** Yes, yes.

**PHOEBE JUDGE:** Do you think that there's a way to get the message across, get the full picture in front of jurors in cases like these without having to show them these kind of horrendous images? Is it possible?

**GEORGE O'TOOLE, JR.:** Well, I don't know. I mean, if you ask the prosecutors, they would tell you that they have to do this because you can't understand how horrible things were if you didn't see the actual one. Because most people don't extend their imagination in that direction. And so it takes having to see something you don't want to see to understand how bad it was.

I can think of it-- for example, to switch to a different case, I remember trying a child pornography case and the images were awful. And we had a rule that the lawyers-- this would be the prosecution, essentially-- could display the images, but of course, it was the images that were, in a sense, on trial with the defendant. They could display it to the jury for 5 seconds and that's all. So we would take measures like that to try to mitigate the unpleasantness, if not the disgust, that jurors might have. But it would be necessary for them to understand what exactly was at stake in the case.

MUSIC PLAYING]

**PHOEBE JUDGE:** The Boston Marathon bombing trial was five weeks long. The jury found Dzhokhar Tsarnaev guilty on all 30 counts. Then the jurors began what's called the penalty phase to determine whether or not he would be executed. That lasted for four weeks. Then the jury voted for the death penalty. Some of the victim's family members had told the press that they didn't want Tsarnaev to get the death penalty. And after it was all over, one juror spoke publicly saying, "if I had known that, I probably would change my vote." He said, "I've never had to make a decision like that in my life, choosing between somebody getting the death penalty and somebody getting life in prison. And I hope I never have to do something like that again. My mind still goes back every now and then. It's not something that I'll ever forget."

MUSIC PLAYING]

At the end of the trial, you entered an order to extend the term of service for the jurors and the alternate jurors by 90 days. Why?

**GEORGE O'TOOLE, JR.:** Because of the emotional impact of the evidence that they'd seen and because we expected that when they no longer had each other, the jurors, they might be home by themselves and have memories of awful images that they've had, and so on. And so we wanted to allow those people who thought it would be helpful to them to have some counseling about how to handle their emotions and their memories. And so that was the purpose of the order.

MUSIC PLAYING]

**PHOEBE JUDGE:** We'll be right back.

MUSIC PLAYING]

**JILL KAROFSKY:** The very, very first homicide case I had when I was a judge was a 10-day case. It involved a man who put a hit out on a woman, a 19-year-old. And when no one else could find her, he finally found her, he shot her a couple of times, and then he executed her. The testimony was graphic. The photos were graphic. This was a young woman. As the trial was going on, I could see my jurors become more and more distressed every day.

**PHOEBE JUDGE:** Wisconsin Supreme Court Justice Jill Karofsky. Before she joined the Supreme Court, she was the state's first violence against women resource prosecutor, and then a circuit court judge.

**JILL KAROFSKY:** When we bring jurors in, and they are asked to sit in a case, this is what we instruct them. You may not talk about the facts of this case with anyone, not even your fellow jurors until it is time to deliberate. So we're telling them that they need to look at graphic photos. They need to hear graphic testimony. They need to listen to graphic 911 calls. And they can't do the two things that we know people must do in order to work through trauma, and that is, one, process it usually by talking about it. Some people can-- or write about it or process it however. And through relationships with other people. But we have closed those avenues.

So what we ask jurors to do is to just absorb all this trauma and just to keep on absorbing it. And not process it with anyone, just hold it in and hold it in and hold it in. And I could watch my jury in this case struggling. And I kept talking to my colleagues, and I kept talking to the administrators around me saying, I've got a jury that I know is in distress, how can I help them? And there really wasn't anything available. The best I could do was, one of my fellow judges has a very-- an elderly lab named Ursa, and she brought Ursa into the courthouse on one occasion. And I said, I'm going to ask my jurors if they'd like a visit from Ursa over lunch. And they were all for it.

So I didn't go in there but my colleague brought Ursa in and they all got to love up a dog over lunch. That was the best I could do. And the thing I was most afraid of happening happened, and that is that my jury deliberated late on a Friday afternoon into a Friday evening. They came back with the verdict Friday night. And I sent them out into the dark all by themselves. And I know they had to have been scared because when I left the courthouse that night and I took the special judge elevator down to the special judge garage where no one could get me and I got into my car, I was still scared. And I felt terrible.

Entry ID: 6711806    Date Filed: 04/04/2025    Page: 112    Document: 00118268883    Case: 25-1335

**PHOEBE JUDGE:** Judge Karofsky contacted a friend who was a therapist who said she'd be willing to see jurors for two free sessions. If they needed more, she'd work with them to find a way to get sessions covered by insurance. Then Judge Karofsky wrote a letter she'd give to jurors at the end of a trial. The letter describes ways they might feel afterwards. They might notice changes in their appetite or sleep. And said that if they were having a tough time, to call her or the therapist.

**JILL KAROFSKY:** And people reached out. And their biggest concerns were, number one, did we get it right? And number two, am I going to be in any physical danger because of the verdict that we rendered? I had one individual call me the day after one of these trials. And this guy was great. He was-- I don't know, he's probably late 50s, early 60s, tall guy, big guy. And he got on the phone with me and he said, judge-- this is the day after the trial-- he said, judge, I walked in the door after serving on your jury last night and I burst into tears. What the hell is wrong with me?

MUSIC PLAYING]

And there are situations where I have seen jurors have to stay out and deliberate until 2:00, 3:00, 4:00, 5:00 in the morning. I wouldn't want to make a decision about should I buy a red car or a blue car at 4:00 in the morning having been up all night. We always say, why don't you sleep on it? I'm going to sleep on it. And I think that's one of the other places where we could be very, very mindful of jurors, of court staff, making sure that everyone is getting enough rest, enough sleep so that they're able to make the best decision that they possibly can. So we put them in a position where they can make the best decision that they possibly can.

Where I worked, we brought jurors in on Monday morning and the jurors had no idea were they going to be on a case or were they going to get to go home. Were they going to be on a half-day trial about a retail theft or maybe a first-time drunk-driving. Or were they going to be on a multi-day graphic child sexual assault case, a child pornography case, a homicide, a sexual assault, a sexual assault case of an adult. Like they would have no idea. And they would come in and I tried to be very sensitive about the questions I was asking people, especially in a domestic violence or a sexual assault case. I would let them know upfront what the case was about and I would say, if just knowing what the issue in this case is about, if you hear that and you are thinking there is no way I can sit on this jury trial, I'm going to let you go without asking any more questions.

That doesn't always happen. There are some judges who believe that they need to individually talk to each of the jurors. And by individually, it's not just the judge and the juror, the courtrooms have to be open. They can ask the other jurors to leave but anyone else can sit in there and they can ask, why can't you sit on this case? Have you been a victim before? Has your child been a victim before? And they feel like they need to ask all these probing questions. So right from the get-go, you can really, really trigger some people.

There are instances where people have shown up for a jury trial where the judge has asked, have any of you ever been a victim of a sexual assault? Someone will raise their hand and it will be the first time they have ever disclosed that they were a victim of sexual assault, the first time in a public courtroom without any support there, without knowing what that answer is going to mean. Does that mean they're going to be on the jury, they're not going to be on the jury? In front of these complete strangers, on the record, so there's a court reporter taking down every word that is being said.

I think the justice system is just now understanding how trauma impacts victims. I think the justice system is just now understanding how trauma impacts defendants. And we haven't quite had the opportunity to look out and understand how trauma is affecting everyone in the courtroom.

MUSIC PLAYING]

**PHOEBE JUDGE:** Why aren't jurors given more preparation, explicit preparation or warnings about the type of evidence that they might have to encounter?

**PAMELA WOOD:** Well, I think in some cases, they might be. But in general, you don't-- the court doesn't want to do anything to color or influence the juror's preconceptions about the case.

**PHOEBE JUDGE:** Massachusetts jury commissioner Pamela Wood.

**PAMELA WOOD:** The court doesn't want to presume that somebody might have a certain reaction to a certain type of evidence. Now, if it's fairly clear, if it's going to be a very gory murder case involving dismemberment or something like that, the judge might say something. But they're not going to emphasize it because they don't want to be seen as opining or coloring their own view or the juror's view of what might or might not be upsetting. We, my office, the Office of Jury Commissioner send around a survey to everybody after they serve and ask for their views. And it really runs the gamut.

People-- so you could easily get somebody who'd say, I wish the judge had warned me there would be graphic photographs. But at this-- in the same trial, somebody will say, you know, I really didn't appreciate the judge, you know, presuming that I couldn't handle it or I felt like the judge was trying to discourage me from serving or something. So people have very different reactions and that's one of the beauties of the jury system, is that people bring different perspectives to the task. And so the court is always walking a very fine line of trying to preserve that open-mindedness and not suggest that this is going to be a very upsetting case or this is going to be a very disturbing case because right away, I mean, the defense would object to that to say let the jury decide how they feel about this case. Don't you bring them into the case saying, oh don't do this if you're squeamish or if you have sensitive, you know, sensibilities. Without naming names, I remember raising this with one judge who said, tell them to suck it up.

MUSIC PLAYING]

**PHOEBE JUDGE:** We'll be right back.

MUSIC PLAYING]

In your time as jury commissioner, how long have people been talking about trauma for jurors?

**PAMELA WOOD:** Off and on, really, the entire time. It's been a very troubling problem for probably long before I became jury commissioner. You know, I received some communications early on from jurors but I can't imagine my predecessor didn't get the same sort of thing, saying this was really upsetting. You know, I wish I'd known it was going to be that graphic. But I will tell you that I served on a jury last April in federal court, and it wasn't graphic or gory or anything like that. And it was a civil case so nobody was going to lose their liberty over it.

Entry ID: 6711806    Date Filed: 04/04/2025    Page: 114    Document: 00118268883    Case: 25-1335

And I was struck by how stressful, I guess, I found the responsibility of sitting there in the box and thinking I'm going to have to decide who wins this case and who doesn't with my fellow jurors. And even that was stressful. And we see that in the comments that people say. It was an awesome responsibility. Some people love that. They say, I felt so empowered. I renewed my faith in the judicial system or it made me proud to live in a democracy. You get very inspirational comments like that.

The letter, I think, that means the most to me that I've gotten over the years was from a gentleman who wrote to me and said, I've made mistakes in my life. I'm going to choke up. I do every time I tell this story. He said, I made mistakes in my life and I'm a convicted felon. And I thought I would never be a part of the community again. And I went to jury duty and they put me on the jury and they made me the foreperson. And I feel like I'm a part of the community again. And I just thought, boy, that's really what it's about, is making people feel like their voice is important and that they're part of the government. That they are what makes our society operate.

But it's not a walk in the park. It's not a walk in the park at all. So it can be-- it's a serious experience, let's just say that. Every now and then, we get some comment from someone who says this was a waste of time. This case never should have come to trial. The prosecutor didn't have a case. But much more often, that's rare, and much more often, people talk about what an important and sometimes stressful experience it was.

**PHOEBE JUDGE:** Federal courts can grant jurors access to counseling if they've been on a high-stress trial. They can basically be temporarily treated like a federal employee and have access to some of those mental health benefits. This is how Judge O'Toole was able to get the jurors free counseling after the Boston bombing trial.

Pamela Wood says Massachusetts had tried to make something like this happen at the state level. They'd also tried to share information about ways jurors could get help on their own.

**PAMELA WOOD:** But it was all just extremely ad hoc. We felt like we had to do something and sort of acknowledge that this was even an issue.

**PHOEBE JUDGE:** One judge wondered if jurors could be considered state employees since they were paid for their time and temporarily get state employee benefits. Pamela says that didn't work out. But after a lot of trial and error, the state of Massachusetts figured out how to implement a statewide juror counseling program. The state will pay for jurors to have three free sessions with a counselor. If that isn't enough, the counselor will help them make a plan.

And have jurors been using the program?

**PAMELA WOOD:** They have. They have. Very few, thankfully. I mean, it's interesting people-- some people say, well, how's it going? Are you getting lots and lots of takers? And I'm like, I don't want lots and lots of takers. I don't want to discover that jury service is traumatizing for what large groups of people. But for the few, for whom it is, we want to have something available.

**PHOEBE JUDGE:** They've been up and running for about a year. And she says that some people have taken advantage of the program only meet with a counselor once.

Entry ID: 6711806    Date Filed: 04/04/2025    Page: 115    Document: 00118268883    Case: 25-1335

**PAMELA WOOD:** In fact, there was one person who called as they were leaving the courthouse. And they left a message. And so the counselor called them back and they were kind of resolved at that point. And they said as soon as they left the message they felt better just knowing that they had, that there was this option, and that they weren't alone with this. So it's kind of an interesting-- it's been kind of an interesting phenomenon in that way. It's almost like just knowing that it's available is doing a lot to serve the purpose that we're trying to achieve.

**PHOEBE JUDGE:** And acknowledging that it is OK to have feelings about what you saw or heard or had to take part--

**PAMELA WOOD:** Absolutely. Absolutely. I think that's a huge part of it. And I think that's a change in recent years of the attitude about this experience of serving as a juror. There was a feeling like yes, it's tough in a lot of ways. It's tough to arrange your schedule to get to the courthouse. It may be tough to get to the courthouse. It's tough to arrange child care and be away from your family. And it's tough to argue with strangers and have to come to an agreement when you may not agree.

We acknowledge it's an inconvenience, it's demanding, and it's an obligation of citizenship and it's also a right. And it's just tremendously important to our democracy, and we appreciate you, and we thank you. And we hope you'll recover from all of it, from taking the time off and getting the child care and being away from your work and your family, and also whatever you saw. And this is sort of an acknowledgment that that's really a little different from the inconveniences of serving as a juror.

MUSIC PLAYING]

**PHOEBE JUDGE:** Criminal is created by Lauren Spohrer and me. Nadia Wilson is our senior producer. Katie Bishop is our supervising producer. Our producers are Susannah Roberson, Jackie Sojico, Libby Foster, Lilly Clark, Lene Sillesen, and Megan Cunnane. Our technical director is Rob Byers, engineering by Russ Henry. Julienne Alexander makes original illustrations for each episode of *Criminal*. You can see them at thisiscriminal.com. We're on Facebook and Twitter @CriminalShow. And we're also on YouTube at youtube.com/criminalpodcast.

*Criminal* is recorded in the studios of North Carolina Public Radio WUNC. We're part of the Vox Media Podcast Network. Discover more great shows at podcast.voxmedia.com. I'm Phoebe Judge. This is *Criminal.*

MUSIC PLAYING]

**NARRATOR 2 (ORIENTATION VIDEO):** Today, some of you may not be chosen to hear a case but your presence here is still vitally important because it may cause some cases to be resolved without the need for a trial.

**PERSON 1 (ORIENTATION VIDEO):** Jurors, I just want to thank you for being here today.

**NARRATOR 2 (ORIENTATION VIDEO):** By being here ready to serve, you've done your part to preserve our constitutional right to a trial by jury. After the trial, you will go back to the business of everyday life. Hopefully, you will have a renewed sense of the importance of the jury system to our rights and freedoms as citizens.

MUSIC PLAYING]

Case: 25-1335    Document: 00118268883    Page: 116    Date Filed: 04/04/2025    Entry ID: 6711806

# Exhibit F

**Government's Response to Defendant's Motion for Recusal and Disclosure**

**(Sept. 17, 2024)**

Case: 25-1335    Document: 00118268883    Page: 117    Date Filed: 04/04/2025    Entry ID: 6711806

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 13-cr-10200-GAO |
| | ) | |
| v. | ) | **PROVISIONALLY FILED UNDER SEAL** |
| | ) | |
| DZHOKHAR A. TSARNAEV, | ) | |
| | ) | |
| Defendant | ) | |

## RESPONSE TO DEFENDANT DZHOKAR TSARNAEV'S MOTION FOR RECUSAL AND FOR DISCLOSURE

Defendant Dzhokhar A. Tsarnaev's motion for recusal and for disclosure should be denied. As discussed in greater detail below, there is no basis for recusal or disclosure in this case.

*First*, Tsarnaev's recusal motion is untimely. A recusal motion must be made at the earliest moment after acquiring knowledge of the relevant facts, and, in this case, each of the remarks that Tsarnaev identifies in his motions have been publicly available for more than a year, and the majority for more than eight years. Transcripts of this Court's remarks during the trial likewise were made available to the parties years ago. Tsarnaev makes no attempt to explain in his supporting memorandum ("Def. Mem.") why he failed to diligently act on the publicly available remarks and/or in-court statements and timely raise them in a recusal motion or in his appeal. The fact that this case has been pending on appeal since 2016 does not diminish Tsarnaev's responsibility for timely seeking recusal, as he could have raised a recusal claim in that appeal or moved this Court to recuse while the appeal was pending, as the Court retained jurisdiction to consider such a claim. Because Tsarnaev failed to avail himself of either option, his recusal motion should be denied as untimely.

1

**F1**

*Second*, untimeliness aside, Tsarnaev fails to identify circumstances that merit recusal. He cannot sustain his argument that this Court's remarks contravened Canon 3(A)(6) of the Code of Conduct for United States Judges. The Canon expressly exempts "public statements made in the course of the judge's official duties, . . . explanations of court procedures, or . . . scholarly presentations made for purposes of legal education." https://www.uscourts.gov/judges-judgeships/code-conduct-united-states-judges#d. That exemption applies to all the statements identified by Tsarnaev, none of which constituted a public comment "on the merits" of his claim of juror bias. The Court's remarks, likewise, fell outside the ambit of *In re Boston's Children First*, 244 F.3d 164 (1st Cir. 2001), as the First Circuit emphasized that that decision was based on "the particular events in, and character of, a highly idiosyncratic case," and added that, going forward, recusal claims must be considered on a "case-by-case basis." *Id.* at 172. Given the nature and context of the Court's remarks, none of them violated the constitutional requirement that a judge satisfy the appearance of impartiality.

*Third*, Tsarnaev's motion for additional disclosures should be denied. Unlike the circumstances in *United States v. Sampson*, 148 F. Supp. 3d 75, 116 (D. Mass. 2015), where the government sought additional information about an event that the district court had voluntarily disclosed to the parties, Tsarnaev's request is a fishing expedition for remarks that might bolster his patently meritless recusal motion. The government has no doubt that the Court would disclose any facts sounding within section 455. But Tsarnaev's motion for disclosure should be denied.

**F2**

Case: 25-1335    Document: 00118268883    Page: 119    Date Filed: 04/04/2025    Entry ID: 6711806

## LEGAL STANDARDS

Section 455(a) provides that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. §455(a). As the First Circuit has recognized, section 455(a) "seeks to balance two competing policy considerations: first, that courts must not only be, but seem to be, free of bias or prejudice, and second, the fear that recusal on demand would provide litigants with a veto against unwanted judges." *In re Boston's Children First*, 244 F.3d at 167 (cleaned up). Recusal under section 455(a) thus is appropriate "only if the facts provide what an objective, knowledgeable member of the public would find to be a reasonable basis for doubting the judge's impartiality." *In re United States*, 666 F.2d 690, 695 (1st Cir. 1981).

Because "[a] motion to recuse is a serious matter" and "courts will reject what appear to be strategic motions to recuse a judge whose rulings have gone against the party," the First Circuit has required, in general, that "a party must raise the recusal issue at the earliest moment after [acquiring] knowledge of the [relevant] facts." *In re United States*, 441 F.3d 44, 65 (1st Cir. 2006) (cleaned up). Moreover, where "the facts upon which the motion relies are public knowledge," courts have applied this timeliness requirement "even if the movant does not know them." *United States v. Siegelman*, 640 F.3d 1159, 1188 (11th Cir. 2011) (per curiam) (citing *Nat'l Auto Brokers Corp. v. Gen. Motors Corp.*, 572 F.2d 953, 957-59 (2d Cir. 1978)). A party seeking recusal under section 455 thus "cannot claim ignorance of key facts easily discoverable— they are charged with knowledge of all facts known or knowable, if true, with due diligence, from the public record or otherwise." *In re Medtronic, Inc. Sprint Fidelis Leads Prod. Liability Litig.*, 601 F. Supp. 2d 1120, 1131 (D. Minn. 2009) (cleaned up).

Entry ID: 6711806

Date Filed: 04/04/2025

Page: 120

Document: 00118268883

Case: 25-1335

## ARGUMENT

**A.    Tsarnaev's Recusal Motion is Untimely.**

As a threshold matter, Tsarnaev's recusal motion is untimely, as each of the remarks that he identifies in his motion have been publicly available for years:

- The Boston College Law School forum took place on April 6, 2016, and stories about it have been available on the Internet since April 7, 2016. *See* https://www.wbur.org/morningedition/2016/04/07/judge-tsarnaev-bc-law-forum and https://www.wgbh.org/news/local/2016-04-07/tsarnaev-trial-judge-revisits-issues-of-race-the-death-penalty-and-fairness.

- The panel discussion sponsored by the Administrative Office of the U.S. Courts ("U.S. Courts panel discussion") took place on November 17, 2016, and has been available on the Internet since May 7, 2017. *See* https://www.uscourts.gov/news/2017/03/02/inside-look-jury-experience, and https://www.youtube.com/watch?v=OEudQAY9c6Q.

- The *Criminal* podcast episode "Did We Get It Right?" was broadcast and made publicly available on the Internet on May 12, 2023, more than one and a half years ago. *See* https://thisiscriminal.com/episode-218-did-we-get-it-right-5-12-2023 and https://podcasts.apple.com/us/podcast/did-we-get-it-right/id809264944?i=1000612747092.

Tsarnaev also points to this Court's comments to the jurors during a lobby conference held on March 3, 2015, when the verdict was returned on May 15, 2015, and at the sentencing hearing on June 24, 2015, all of which were made available to the parties more than eight years ago. *See* ECF Docket No. 1133-1 (filed March 9, 2015); ECF Docket No. 1661 (filed May 10, 2016); ECF Docket No. 1476 (filed June 24, 2015).

Tsarnaev makes no attempt to explain why he failed to diligently learn of the Court's remarks or should be permitted to assert them in support of a recusal motion years later. As a result, his recusal motion should be denied as untimely. *See, e.g., Siegelman*, 640 F.3d at 1189 (holding that recusal motion was untimely because the basis for the motion – the district judge's

**F4**

Case: 25-1335    Document: 00118268883    Page: 121    Date Filed: 04/04/2025    Entry ID: 6711806

"ownership interest in two aviation companies that engage in business with agencies of the United States" was "readily available" to the defendant "prior to trial" via the Internet and the judge's public financial-disclosure reports); *Nat'l Auto Brokers Corp*, 572 F.2d at 958–59 (holding that recusal motion was untimely where district judge's former membership in law firm "had for years been a matter of public knowledge and that firm's representation of [defendant] had been known to plaintiff's counsel for months prior to trial"); *United States v. Hubbard*, 2022 WL 281548, at *2 (D. Hawai'i Jan 30, 2022) ("Defendant's Motion to Recuse is untimely as the factual basis for his Motion occurred more than ten years before proceedings began and was publicly available at the time."); *Armenian Assembly of America, Inc. v. Cafesjian*, 783 F. Supp. 2d 78, 88 (D.D.C. 2011) (holding recusal motion untimely because "there is no reason why Plaintiffs could not have performed a simple internet search and discovered the alleged 'connection' between the Court and Cafesjian before the parties devoted substantial resources trying the case before the undersigned"); *United States v. Olis*, 571 F. Supp. 2d 777, 792 (S.D. Tex. 2008) (holding recusal motion untimely because factual allegations on which defendant based his motion all "stem from sources of public information that were available well before Olis filed his motion to vacate on October 5, 2007," and because defendant failed to argue that his delay was either necessary or reasonable).

Tsarnaev's long-pending appeal does not excuse his dilatory recusal motion. Tsarnaev could have raised his recusal claim in that appeal, as he filed his opening brief on December 27, 2018, long after the Court's remarks at trial, the Boston College Law School forum, and the U.S. Courts panel discussion. The First Circuit would presumably have reviewed such a claim for plain error, as it has done in other cases in which a party raises a recusal claim for the first time on appeal. *See United States v. Caramadre*, 807 F.3d 359, 374 (1st Cir. 2015) ("Given the

Case: 25-1335    Document: 00118268883    Page: 122    Date Filed: 04/04/2025    Entry ID: 6711806

importance of impartiality, we think that the better rule is that a claim of judicial bias, raised for the first time on appeal, should be reviewed for plain error. Consequently, we reject the government's waiver argument and hold instead that Caramadre's bias-based recusal claim engenders plain error review."); *United States v. Reynolds*, 646 F.3d 63, 74 (1st Cir. 2011) ("Since Reynolds makes this claim [under section 455(a)] for the first time on appeal, plain error review applies, and Reynolds cannot meet the prejudice prong."); *United States v. Cruz-Mercado*, 360 F.3d 30, 36 (1st Cir. 2004) ("First, Cruz neither objected to these comments nor sought recusal of the trial judge based on partiality, limiting our review to assessing only whether plain error occurred.").

Alternatively, Tsarnaev could have filed his recusal motion directly in this Court, as several courts have held that a notice of appeal does not divest a district court of jurisdiction to consider such a request. *See, e.g., Lopez Dominguez v. Gulf Coast Marine & Assocs., Inc.*, 607 F.3d 1066, 1073 (5th Cir. 2010); *Oyekwe v. Research Now Group Inc.*, 2021 WL 9881278, at *1 (N.D. Tex. June 1, 2021); *Guerrero v. Weeks*, 2013 WL 5934303, at *2 (E.D. Va. Nov. 5, 2013). But Tsarnaev failed to avail himself of either option, and, once again, he makes no attempt to explain that delay in his supporting memorandum or justify why this Court should consider it at this late date. As a result, his recusal motion is untimely and can be denied on that basis alone.

**B.** <u>**No Reasonable Person Would Doubt the Court's Impartiality**</u>.

In addition to being untimely, Tsarnaev's recusal motion fails on the merits. Tsarnaev asserts (Def. Mem. at 14) that this Court's remarks at the Boston College Law School forum, the U.S. Courts panel discussion, and the *Criminal* podcast all "contravened" Canon 3(A)(6) of the Code of Conduct of United States Judges, the decision in *In re Boston's Children First*, and the

constitutional requirement that a judge satisfy the appearance of impartiality.    He also asserts (Def. Mem. at 17) that "this Court's statements and actions in the courtroom buttress the case for recusal."    None of those assertions is well taken.

### 1.    None of the Court's Remarks Violated Canon 3(A)(6).

Canon 3(A)(6) provides:

> A judge should not make public comment on the merits of a matter ending or impending in any court.    A judge should require similar restraint by court personnel subject to the judge's direction and control.    The prohibition on public comment on the merits does not extend to public statements made in the course of the judge's official duties, to explanations of court procedures, or to scholarly presentations made for purposes of legal education.

https://www.uscourts.gov/judges-judgeships/code-conduct-united-states-judges. The First Circuit has cautioned that Canon 3(A)(6) and section 455(a) do not "overlap perfectly," as "it is possible to violate the Code without creating an appearance of partiality; likewise, it is possible for a judge to comply with the Code yet still be required to recuse herself."    *In re Boston's Children First*, 244 F.3d at 168 (cleaned up).

None of the remarks that Tsarnaev identifies runs afoul of Canon 3(A)(6). To begin, none constitute a public comment "on the merits" of an issue in the case, including specifically Tsarnaev's claim that Jurors 138 and 286 should have been stricken for cause on account of bias. Judges improperly comment on "the merits" of a case when they publicly "disclose [their] views on the factual and legal matters at the heart of the case."    *United States v. Microsoft Corp.*, 253 F.3d 34, 112 (D.C. Cir. 2001) (en banc) (per curiam); *see also In re Charges of Judicial Misconduct*, 769 F.3d 762, 793 (D.C. Cir. 2014).    In *Microsoft Corp.*, a district judge, in a pending case, gave "secret interviews to select reporters" during which he discussed his "opinions about the credibility of witnesses, the validity of legal theories, the culpability of the defendant,

the choice of remedy, and so forth [which] all dealt with the merits of his actions." 253 F.3d at

112. The judge told the reporters, among other things, of "his distaste for the defense of

technological integration—one of the central issues in the lawsuit," described "Microsoft's

conduct, with particular emphasis on what he regarded as the company's prevarication, hubris, and

impenitence," likened Microsoft's writing of incriminating documents to drug traffickers, and

"secretly divulged to reporters his views on the remedy for Microsoft's antitrust violations." *Id.*

at 109-11. The D.C. Circuit concluded that "[t]he public comments were not only improper, but

also would lead a reasonable, informed observer to question the District Judge's impartiality."

*Id.* at 115. Notably, the D.C. Circuit distinguished the district court's actions from "[d]iscreet

and limited public comments [that] may not compromise a judge's apparent impartiality." *Ibid.*

The First Circuit also considered a district judge's comments regarding "the merits" of a

pending matter in *In re Boston's Children First*. In that case, the district court entered a

procedural order stating it would resolve the issue of standing before considering a motion for

class certification, and the plaintiffs subsequently moved for class certification, analogizing their

case to *Mack v. Suffolk County*, 191 F.R.D. 16 (D. Mass. 2000), in which class certification had

preceded the resolution of standing issues. 244 F.3d at 165. Plaintiff's counsel were

subsequently quoted in a *Boston Herald* article making pejorative comments about the judge's

handling of the case, and the judge's responsive letter to the *Herald* – citing inaccuracies in its

coverage – resulted in a follow-up article that quoted the judge as saying: "In the [*Mack*] case,

there was no issue as to whether [the plaintiffs] were injured. It was absolutely clear every

woman had a claim. This is a more complex case." *Id.* at 166. The district court's comments

led the First Circuit to order recusal, as it found that a reasonable person might view the remarks

"as a preview on the ruling on the merits of petitioner's motion for class certification, despite the fact that defendants had not yet filed a response to that motion." *Id.* at 169-71.

After the First Circuit's opinion was released and the district judge petitioned for rehearing en banc, the panel in *In re Boston's Children First* consulted informally with the three non-panelist active judges and noted that they "are currently of the view that, even if the district court's statement to the reporter comprised a comment on the merits, it does not create an appearance of partiality such as to require recusal under 28 U.S.C. §455(a)," and were "particularly concerned that section 455(a) not be read to create a threshold for recusal so low as to make any out-of-court response to a reporter's question the basis for a motion to recuse." *Id.* at 172. The panel reiterated its view that recusal was required "based on the particular events in, and character of, a highly idiosyncratic case," but emphasized "the continuing need for a case-by-case determination of such issues." *Ibid.*

This case is a world apart from the circumstances at issue in *Microsoft Corp.* or *In re Boston's Children First*. To begin, none of the remarks identified in Tsarnaev's motion constitute a comment "on the merits" of a pending legal issue in the case, let alone a specific comment on his claim that Jurors 138 and 286 should have been stricken for cause on account of bias. As Tsarnaev acknowledges (Def. Mem. at 5), the Court prefaced its remarks at the Boston College Law School forum by stating that it would "not address the merits of any of the legal issues in the case," and that "the case is in the very early stages of an appeal, and it would be inappropriate for me to make any comments about any potential appellate issues." Exhibit A to Recusal Motion at 1-2. This Court adhered to that approach and addressed how it conducted the trial management in this case and in *United States v. Mehanna* in broad strokes and at a high level

9

**F9**

of generality.    *Id.* at 2-8.    The Court likewise discussed only generally the mechanics of its trial management in this case in its remarks at the U.S. Courts panel discussion and during the *Criminal* podcast.    In neither instance did the Court discuss the merits of an issue in this case.    *See* https://www.uscourts.gov/news/2017/03/02/inside-look-jury-experience; Exhibit B to Recusal Motion at 4-7.    At most, the Court's remarks constitute the species of "[d]iscreet and limited public comments" that do not call into question its impartiality.    *See Microsoft*, 253 F.3d at 115.

Nonetheless, Tsarnaev asserts (Def. Mem. at 16) that a reasonable person could view some of this Court's remarks as an "anticipatory" defense of its ruling denying his motion to strike Jurors 138 and 286 for cause on account of bias.    He is wrong.    Tsarnaev cites no case requiring recusal based on a speculative interpretation of generic statements as an "anticipatory defense" of a ruling, and his attempt to analogize this case to *In re Boston's Children First* falls flat.    The plaintiffs in that case had already sought class certification when the district judge characterized the lawsuit as being a "more complex case" than another in which class certification had been granted, and the First Circuit found, under the circumstances, that a reasonable person might view the judge's comments "as a preview on the ruling on the merits of petitioner's motion for class certification, despite the fact that defendants had not yet filed a response to that motion."    244 F.3d at 169-71. Here, by contrast, Tsarnaev fails to grapple with the inconvenient fact that he debuted his appellate claim concerning Jurors 138 and 286 on December 27, 2018, more than two years after this Court participated in the Boston College Law school forum and the U.S. Courts panel discussion. Tsarnaev, in other words, is necessarily suggesting that a reasonable person would believe that this Court correctly anticipated that Tsarnaev would appeal (amongst the hundreds of pretrial and trial rulings) the denial of his motion to strike Jurors 138 and 286 for cause, and that it used the occasion

Case: 25-1335    Document: 00118268883    Page: 126    Date Filed: 04/04/2025    Entry ID: 6711806

Case: 25-1335    Document: 00118268883    Page: 127    Date Filed: 04/04/2025    Entry ID: 6711806

of these two events to provide an "anticipatory defense" of that ruling.    No reasonable person would harbor such an unrealistic, if not farcical, view.    *See Samuel v. University of Pittsburgh*, 395 F. Supp. 1275, 1279 (W.D. Pa. 1975) (in denying recusal motion under section 455(a), noting that "the alleged 1973 statements with which counsel takes issue could not have concerned attorneys' fees in this case because counsels' petition for such fees was not filed until March of 1975"), *vacated on other grounds*, 538 F.2d 991 (3d Cir. 1976).

In any event, Tsarnaev misconstrues the remarks that the Court made.    For example, he highlights (Def. Mem. at 3) that after stating that it would not make any comments about any potential appellate issue in this case at the Boston College Law School forum, the Court said the following:

> What I will talk about is some issues regarding the trial management that arise in what we might call high-profile cases, and particularly issues affecting jury management, such as how in the two cases [*Tsarnaev* and *Mehanna*] we managed the mechanics and the logistics of the trials to assure that the defendant, in each case, was given what the Sixth Amendment guarantees, a public trial that is fully fair.

Exhibit A to Recusal Motion at 2.    A reasonable person would understand this remark as simply providing an overview of the presentation that would follow and how the Court sought to achieve what the Sixth Amendment guarantees in every case, "a fair trial before an impartial jury." *United States v. Tsarnaev*, 595 U.S. 302, 324 (2022).    No reasonable person would understand it as an "anticipatory defense" of this Court's ruling denying Tsarnaev's motion to strike Jurors 138 and 286 for cause.    Tsarnaev also highlights (Def. Mem. at 3) the following remark at that same forum: "I have to say, by the way, I'll just take this opportunity to say, the public-spiritedness of these jurors was remarkable throughout, both the ones who were selected and the ones that were not."    Exhibit A to Recusal Motion at 6.    No reasonable person would find this remark as

11

**F11**

Case: 25-1335    Document: 00118268883    Page: 128    Date Filed: 04/04/2025    Entry ID: 6711806

anything other than overall praise for the petit jury and the jury venire in this case as a whole rather than an "anticipatory defense" of the Court's rulings with respect to any specific juror.

Tsarnaev highlights (Def. Mem. at 4) that the Court noted that "[o]ne of the features of the modern age" is exposure to social media and that this has caused concern for courts – including that jurors "will be involuntarily subjected to others, like Facebook friends, to improper information, which they shouldn't' have" – and described the steps it took in this case and others to ensure this does not happen.    Exhibit A to Recusal Motion at 6.    He also highlights (Def. Mem. at 4) that as an aside during this discussion, the Court said the following:

> By the way, I have no doubt that the parties were at least spot-checking juror social media sites to watch for any indication of breach of duty, and we heard of none.

> But beyond exhortation and constant reminders and maybe check-ups, appeals to their better natures, I'm not sure much can be done.    We ask them to do their duty, and I think they do.

Exhibit A to Recusal Motion at 7.    A reasonable person would understand these remarks as a description of this Court's views about how best to ensure that members of a seated jury are not exposed to outside influences, both in this case and in others, and not a comment about anything that happened during the jury selection process.    Moreover, the Court did not suggest that these measures could guarantee effectiveness, and no reasonable person would view these remarks as an "anticipatory defense" against a claim that its efforts had failed.

Tsarnaev also highlights (Def. Mem. at 5) the WGBH article about the Boston College Law forum, which states that during a question-and-answer session at the end, the Court "was asked if he has any lingering questions or doubts about the Boston Marathon trial outcome.    He said no.    He had moved on."    https://www.wgbh.org/news/local/2016-04-07/tsarnaev-trial-

judge-revisits-issues-of-race-the-death-penalty-and-fairness. A reasonable person would understand this answer as simply a reflection of the commonly held view about the nature of the judicial craft, rather than any form of "anticipatory defense" of the Court's rulings in this case. *See, e.g.,* Stewart J. Schwab, *In Memoriam: Sandra J. O'Connor – Justice O'Connor as the Good Judge*, 137 HARV. L. REV. 1809, 1811 (May 2024) ("In approaching a case, Justice O'Connor wanted to weigh all arguments and perspectives, make a decision, write an opinion explaining what facts and factors justified the decision, and move on. 'Don't look back' was a favorite admonition."); Hon. Dana M. Levitz, *So, You Think You Want to be a Judge*, 38 U. BALT. L. REV. 57, 68 (Fall 2008) ("A judge has to have the ability to make a thoughtful, reasoned decision and then move on to the next case without dwelling on the result."); Kenneth W. Starr, *The Courts of Appeals and the Future of the Federal Judiciary*, 1991 WISC. L. REV. 1, 3 ("Now in saying this, I am mindful that, above all, judges are called upon to judge. They are there to decide cases and then to move on to the next case.").

Tsarnaev additionally highlights (Def. Mem. at 6) the fact that during the U.S. Courts panel discussion, the Court said: "And by and large my experience has been jurors take their responsibility seriously and they try to do, to live by those guidelines." *See* https://www.uscourts.gov/news/2017/03/02/inside-look-jury-experience. A reasonable person would understand this remark as simply reflecting the Court's experience trying criminal cases as a federal and state judge over the course of a career spanning more than four decades, and not an assessment of what the jury did in this particular case. The same holds true of the Court's remarks about its experience with juries and their compliance with instructions during the *Criminal* podcast. *See* Exhibit B to Recusal Motion at 4-7.

Case: 25-1335    Document: 00118268883    Page: 130    Date Filed: 04/04/2025    Entry ID: 6711806

Hence, none of the Court's remarks at these two events or in the *Criminal* podcast were a comment "on the merits" of Tsarnaev's claim that two seated jurors should have been stricken for cause on account of bias, and they therefore did not run afoul of Canon 3(A)(6).   They also did not run afoul of Canon 3(A)(6) because, even assuming *arguendo* that one or more of this Court's remarks could possibly be construed as a comment "on the merits" of his juror bias claim, that canon by its terms does not extend to "public statements made in the course of the judge's official duties, to explanations of court procedures, or to scholarly presentations made for purposes of legal education."   Each of the events in question fall under these exceptions.   The Boston College Law School forum took place at that law school and was a discussion about national security issues and the role of the judiciary, and this Court's fellow panel members included three Boston College Law School professors.   *See* https://lawmagazine.bc.edu/2016/04/fairness-was-foremost-for-marathon-bombing-judge/.   The U.S. Courts panel discussion examined the jury process and selection, jury duty myths, the juror experience, and how high-profile and complex trials are handled, it was moderated by a law professor, and this Court's fellow panel members were Judge Reggie Walton of the U.S. District Court for the District of Columbia and Robin Tabora, the Clerk of Court for the U.S. District Court for the District of Connecticut.   *See* https://www.uscourts.gov/news/2017/03/02/inside-look-jury-experience.   The Court's remarks during these events plainly constituted scholarly presentations made for the purpose of legal education, and they consequently did not contravene Canon 3(A)(6).   *See In re Charges of Judicial Misconduct*, 769 F.3d at 795 (finding that even if judge's remarks during law school presentation constituted comments about the "merits" of an impending case, "that discussion would fall withing the 'scholarly presentation' exception to Canon 3A(6).").

14

Case: 25-1335     Document: 00118268883     Page: 131     Date Filed: 04/04/2025     Entry ID: 6711806

Similarly, this Court's public descriptions of the mechanics of the trial in this case, including the process of jury selection, also fell outside the stated reach of Canon 3(A)(6).   *See Microsoft Corp.*, 253 F.3d at 112 (distinguishing between "purely procedural matters," which a judge may properly discuss in public under Canon 3(A)(6), and the judge's "views on factual and legal matters at the heart of the case," upon which the judge may not publicly comment).

**2.      None of the Court's Remarks Otherwise Would Lead A Reasonable Person To Doubt Its Impartiality.**

Nor did any of this Court's remarks during these events run afoul of *In re Boston's Children First* or the constitutional requirement that a judge satisfy the appearance of impartiality.   As noted, the panel in *In re Boston's Children First* stated that recusal was required "based on the particular events in, and character of, a highly idiosyncratic case," but added that the other three active judges of the court disagreed and that, "[i]n the circumstances, it seemed to the panel fair to acknowledge a difference of views among the active judges, and the continuing need for a case-by-case determination of such issues."   244 F.3d at 172.   That decision consequently did not establish any kind of across-the-board rule as Tsarnaev appears to suggest, and he fails to demonstrate that the circumstances here resemble the unique context in *In re Boston's Children First*.   Because Tsarnaev's arguments all involve highly speculative claims concerning the supposed appearance of bias, his constitutional arguments for recusal likewise fail.

**3.      The Court's Comments to the Jury Do Not Support Recusal.**

Tsarnaev further asserts (Def. Mem. at 17) that this Court's "statements and actions in the courtroom buttress the case for recusal."   But Tsarnaev badly misconstrues the remarks he highlights, takes them out of context, or both.

15

**F15**

Tsarnaev first notes (Def. Mem. at 8) that during an *ex parte* lobby conference with the seated jurors on March 3, 2015, this Court said "[y]ou and I are in this together" and "[w]e're on the same team here," after which the Court shook the juror's hands.   The full context of this Court's remarks dispels any notion that they support a basis for recusal:

> Jurors – you're real jurors now.   I just wanted to come in and just come in and just personally thank you for your anticipated service in this case.   This is a very important responsibility, as I'm sure you all understand.   You and I are in this together.   We're on the same side here.   Our side is justice.   Our job is to be as fair and impartial as we possibly can, and I know you all can do it because I have seen jurors over the years do exactly this.   It's going to be a serious responsibility.   It's one you can handle.   We're very confident in that.   And I just wanted to express that to you.
>
>             \*   \*   \*
>
> So that's really all I have to say except, finally, the Supreme Court of the United States has a very interesting tradition.   Before they go out to the bench to hear argument and before they conference a case, they all shake hands with each other, and I thought we'd do that because we're now teammates.   I'm going to go around, and you can do it.

(The judge shakes hands with the jurors).

ECF Docket No. 1133-1, at 20, 22.   No reasonable person would understand that the Court's remarks were anything other than an affirmation that the duties of the Court and jury were the same – "our side is justice" and 'to be as fair and impartial as we possibly can" – as well as an exhortation to the jury to live up to that duty and responsibility.

Tsarnaev next cites (Def. Mem. at 8) portions of this Court's remarks to the jury after it had returned its verdict in this case.   Again, the full context of this Court's remarks is key:

> So, as I was saying, I want to thank you for your service.   And I express that thanks not only on my own behalf, which I do sincerely, but more importantly, on behalf of the citizens of Massachusetts whom you represent for the purposes of this trial.

Case: 25-1335    Document: 00118268883    Page: 133    Date Filed: 04/04/2025    Entry ID: 6711806

> We ask of our fellow citizens active engagement and participation in the work of self-government. In particular, we ask our fellow citizens to participate in administering justice fairly and impartially by sitting as trial jurors. We asked of you the important and difficult task of judging the evidence in this case and of rendering a just verdict guided by your best judgment in evidence.
>
> I want especially to commend the alternate jurors. After all the time and attention you gave in listening to the evidence, you learned that you would not be part of the decision. That must be frustrating. Perhaps it is a relief. In any event, it is necessary to have alternates available, and your service has been just as vital to the process as that of the deliberating jurors.
>
> The inconvenience to all of you in serving on this case has been considerable, yet you have each borne that inconvenience with grace and understanding. The seriousness and responsibility with which you have performed your service as jurors should stand as a model for future juries.
>
> Abraham Lincoln once said, "There is no grievance that is a fit object for redress by mob law." Your service as jurors in this case has been the very antithesis of mob law. The issues have been thoroughly presented to you, and you have thoughtfully resolved them. Obviously, the facts and circumstances of this case arouse powerful emotions, but on behalf of a community seriously aggrieved, you have demonstrated convincingly that even in such circumstances, men and women of honesty and goodwill can set aside emotions and make careful, rational and solemn judgments about guilt or innocence and life or death. You can, you should, be justly proud of your service in this case.

ECF Docket No. 1661-16 to 1661-17. No reasonable person would understand the Court's observation as anything other than a recognition that the jury had done its duty to render a fair and just verdict, rather than a suggestion about what a fair and just verdict might be. Indeed, this Court's remarks are little different from those made by the district judge in *Sampson* after the jury returned a sentence of death following the second penalty-phase trial in that case:

> Since the founding of our nation, individual citizens, like yourselves, have rendered important decisions as jurors. We regularly ask citizens to participate in administering justice fairly and impartially by sitting as trial jurors.
>
> In this case, we have asked you to make more than the ordinary sacrifice. The trial was long, some of the evidence difficult, and the question for decision of the highest importance in gravity.

17

**F17**

Case: 25-1335    Document: 00118268883    Page: 134    Date Filed: 04/04/2025    Entry ID: 6711806

> You serve as a model for all your fellow citizens and all future jurors. You performed your service with seriousness and responsibility. In the face of evidence that arouses powerful emotions, you demonstrated convincingly that men and women of honesty and good will can put aside emotions to make careful, rational, and solemn judgments about life and death. You can be proud of your service in this case.

ECF Docket No. 2957, at 58, *United States v. Sampson*, No. 01-cr-10348-LTS.

Finally, Tsarnaev cites (Def. Mem. at 9) this Court's statements during the sentencing hearing as supporting his recusal motion. Here, too, context is key:

> First, I want to acknowledge the presence of a number of the jurors and alternates who participated in the trial of this case. They are here at my invitation. It is my practice, after a verdict in every criminal trial, to talk informally with the discharged jurors, principally to thank them again personally for their service. It is my habit on such occasions to invite them to return to attend the sentencing hearing, and sometimes they do.

> Consistent with that practice, I extended a similar invitation to the jurors in this case to attend. As you can see, many of them accepted and are here. Because so many were interested and because we have limited public seating in the courtroom, as a courtesy and as a gesture of respect for their service, I authorized them to sit in the jury box. I do want to emphasize, of course, that they are present now. They are no longer a jury, but a group of citizens who are here, each in his or her individual capacity. Nonetheless, I take this occasion again to thank the now-former jurors for their exceptional service.

> Much of the evidence in this case was hard to hear and see. We made great demands on their time and asked them to insulate themselves from potential extraneous influences in ways that an ordinary person would find difficult or uncomfortable. We asked them to make significant changes to their daily routines and to spend a long time away from work and other pursuits. We also asked them to accept the responsibility to set aside any preconceived ideas, and instead to reason from the evidence presented in this trial to any conclusions and not the other way around. Above all, we asked them, as they acted to perform their high duty, to be utterly fair and impartial in their deliberations. Their careful verdict satisfies me that they did what they were asked to do. Theirs was not the only possible verdict, but it is certainly a rational one on the evidence.

> That they performed their duty so well and faithfully came as no surprise to me. I've been presiding over jury trials in this state for more than 30 years, and I know how seriously Massachusetts jurors take the responsibilities of jury service.

**F18**

Case: 25-1335    Document: 00118268883    Page: 135    Date Filed: 04/04/2025    Entry ID: 6711806

> I had no doubt that we could select a jury for this case that would accept and perform their high duty conscientiously and justly.   The proof is in the pudding.

ECF Docket No. 1476, at 3-5.   No reasonable person would construe these remarks as anything other than a statement that the jury, consistent with its duty, had reached a careful and rational verdict based on the evidence – even though "[t]heirs was not the only possible verdict" – rather than any form of suggestion that the only possible verdict in the case was a sentence of death.

### C.   **Tsarnaev's Request for Disclosures Should Be Denied**.

Tsarnaev alternatively asks this Court (Def. Mem. at 18-20) to "disclose the dates, circumstances, and substance of all public comments that Your Honor has made about this case, as well as the dates, circumstances, and substance of all ex parte communications with the jurors." The request should be denied.

Although the First Circuit has said that there is nothing in section 455 that would prevent the party seeking recusal from trying to "engage in discovery incident to a recusal motion," it has made clear that "the allowance of such discovery is within the sound discretion of the court."   *In re Martinez-Catala*, 129 F.3d 213, 220 (1st Cir. 1997) (citing, *e.g.*, *Cheeves v. Southern Clays, Inc.*, 797 F. Supp. 1570, 1580 (M.D. Ga. 1992)).   Here, Tsarnaev is largely making a speculative request for discovery regarding other possible events in which the Court may have spoken, or other comments it may have made to the jury.   This is altogether different from the circumstances in *Sampson*, where the government sought additional information about an event following a voluntary disclosure by the district judge under 28 U.S.C. §455(e).   *See Sampson*, 148 F. Supp. 3d at 115.   Indeed, by requesting evidence he cannot identify from public sources, Tsarnaev only serves to undercut his argument that the Court has created an appearance of bias.   Regardless, his request for disclosure is nothing more than a fishing expedition and should be denied.   *See*

*Cheeves*, 797 F. Supp. at 1582 (in denying request for discovery in aid of recusal motion under 28 U.S.C. §§144 and 455(a), stating that "[e]ither the alleged bias has already been manifested in some way within the knowledge, information or belief of the party-affiant, or the effort to depose the judge would be a classic fishing expedition").

The government, once again, has every expectation that if the Court believes its participation in any event or any possible extra-judicial statement might cause a reasonable person to doubt its impartiality, it will voluntarily disclose it to the parties.   But Tsarnaev's motion for disclosure should be denied.

## **CONCLUSION**

For the foregoing reasons, Tsarnaev's motion for recusal and for disclosure should be denied.

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

By: */s/ Mark T. Quinlivan*
NADINE PELLEGRINI
JASON A. CASEY
MARK T. QUINLIVAN
Assistant U.S. Attorneys
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3606
mark.quinlivan@usdoj.gov

JEFFREY B. KAHAN
Deputy Chief, Capital Case Section
U.S. Department of Justice
1331 F St., N.W., Suite 650
Washington, D.C. 20530

Dated:   September 17, 2024

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document this document was served by email on counsel for the defendant on September 17, 2024.

By:     */s/ Mark T. Quinlivan*
MARK T. QUINLIVAN
Assistant U.S. Attorney

Date:   September 17, 2024

**F21**

Case: 25-1335    Document: 00118268883    Page: 138    Date Filed: 04/04/2025    Entry ID: 6711806

# Exhibit G

**Defendant's Reply in Support of Motion for Recusal and Disclosure**

**(Sept. 27, 2024)**

Case: 25-1335    Document: 00118268883    Page: 139    Date Filed: 04/04/2025    Entry ID: 6711806

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

DZHOKHAR TSARNAEV

No. 13-cr-10200-GAO

LEAVE TO FILE GRANTED 10/11/2024

**DEFENDANT DZHOKHAR TSARNAEV'S REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR RECUSAL AND FOR DISCLOSURE**

On behalf of Dzhokhar Tsarnaev, the defense submits this reply to the government's September 17, 2024 response ("Resp."), and in further support of our September 3, 2024 motion for recusal and disclosure ("Mot."). Contrary to the government's argument, this motion is timely. The defense acted with diligence, seeking recusal as soon as the claim was available, and procured no strategic advantage by the timing of this motion. On the merits, Your Honor's public comments about the precise issues presented on remand—in particular, Your Honor's praise for the seated jurors' "remarkable" "public-spiritedness" and confidence that Mr. Tsarnaev received a "fully fair" trial—at the very least "create the appearance of impropriety that [28 U.S.C. §] 455(a) is designed to address." In re Boston's Children First, 244 F.3d 164, 170 (1st Cir. 2001). Pursuant to §§ 455(a) and 455(e) and the Fifth and Eighth Amendments, this Court should recuse, or in the alternative, reserve decision, disclose its public comments about the case and its ex parte communications with the jurors, and allow the defense to supplement this motion.

**ARGUMENT**

I.      **This Court Should Recuse Itself.**

A.      <u>The Motion Is Timely.</u>

The government argues that this motion is untimely because all of Your Honor's extrajudicial statements "have been publicly available for years." Resp. 4. In the government's

Case: 25-1335    Document: 00118268883    Page: 140    Date Filed: 04/04/2025    Entry ID: 6711806

view, even though Your Honor made all of these statements while Mr. Tsarnaev's appeal was pending, the defense should nonetheless "have raised a recusal claim in that appeal or moved this Court to recuse while the appeal was pending." Resp. 1. The government is mistaken.

      1.     At the outset, the defense could not have raised a recusal claim in the First Circuit on appeal, or in this Court while the appeal was pending. In the Circuit, Mr. Tsarnaev was appealing a judgment, but Your Honor's remarks postdated—and thus offered no grounds to attack—that judgment. See, e.g., United States v. Muriel-Cruz, 412 F.3d 9, 12 (1st Cir. 2005) ("Absent extraordinary circumstances, ... we consult only the record extant at the time the district court rendered its decision."). To be clear, the defense is not arguing that this Court should have recused itself during trial. Rather, the defense is arguing that Your Honor's post-judgment public comments praising the jurors and defending the jury-selection process could now cause a reasonable observer to doubt Your Honor's impartiality on the specific question whether two of the jurors lied during voir dire or were biased against Mr. Tsarnaev. That claim did not materialize until the Circuit ordered the specific remand proceedings now pending.

      Moreover, the Circuit's "review" on direct appeal was "limited to the record below." Cipes v. Mikasa, Inc., 439 F.3d 52, 57 (1st Cir. 2006) (citing Fed. R. App. P. 10). See also, e.g., Hurney v. Carver, 602 F.2d 993, 996 (1st Cir. 1979) (declining to consider factual allegations first raised in appellate brief, explaining that "[o]ur scope of review of facts ... is limited to those contained in the district court record"). Fed. R. App. P. 10(a) provides that "the record on appeal" is composed of "the original papers and exhibits filed in the district court," "the transcript of proceedings, if any," and "a certified copy of the docket entries prepared by the district clerk." Thus, in Muriel-Cruz, the Circuit declined to expand the record to include supplemental material not presented to the district court, where that material postdated (and was

**G2**

Case: 25-1335      Document: 00118268883      Page: 141      Date Filed: 04/04/2025      Entry ID: 6711806

thus "immaterial" to) the decision on appeal. 412 F.3d at 12. The government contends that an appellate recusal claim would have been reviewed for plain error (Resp. 5–6), but the government's cases all involved grounds for recusal that arose during district court proceedings, were part of the record, and could have been presented to district judges in the first instance (or to the Circuit on plain error). See, e.g., United States v. Caramadre, 807 F.3d 359, 374 (1st Cir. 2015) (judge's statements in rescript denying motion to withdraw guilty plea); United States v. Reynolds, 646 F.3d 63, 74 (1st Cir. 2011) (judge's presiding at pretrial competency hearing during which defendant made admissions of guilt before presiding at bench trial); United States v. Cruz-Mercado, 360 F.3d 30, 35–36 (1st Cir. 2004) (judge's statements during sentencing and bail revocation hearing). The government cites no case where an appellate court heard a recusal claim challenging a judgment on the basis of events that postdated the judgment and were not part of the record on appeal. That course would have conflicted with First Circuit precedent.

2. Nor could the defense have moved to recuse in this Court because the notice of appeal divested this Court of jurisdiction. "The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58 (1982). The government identifies a few out-of-Circuit cases holding that a district court retains authority to recuse itself despite a pending appeal, but the weight of authority is to the contrary. See, e.g., Weiss v. Hunna, 312 F.2d 711, 713 (2d Cir. 1963) (Friendly, J.) (filing of notice of appeal divested district court of jurisdiction to entertain Fed. R. Civ. P. 60(b) motion to vacate judgment on ground that judge should have disqualified

Entry ID: 6711806    Date Filed: 04/04/2025    Page: 142    Document: 00118268883    Case: 25-1335

himself).[1] Moreover, § 455(a) concerns recusal in any "proceeding." There was no "proceeding" concerning the jurors before this Court, and so nothing for this Court to be disqualified from. See United States v. Bowens, 291 F. App'x 644, 645 (10th Cir. 2008); United States v. Day, 215 F. App'x 975, 976 (11th Cir. 2007) (both holding that district courts lacked jurisdiction to entertain recusal motions absent pending "proceedings").

       3.      Moreover, when Your Honor made his public comments, the recusal question was not live. Mr. Tsarnaev's appeal was pending, and it was speculative at best that the case would ever return to Your Honor. By far, the most probable outcomes of the appeal were (i) affirmance, or (ii) remand for a new trial or a new penalty phase, neither of which would have required resolution of the recusal question. If the Circuit affirmed, there would have been no further proceedings before this Court. And if the Circuit remanded for a new trial or a new penalty phase, D. Mass. Local Rule 40.1(*l*)(1) (formerly codified at Local Rule 40.1(k)(1)) would have required reassignment to a new judge: "When an appellate court remands a case to this court for a new trial, the case shall be reassigned to a district judge other than the judge before whom the first trial was held." In the Circuit's first opinion, that is what happened. United States v. Tsarnaev, 968 F.3d 24, 106 (1st Cir. 2020) (vacating death sentences "with directions to hold a new penalty-phase trial consistent with this opinion and with Local Rule 40.1(k)(1)").

       When it became clear that recusal was a live issue—that is, when the Circuit did remand for further proceedings concerning the juror misconduct claim—the defense acted with diligence.

---

[1] See also Manookian PLLC v. Burton, 2023 WL 1867456, at *3 (M.D. Tenn. Feb. 9, 2023); Araman v. Real Estate Bd., 2022 U.S. Dist. LEXIS 136516, at *1 (S.D.N.Y. Aug. 1, 2022); Straw v. Dentons US LLP, 2020 WL 4004128, at *1 (S.D.N.Y. July 15, 2020); Mathis v. Goldberg, 2013 WL 4236401, at *1 (D. Md. Aug. 14, 2013); Christian v. United States, 2008 WL 6582216, at *2 (D. Md. March 12, 2008); McCole v. Shannon, 2007 WL 954338, at *5 n.8 (E.D. Pa. March 27, 2007).

**G4**

Case: 25-1335          Document: 00118268883          Page: 143          Date Filed: 04/04/2025          Entry ID: 6711806

Within days of this Court's order scheduling a status conference, we wrote to call this Court's attention to Local Rule 40.1(*l*)(2) and to express our "understanding that the case should be returned to the Clerk for reassignment." DE.1806, at 2. "If this Court is not inclined to refer the case for reassignment," we added, "we wish to advise the Court that we intend to file a separate motion for the Court to recuse itself pursuant to 28 U.S.C. § 455." DE.1806, at 2. The defense took all of these steps before this Court made any rulings on remand, demonstrating that we sought no strategic advantage through timing. See In re United States, 441 F.3d 44, 65 (1st Cir. 2006) (granting mandamus, rejecting district court's ruling that recusal motion was untimely, explaining that timeliness turns on "whether there was a calculated withholding of a recusal motion" or whether motion was "strategic" attempt "to recuse a judge whose rulings have  gone against the party") The government does not argue that the timing of the motion was manipulative and identifies no edge that we have attained or prejudice that it has suffered.

　　　For these reasons, each of the government's out-of-Circuit cases (Resp. 4–5) is readily distinguishable. Each involved grounds for recusal known while the case was pending in the district court but not raised until after the movant had lost (or was losing) at trial, so that the motions could be characterized as strategic. See, e.g., United States v. Siegelman, 640 F.3d 1159, 1187–88 (11th Cir. 2011) (rejecting recusal motion that "has all the earmarks of an eleventh-hour ploy based upon [defendant's] dissatisfaction with the jury's verdict and the judge's post-trial rulings," explaining that timing rule's "purpose" is to "'prevent a litigant from waiting until an adverse decision has been handed down before moving to disqualify the judge'"); Nat'l Auto Brokers Corp. v. Gen. Motors Corp., 572 F.2d 953, 957–58 (2d Cir. 1978) (rejecting recusal motion made "[a]fter five weeks of trial and at a point when the inadequacy of [movant's] proof

was rapidly becoming apparent"). Here, the basis for recusal did not arise until after entry of judgment and notice of appeal, and the defense gained no strategic edge through delay.

4. Furthermore, the issue of recusal was not ripe until the First Circuit remanded this case to this Court for further proceedings. Until that occurred, there was no reason for any court to decide whether recusal was warranted. The "basic rationale" of ripeness doctrine is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." Abbott Labs. v. Gardner, 387 U.S. 136, 148 (1967). "A claim is not ripe ... if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" United States v. Texas, 523 U.S. 296, 300 (1998). Courts ask "whether resolution of the dispute should be postponed in the name of 'judicial restraint from unnecessary decision of constitutional issues,'" mindful that "'delay may see the dissipation of the legal dispute without need for decision.'" Roman Catholic Bishop of Springfield v. City of Springfield, 724 F.3d 78, 89 (1st Cir. 2013). Deciding a recusal issue would therefore have been "premature," Abbot Labs., 387 U.S. at 148, as return of the case to Your Honor was a "contingent future event[]" that "may not [have] occur[red] at all.'" Texas, 523 U.S. at 300. See, e.g., Indus. Network Sys., Inc. v. Armstrong World Health Indus., Inc., 54 F.3d 150, 156 (3d Cir. 1999) (motion to recuse district judge with respect to issue of attorney's fees was "not ripe for review" because there was no matter pertaining to fees before judge); see also, e.g., United States v. Parada, 408 F. App'x 176, 177 (10th Cir. 2011); United States v. Pons, 61 F.3d 914, at *1 (9th Cir. 1995) (table); Bourne v. New Hampshire, 2012 WL 3962759, at *2 (D.N.H. Sept. 11, 2012); United States v. Hendrickson, 2011 WL 1543147, at *2 (E.D. Mich. Apr. 21, 2011) (all deeming recusal motions unripe absent pending proceedings involving actor sought to be recused).

Case: 25-1335    Document: 00118268883    Page: 145    Date Filed: 04/04/2025    Entry ID: 6711806

5.    Most important, reliance on a dubious time bar to avoid consideration of a substantial recusal question would disserve the interest that § 455(a) is meant to advance: "public confidence in the impartiality of the judicial process." H.R. Rep. 93–1453, 1974 U.S.C.C.A.N. 6351, 6355. Perhaps that is why the government can locate no decision from the First Circuit or this District denying a recusal motion as untimely. In In re United States, 666 F.2d 690, 694 (1st Cir. 1981) (cited at Resp. 3), the Circuit held that a government recusal motion filed before a federal criminal retrial was timely, even though the basis for the motion—the judge's prior "relationships" with several case participants—was "in large outline obvious long before the [first] trial began." The Circuit credited "the prosecutor's position that he had not felt that an earlier motion to disqualify would have been justified by the facts then available to him." Id. And in In re United States, 441 F.3d at 65 (cited at Resp. 3), the Circuit again held a government recusal motion timely, noting that "[a] motion to recuse ... must have a factual foundation; it may take some time to build the foundation." Indeed, even if this motion were untimely (and it is not), this Court would have discretion to reach the merits anyway. See, e.g., United States v. O'Brien, 18 F. Supp. 3d 25, 32 (D. Mass. 2014) ("[B]ecause of the relatively high stakes involved, I am reluctant to deny the motion solely on the grounds that it is untimely. I will therefore proceed to consider the merits."). Finally, § 455(a) is addressed to judges, not litigants. The statute is "automatic, mandatory, and self-executing." United States v. Chantal, 902 F.2d 1018, 1023 (1st Cir. 1990). "In fact, the judge is expected to recuse sua sponte, where necessary, even if no party has requested it." In re Martinez-Catala, 129 F.3d 213, 220 (1st Cir. 1997).

B.    This Court's Public Comments Create An Appearance Of Partiality Requiring Recusal.

On multiple occasions over the course of several years, Your Honor "invite[d] trouble" by taking the "very rar[e]" step of speaking to the press and the public about this case while it

Case: 25-1335          Document: 00118268883          Page: 146          Date Filed: 04/04/2025          Entry ID: 6711806

was pending on appeal. <u>Boston's Children First</u>, 244 F.3d at 170–71; Mot. 3–7. The government responds that none of Your Honor's statements "constituted a public comment 'on the merits,'" and that all "fell outside the ambit of [<u>Boston's Children First</u>]," so that "none of them violated the constitutional requirement that a judge satisfy the appearance of impartiality." Resp. 2.

      The First Circuit remanded this case "to conduct an appropriate investigation of the potential bias suggested by the apparent discrepancies between the answers of Jurors 138 and 286 to the court's inquiries in jury selection and the information contained in their social media communications" and to determine whether "either juror suffered from a disqualifying bias." <u>United States v. Tsarnaev</u>, 96 F.4th 441, 475 (1st Cir. 2024). "If the investigations establish that either juror suffered from a disqualifying bias," vacatur of the death sentence is required. <u>Id.</u> The issues before this Court therefore include whether the jurors: (i) complied with this Court's instructions regarding social media use; (ii) lied during voir dire about their social media activity; or (iii) harbored disqualifying bias against Mr. Tsarnaev, such that the death sentences that each voted to impose must be vacated as fundamentally unfair. With full knowledge of the factual basis for Mr. Tsarnaev's appellate claim—which had been presented to the Court during jury selection, <u>see</u> DE.1100—Your Honor made public comments addressing the "merits" of the precise issues on remand. Regarding the jurors' social media use, Your Honor said that during this trial, he had "heard of no[]" "indication of any breach of duty" by the jurors to "avoid[] extraneous information" on social media and declared: "We ask them to do their duty, and I think they do." Mot. 4. <u>See also</u> Mot. 6 ("[B]y and large my experience has been jurors take their responsibility seriously and ... try to live by those guidelines."). As to their character and honesty, Your Honor appeared to break from his prepared remarks to say: "[T]he public-spiritedness of these jurors was remarkable throughout." Mot. 3. And Your Honor said that Mr.

Case: 25-1335   Document: 00118268883   Page: 147   Date Filed: 04/04/2025   Entry ID: 6711806

Tsarnaev "was given what the Sixth Amendment guarantees, a public trial that is fully fair,"— necessarily including a jury of unbiased jurors—such that Your Honor had no "lingering questions or doubts about the Boston Marathon Bombing trial outcome." Mot. 3, 5. The government's effort to explain these remarks proves the point. According to the government, a reasonable observer would have understood the "public-spirited[]" comment as "overall praise for the petit jury." Resp. 12. If so, this reasonable observer could likewise question whether Your Honor could now find that the same "public-spirited[]" jurors who merited effusive "praise" in fact lied in order to impose a death sentence.

In any case, <u>Boston's Children First</u> ordered recusal even though it was "not at all clear that [the district judge] was commenting on the merits," because "the comments were sufficiently open to misinterpretation so as to create the appearance of partiality." 244 F.3d at 168, 170. As the government acknowledges, a violation of Canon 3(A)(6) is not invariably necessary. Resp. 7. The government tries to parry <u>Boston's Children First</u> by invoking the views of the judges who weren't on the panel (Resp. 9), but the actual panel decision is what counts, and it is controlling here. True, recusal is decided on a "case-by-case" basis, but all of the salient facts in <u>Boston's Children First</u> appear here, too. This is a "newsworthy case[] where tensions may be high" and the Marathon bombings were "a matter of significant local concern." <u>Id.</u> at 169. Your Honor, like the district judge in <u>Boston's Children First</u>, took the highly unusual step of speaking several times to the public and the news media about this case during its pendency. "[T]he very rarity of such public statements, and the ease with which they may be avoided, make it more likely that a reasonable person will interpret such statements as evidence of bias." <u>Id.</u> at 170. In addition, Your Honor's comments "may be misinterpreted because of [their] ambiguity." <u>Id.</u> at 170. The government has done its best to characterize these statements as innocuous efforts

to explain court procedures or educate the public. Resp. 2. That reading is inferior to the defense's, but at a minimum, ours is equally plausible, and that suffices to trigger § 455(a). See Boston's Children First, 244 F.3d at 170 ("appearance of partiality" arose from comments that "could easily be characterized as legitimate efforts to explain operative law").

**II.      If This Court Does Not Recuse Itself, It Should Disclose All Public Comments That It Has Made About This Case And The Substance Of Any Ex Parte Communications With The Jurors.**

The government "has no doubt that the Court would disclose any facts sounding within [§] 455," but nonetheless urges denial of the defense's motion, which is deemed "a speculative request for discovery regarding other possible events in which the Court may have spoken, or other comments it may have made to the jury." Resp. 2, 19. The government's position is incoherent. If the government is confident that this Court "would disclose" any facts relevant to disqualification, then there is no reason to oppose the motion, and likewise no reason for this Court to decline. See Am. Bar Ass'n, Model Code of Judicial Conduct R. 2.11 cmt.5. Moreover, the defense's request is far from "speculative." We know that Your Honor spoke to the public at Boston College Law School on April 6, 2016 and discussed this case, but we do not have evidence of everything that Your Honor said. Mot. 7 n.1. Likewise, we know that Your Honor was scheduled to speak to an audience at the Harvard Club of Boston about "Current Issues Being Presented to the Judiciary for Decision" on November 7, 2017, but we do not have evidence of what Your Honor said. Id. We also know that Your Honor "talk[ed] informally" with the jurors ex parte after the verdict, but aside from "invit[ing]" them to return for sentencing, we do not know what else was said. See Mot. 20 (quoting DE.1476, at 3). Specific requests for disclosure pertaining to known events are the opposite of a "fishing expedition." Resp. 19. They are a good-faith, diligent effort to build an evidentiary record.

Case: 25-1335    Document: 00118268883    Page: 149    Date Filed: 04/04/2025    Entry ID: 6711806

**CONCLUSION**

This Court should recuse, or in the alternative, reserve decision, disclose its public comments about the case and its <u>ex parte</u> communications with the jurors, and allow the defense to supplement this motion.

Respectfully submitted,

DZHOKHAR TSARNAEV

by his attorneys:

<u>/s/ *Deirdre von Dornum*</u>

Deirdre D. von Dornum, Esq.
Mia Eisner-Grynberg, Esq.
Daniel Habib, Esq.
Federal Defenders of New York, Inc.
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201
(718) 330-1200
deirdre_vondornum@fd.org
mia_eisner-grynberg@fd.org
daniel_habib@fd.org

David Patton, Esq.
*Pro Hac Vice*
350 5th Avenue, 63rd Floor
New York, NY 10118
(212) 763-0883
dpatton@heckerfink.com

William Fick, Esq.
Fick & Marx, LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
wfick@fickmarx.com

11

**G11**

**<u>Certificate of Service</u>**

I hereby certify that this document will be served by email on counsel for the government on **September 27, 2024.**

*<u>/s/ Deirdre von Dornum</u>*
Deirdre D. von Dornum, Esq.
Federal Defenders of New York, Inc.
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201
(718) 330-1200
deirdre_vondornum@fd.org

12

**G12**

Case: 25-1335    Document: 00118268883    Page: 151    Date Filed: 04/04/2025    Entry ID: 6711806







2

**H2**

Case: 25-1335     Document: 00118268883     Page: 154     Date Filed: 04/04/2025     Entry ID: 6711806



**H3**



Case: 25-1335     Document: 00118268883     Page: 156     Date Filed: 04/04/2025     Entry ID: 6711806



I1

Case: 25-1335    Document: 00118268883    Page: 157    Date Filed: 04/04/2025    Entry ID: 6711806



2

**I2**

Case: 25-1335     Document: 00118268883     Page: 158     Date Filed: 04/04/2025     Entry ID: 6711806



3

**I3**

Case: 25-1335    Document: 00118268883    Page: 159    Date Filed: 04/04/2025    Entry ID: 6711806







SEALED HEARING

J1

Case: 25-1335     Document: 00118268883     Page: 161     Date Filed: 04/04/2025     Entry ID: 6711806

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**J2**

1

2

3

4

5

6

7

8

9

03:03PM 10

11

12

13

14

15

16

17

18

19

03:04PM 20

21

22

23

24

25

SEALED HEARING

**J4**