**No. 25-1335**

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

**In re DZHOKHAR A. TSARNAEV,**
Petitioner.

**REPLY IN SUPPORT OF
PETITION FOR WRIT OF MANDAMUS**

David E. Patton, Esq.
Court of Appeals # 1173507
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
Tel.: (212) 763-0883
DPATTON@HECKERFINK.COM

William W. Fick, Esq.
Court of Appeals # 82686
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
WFICK@FICKMARX.COM

Daniel Habib, Esq.
Court of Appeals # 1173462
Deirdre D. von Dornum, Esq.
Court of Appeals # 11713158
Mia Eisner-Grynberg, Esq.
Court of Appeals # 1186916
FEDERAL DEFENDERS OF NEW
    YORK, INC.
52 Duane Street, 10th Floor
New York, NY 10007
(212) 417-8769
DANIEL_HABIB@FD.ORG
DEIRDRE_VONDORNUM@FD.ORG
MIA_EISNER-GRYNBERG@FD.ORG

*Attorneys for Petitioner*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... ii

INTRODUCTION ..................................................................................... 1

ARGUMENT ........................................................................................... 2

    This Court Should Grant Mandamus And Order Recusal................................ 2

        A.    Judge O'Toole's Public Comments Create An Appearance Of Partiality Requiring Recusal............................ 2

        B.    Judge O'Toole's Order Denying Recusal Merits No Deference. ........................................................................ 11

        C.    Tsarnaev Satisfies The Other Grounds For Mandamus............ 14

    CONCLUSION......................................................................................... 17

# TABLE OF AUTHORITIES

**Cases**

Abbott Labs. v. Gardner, 387 U.S. 136 (1967)......................................................16

Cipes v. Mikasa, Inc., 439 F.3d 52 (1st Cir. 2006)...............................................15

Gioiosa v. United States, 684 F.2d 176 (1st Cir. 1982)..........................................12

Griggs v. Provident Consumer Discount Co., 459 U.S. 56 (1982) ........................15

In re Boston's Children First, 244 F.3d 164 (1st Cir. 2001)........................... passim

In re Bulger, 710 F.3d 42 (1st Cir. 2013) ...........................................................5, 7

In re Charges of Judicial Misconduct, 769 F.3d 762 (D.C. Cir. 2014) ..................10

In re Creech, 119 F.4th 1114 (9th Cir. 2024) ..........................................................4

In re IBM Corp., 45 F.3d 641 (2d Cir. 1995) ................................................. 10, 16

In re Martinez-Catala, 129 F.3d 213 (1st Cir. 1997) .............................................14

In re United States, 666 F.2d 690 (1st Cir. 1981).......................................... 10, 16

In re United States, 441 F.3d 44 (1st Cir. 2006).......................................... 11, 14

Liteky v. United States, 510 U.S. 540 (1994)...........................................................5

United States v. Bowens, 291 F. App'x 644 (10th Cir. 2008)................................15

United States v. Castro-Taveras, 841 F.3d 34 (1st Cir. 2016).............................10

United States v. Day, 215 F. App'x 975 (11th Cir. 2007)......................................15

United States v. DeJesus-Torres, 64 F.4th 33 (1st Cir. 2023) ...............................12

United States v. Microsoft Corp., 253 F.3d 34 (D.C. Cir. 2001) ............................3

United States v. Muriel-Cruz, 412 F.3d 9 (1st Cir. 2005) .....................................14

United States v. Nunez, 2021 WL 1095978 (D. Me. March 22, 2021)...................13

United States v. Roman-Huertas, 848 F.3d 72 (1st Cir. 2017)...............................10

United States v. Texas, 523 U.S. 296 (1998).........................................................16

United States v. Whorley, 550 F.3d 326 (4th Cir. 2008)........................................16

Weiss v. Hunna, 312 F.2d 711 (2d Cir. 1963) .......................................................15

**Statutes**

18 U.S.C. § 455(a) ...................................................................... 1, 3, 5, 15

**Other Authorities**

Addendum, United States v. Tsarnaev, No. 16–6001 (1st Cir. Dec. 27, 2018) ........6

Code of Conduct for United States Judges, Canon 3(A)(6) ..................................1, 9

Code of Conduct for United States Judges, Canon 3(A)(6) cmt ............................10

Keith Levinsky, Fairness Was Foremost for Marathon Bombing Judge, Boston
    College Law Magazine Online (Apr. 12, 2016), https://tinyurl.com/42fcefv2 .....3

**Rules**

Fed. R. App. P. 10(a) .............................................................................................15

Fed. R. Civ. P. 60(b) .............................................................................................15

# INTRODUCTION

"[W]hen a judge makes public comments to the press regarding a pending case," he "invites trouble."  In re Boston's Children First, 244 F.3d 164, 171 (1st Cir. 2001).  That is especially true "in newsworthy cases where tensions may be high" and in "matter[s] of significant local concern."  Id. at 169.  In Boston, there is no bigger case, and none that elicits hotter passions, than Dzhokhar Tsarnaev's capital prosecution for his part in the Marathon bombings.  But rather than follow the clear direction supplied by this Court and Canon 3(A)(6) of the Code of Conduct for United States Judges, Judge O'Toole spoke to public audiences at least three times about this case—once on a true-crime podcast—during the pendency of Tsarnaev's appeal.  The judge discussed the precise issues now before him on remand, praising the "public-spiritedness" of the jurors, who had given no "indication of breach of duty" and delivered a "fully fair" trial.  Judge O'Toole had no permissible reason for doing this, and the government provides none.

Instead, the government downplays Judge O'Toole's remarks, suggesting strained and even revisionist interpretations that disregard the rigorous standard imposed by Boston's Children First in cases like this one: "[E]ven ambiguous comments may create the appearance of impropriety" that triggers 18 U.S.C. § 455(a)'s obligation to recuse.  244 F.3d at 170.  Next, unable to defend the order below, the government rewrites it to elide Judge O'Toole's mistaken belief that

1

this Court had expressed a view about recusal.  And the government offers no compelling justification for the judge's refusal to disclose his other public statements and <u>ex parte</u> communications with the jurors—a refusal that casts even greater doubt on his impartiality.  Finally, the government repackages a timeliness argument that didn't prevail below as an equitable objection to mandamus.  But the defense litigated recusal with diligence.  This Court should grant the writ.[1]

## ARGUMENT

## This Court Should Grant Mandamus And Order Recusal.

A.    <u>Judge O'Toole's Public Comments Create An Appearance Of Partiality Requiring Recusal.</u>

1.    At the threshold, the government ignores two key principles.  First, the government overlooks that, apart from what he said, Judge O'Toole's "'expressive conduct in deliberately making the choice to appear'" at panel discussions and on a podcast "'conveyed an uncommon interest and degree of personal involvement'" in this case.  <u>Boston's Children First</u>, 244 F.3d at 169. "[T]he very rarity of such public statements, and the ease with which they may be avoided, make it more likely that a reasonable person will interpret such statements as evidence of bias."  <u>Id.</u> at 170.  Hence the admonition that "judges should be particularly cautious about commenting on pending litigation."  <u>Id.</u> at 169–70.

---

[1] Tsarnaev's Mandamus Petition is cited "Pet."  Exhibits to the Petition are cited "Exh."  The government's Answer is cited "Ans."

2

Second, when it comes to what Judge O'Toole did say, the government neglects the "hard line" drawn in <u>Boston's Children First</u> against public comments, even "mild" ones.  <u>See</u> <u>United States v. Microsoft Corp.</u>, 253 F.3d 34, 114 (D.C. Cir. 2001).  <u>Boston's Children First</u> ordered recusal even though it was "not at all clear that [the district judge] was commenting on the merits," and her "public comments could easily be characterized as legitimate efforts to explain operative law." <u>Id.</u> at 168, 170.  "Ambigu[ity]" is enough to trigger § 455(a).  <u>See id.</u> at 170.

2.    Evaluated in light of these two principles, Judge O'Toole's public comments, made in diverse settings over the course of seven years and addressed to the very issues presented on remand, once again compel this Court to act.

The government's response is as simple as it is unconvincing: recharacterize and minimize.  For example, during the 2016 Boston College Law School panel, Judge O'Toole praised the jurors, including Jurors 138 and 286, whose misconduct and bias he must now investigate: "[T]he public-spiritedness of these jurors was remarkable throughout."  Pet. 7.  This statement—which attracted media attention, <u>e.g.</u>, Keith Levinsky, <u>Fairness Was Foremost for Marathon Bombing Judge</u>, Boston College Law Magazine Online (Apr. 12, 2016), https://tinyurl.com/42fcefv2—is far more suggestive of prejudgment than the one at issue in <u>Boston's Children First</u>.  Yet in response, the government quotes an unrelated Supreme Court case, then asserts that "no reasonable person would

3

understand Judge O'Toole's brief aside ... to be in any way improper or disqualifying." Ans. 15. Why not? The questions before the district court on remand are whether, as the defense has alleged, Jurors 138 and 286 not only disobeyed their instructions, but also lied during voir dire about their social media activities and harbored bias against Tsarnaev. If the defense's allegations are true, the jurors have hardly displayed "public-spiritedness." So a reasonable observer could question whether Judge O'Toole, having delivered this praise, is now open to the possibility that these jurors were biased—or whether, instead, he has predetermined the matter. See In re Creech, 119 F.4th 1114, 1123 (9th Cir. 2024) (cited at Pet. 26–27) (judge's public praise of prosecutor was "in tension with" litigant's allegation of prosecutorial misconduct, requiring recusal).

The government notes that the defense had not filed its appellate brief when Judge O'Toole spoke. In the government's view, Tsarnaev's claim thus "necessarily depends" on two propositions: (i) Judge O'Toole "anticipated" an appellate juror-misconduct claim; and (ii) he "intended" his remarks as an "anticipatory defense" of his ruling denying the motions to strike. Ans. 15. As to the first, the defense had already lodged such a claim at trial; the second is irrelevant. During jury selection, Judge O'Toole dismissed Tsarnaev's documented evidence of misconduct, dishonesty, and bias by Jurors 138 and 286 and refused further voir dire. See Pet. 5. So the comments implicated the concern

4

highlighted in <u>Boston's Children First</u>: "[A] judge's defense of [his] own orders, prior to the resolution of appeal, may create the appearance of partiality." 244 F.3d at 170. "To the extent that Judge [O'Toole's] comments might be interpreted as a defense of [his] procedural approach to this litigation," the "appearance of partiality" that results is "troubling." <u>Id.</u> How Judge O'Toole "intended" his comments is immaterial. The analysis is "<u>objective</u>." <u>Liteky v. United States</u>, 510 U.S. 540, 548 (1994). "The point under § 455(a) is not his actual state of mind at a particular time, but the existence of facts that would prompt a reasonable question in the mind of a well-informed person about the judge's capacity for impartiality" today, when he has been charged with determining these jurors' fitness. <u>In re Bulger</u>, 710 F.3d 42, 46 (1st Cir. 2013).

Further, in each of his public appearances, Judge O'Toole vouched for the jurors' compliance with his instructions regarding social media. For example, during the Boston College Law School panel, he said that he had "heard of no[]" "indication of breach of duty" by the jurors in this case, opining: "We ask them to do their duty, and I think they do." Pet. 7–8. The government contends that Judge O'Toole "was primarily addressing the concerns faced by courts nationwide," and when he mentioned this case, was describing "what occurred during the trial, not the jury selection process, especially given the recollection that 'every morning, we asked if they had avoided extraneous information.'" Ans. 16–17. Judge O'Toole's

5

actual words speak for themselves.  He was plainly discussing this case.  He had just given a lengthy account of how he "custom-designed the jury selection process" and referred to what he "heard" from "the parties."  The surmise that Judge O'Toole was describing "the trial, not the jury selection process" is unlikely.  Jury selection is part of the trial.  And the judge did daily ask prospective jurors, not just seated jurors, "if they had avoided extraneous information."  He put that question to Juror 138 on the "morning" that the juror appeared for voir dire—and the juror answered falsely that he had.  Addendum 150–51, United States v. Tsarnaev, No. 16–6001 (1st Cir. Dec. 27, 2018); see also id. 179–80 (Juror 286).  Judge O'Toole spoke in the broadest of terms.  He knew of no "breach of duty" by these jurors, who "do their duty."

Judge O'Toole also declared that he had "managed the mechanics and logistics of the trial[] to assure that the defendant ... was given what the Sixth Amendment guarantees, a public trial that is fully fair."  And during the Q&A, when asked "if he has any lingering questions or doubts about the Boston Marathon Bombing trial outcome," the judge "said no. He had moved on."  Pet. 6–8.  The government brushes all of this off.  According to the government, Judge O'Toole didn't mean "assure," he meant "aspire[] to achieve."  Ans. 13.  That is not what he said.  Then, citing anecdotes from other jurists, the government says that Judge O'Toole "did not affirmatively state that he had no 'lingering doubts or

6

questions,'" just that "he had 'moved on' to other cases on his docket." Ans. 13–14. But that omits the first half of his answer, which disclaimed any "doubts." (If Judge O'Toole had granted the defense's motion for disclosure, we might have a better idea of precisely what he said. See Pet. 8 & n.3; infra Argument § B.) In any case, the government's take on this language is just that—its take, designed to obscure what the average listener could reasonably understand as the judge's confidence—and satisfaction—at having shepherded this difficult case to the right result by empaneling a fair jury. A "reasonable member of the public could easily think" that Judge O'Toole "would only be human" by taking pride in his work, and by "reacting ... in either a defensive or an adversarial way" to the prospect that the jury-selection process he "custom-designed" was tainted and yielded an unreliable verdict. Bulger, 710 F.3d at 46. His comments connote certitude incompatible with the tasks prescribed for remand.

With respect to the 2016 AO panel and the 2023 "Criminal" podcast, during both, Judge O'Toole said that when it comes to social media, jurors "take their responsibility seriously" and "follow through" on their promises to avoid extraneous information. The government responds that these statements reflected the judge's general experience. Ans. 19–22. Judge O'Toole was introduced as having presided over this trial by name, and this trial was the only one that he discussed with particularity. The government also says that Judge O'Toole's

references to the "gruesome" evidence and the 90-day counseling order were mere "statement[s] of fact." Ans. 21–22. These facts betray deep solicitude for the jurors. The judge's choice to call attention to these facts (and to welcome public congratulations for his order) evinces an uncommon investment in the jurors' welfare, even after years had passed. A reasonable observer could doubt whether, having gone on record praising these jurors and touting his innovative measure to protect them, Judge O'Toole could now rule that two of them had subverted the trial—a ruling that would expose both to public scrutiny and opprobrium.

Boston's Children First compels recusal. The government has little to say about that precedent, except that this case is "worlds apart" because some of Judge O'Toole's comments came in "an academic setting" and preceded Tsarnaev's appellate brief. Ans. 18–19, 21, 22–23. These were not guest lectures. Journalists attended (and reported on) the 2016 Boston College Law School event. The "Criminal" podcast was not academic at all. Moreover, when Judge O'Toole spoke, he knew of the defense's allegations of juror bias, as well as the defense's procedural objections to his refusal to conduct further voir dire. He still lauded these jurors and touted the "jury selection process" that he had "custom-designed" to "assure ... full[] fair[ness]." A judge's "defense of [his] procedural approach" "may create the appearance of partiality." 244 F.3d at 170. This case is, or exceeds, Boston's Children First in every way that matters. It involves "a matter

of significant local concern." Id. at 169. Judge O'Toole's gratuitous comments

are at least "ambiguous" and "open to misinterpretation," even if they "could easily

be characterized as legitimate." Id. at 170. Indeed, this case is a fortiori. The

judge in Boston's Children First was reacting to counsel's "provocative attempts to

influence public opinion." Id. at 168. Nothing like that excuse appears here. And

that judge's single comment—that standing was "more complex" in that case than

in another, id. at 166—was far more neutral than Judge O'Toole's many remarks.

Boston's Children First controls the outcome here.

The government says that Canon 3(A)(6) is inapplicable because Judge

O'Toole's comments didn't concern the "merits" and fell within the "scholarly

presentations"/"explanations of court procedures" exception. Ans. 17–18, 21, 22.

The "merits" issues on remand include whether the jurors followed their

instructions about social media, lied during voir dire, or suffered from bias. Judge

O'Toole addressed each. He knew of no "breach of duty" by these "remarkabl[y]"

"public-spirited[]" jurors who returned a "fully fair" verdict. This Court has

ordered recusal even where it was "not at all clear" that the district judge "was

commenting on the merits," because "it is possible for a judge to comply" with

Canon 3(A)(6) "yet still be required to recuse." Boston's Children First, 244 F.3d

at 168. Nor does the "scholarly presentations" exception supply a safe harbor.

"That exception ... is limited by the requirement that the comment 'not denigrate

public confidence in the judiciary's integrity and impartiality.'" In re Charges of Judicial Misconduct, 769 F.3d 762, 788 (D.C. Cir. 2014) (App'x) (cited at Ans.18). This limitation requires "particular care" where, as here, "the public comment involves a case from the judge's own court.  Canon 3(A)(6) cmt.

    3.    Judge O'Toole's in-court statements and actions support recusal based on his extrajudicial conduct.  To clarify Tsarnaev's position: Judge O'Toole's post-judgment public statements are both necessary and sufficient for recusal.  That is, Tsarnaev's recusal claim did not accrue until Judge O'Toole made the public comments now adduced as grounds for disqualification and this Court remanded for further proceedings.  See infra Argument § C.  So Tsarnaev did not "waive[] ... any reliance on those remarks" by not raising them on direct appeal.  Ans. 23.  In any case, the government did not raise this waiver argument in opposing recusal below (see Exh. F, at F4–F6), and has thus itself waived any purported waiver. See, e.g., United States v. Roman-Huertas, 848 F.3d 72, 77 (1st Cir. 2017); United States v. Castro-Taveras, 841 F.3d 34, 54–55 (1st Cir. 2016).

    Contrary to the government's contention (Ans. 23–24), considering Judge O'Toole's in-court actions is proper.  This Court did so in In re United States, 666 F.2d 690, 697 (1st Cir. 1981), and other Circuits have followed suit.  E.g., In re IBM Corp., 45 F.3d 641, 644 (2d Cir. 1995) (explaining that judicial actions "can surely" "warrant recusal ... when accompanied by extrajudicial actions" and

requiring recusal in light of "judicial and extrajudicial actions").  Boston's
Children First did not reject that practice (contra Ans. 24 (citing 244 F.3d at 169 &
n.9)), but simply restated—in dictum, as that case did not involve in-court
actions—the general rule that such actions alone do not warrant disqualification.
Nor was In re United States, 666 F.2d 690, a "one-time exception."  Ans. 24.  This
Court also relied on the district judge's rulings to grant mandamus and order
recusal in In re United States, 441 F.3d 44, 48, 66–68 & n.20 (1st Cir. 2006).

The government fails to appreciate the significance of Judge O'Toole's in-
court actions.  Ans. 24–26.  The government says that when Judge O'Toole called
the jurors his "teammates" and shook their hands, he meant only to convey that
"both had the duty 'to be as fair and impartial as we possibly can.'"  Ans. 24–25.
Likewise, the government downplays Judge O'Toole's post-verdict encomia as
"typical."  Ans. 25.  These observations are debatable.  Certainly, it was most
unusual for the judge to begin trial by telling jurors in a private colloquy that he
and they were "in this together."  Pet. 10.  What matters is the judge's affinity for
and solidarity with the jurors, which could cause a reasonable observer to doubt his
capacity now to investigate them and, if warranted, deem them biased.

B.    Judge O'Toole's Order Denying Recusal Merits No Deference.

The government's defense of Judge O'Toole's decision to keep this case is
half-hearted.  The district court committed legal error, and thus abused its

11

discretion, by stating that "[r]ecusal would be at odds with the direction of the Court of Appeals," as recusal wasn't before this Court.  Pet. 28–29.  The government's answer again relies on a word swap: "Although Judge O'Toole said that 'recusal' would conflict with this Court's directions on remand, he apparently meant 'reassignment.'"  Ans. 8 n.2.  That revision is unpersuasive.  The district court had no occasion to discuss "reassignment," having resolved that issue months earlier.  See Exh. D, at D4–D6.  As the court itself acknowledged, the motion before it sought "'recusal and ... disclosure.'"  Exh. A, at A1 (quoting Exh. E, at E1).  Moreover, the substance of the order reflects the (mistaken) belief that this Court had decided the point: "It is apparent that the Court of Appeals intended that this Court investigate the potential bias of the two jurors at issue."  Exh. A, at A2.  So there's "no reason to doubt that the district court meant what it said."  United States v. DeJesus-Torres, 64 F.4th 33, 40 (1st Cir. 2023).  See Gioiosa v. United States, 684 F.2d 176, 178–79 (1st Cir. 1982) (rejecting government's argument that no legal error occurred because district court only "mislabeled" standard of review, explaining: "[W]e can only accept [the district court's] words at face value").

Likewise unconvincing is the effort to explain Judge O'Toole's refusal to disclose any other public comments about this case and his ex parte communications with the jurors.  Ans. 28–29.  The government mischaracterizes Tsarnaev's request.  The defense sought disclosure of Judge O'Toole's "public"

comments.  E.g., Exh. E, at E1, E4, E5, E21, E22, E23.  The government cherry-picks one sentence from a memorandum below that didn't include this limitation, then accuses Tsarnaev of an unduly "broad" ""fishing expedition.'"  Ans. 28–29 (citing Exh. E, at E22).  This is disingenuous: The same page of the document that the government cites contains a point heading seeking production of "Public Comments."  Seeking disclosure about specific events is the opposite of fishing.  Nor does the government explain why it would have been difficult for Judge O'Toole to collect, or invasive for him to share, statements he made in public settings.  Every judicial nominee must do this.  Meanwhile, binding authority required disclosure of the judge's ex parte talks with the jurors.  Pet. 30.  Neither Judge O'Toole nor the government mentions the latter point.

More fundamentally, Judge O'Toole's refusal to disclose readily available material, pertaining to known events as to which the judge had no privacy interest, undermines confidence in his impartiality.  See, e.g., United States v. Nunez, 2021 WL 1095978, at *6 (D. Me. March 22, 2021) ("Transparency ... strengthens the public's faith that the federal judiciary impartially applies the law.").  The government's effort to construct a technical justification for Judge O'Toole's actions makes things worse.  A judge prioritizing the appearance of impartiality would have disclosed—or stated that there was nothing more to disclose—even in the absence of a defense request.  See Pet. 30.

13

C.    <u>Tsarnaev Satisfies The Other Grounds For Mandamus.</u>

Mandamus lies to remove a disqualified judge, and Tsarnaev meets the criteria for the writ.  Pet. 16, 31–32.  The government concedes that "a <u>clear entitlement to recusal</u>" satisfies the irreparable injury prong. Ans. 29 (quoting <u>In re Martinez-Catala</u>, 129 F.3d 213, 217–18 (1st Cir. 1997)).  Tsarnaev has made that showing.  The government contends that the equities weigh against mandamus because the recusal motion was untimely.  Ans. 29–32.  This old wine is no better in a new bottle.  The government raised this argument below, but the district court didn't accept it, for good reason.  The defense acted with diligence, seeking recusal as soon as the claim was available, and procured no strategic advantage by the timing of its motion.  <u>See</u> <u>In re United States</u>, 441 F.3d at 65 (explaining that, in gauging timeliness, this Court asks "whether there was a calculated withholding of a recusal motion such that we would deem it waived," and holding motion timely).

The defense could not have raised a recusal claim in this Court on appeal, or in the district court while the appeal was pending.  In this Court, Tsarnaev was appealing a judgment, but Judge O'Toole's remarks postdated—and thus offered no grounds to attack—that judgment.  <u>See</u> <u>United States v. Muriel-Cruz</u>, 412 F.3d 9, 12 (1st Cir. 2005) ("[W]e consult only the record extant at the time the district court rendered its decision.").  This Court's "review" was "limited to the record

14

below," Cipes v. Mikasa, Inc., 439 F.3d 52, 57 (1st Cir. 2006), and the judge's

public comments weren't part of that record, see Fed. R. App. P. 10(a).

Nor, contrary to the government's view (Ans. 31–32), could the defense

have moved to recuse in the district court, because the filing of the notice of appeal

divested that court of jurisdiction. See Griggs v. Provident Consumer Discount

Co., 459 U.S. 56, 58 (1982). The government cites one out-of-Circuit

case—where the point wasn't disputed—stating that a district court retains

jurisdiction to recuse itself despite a pending appeal, Ans. 31, but the weight of

authority is to the contrary. See, e.g., Weiss v. Hunna, 312 F.2d 711, 713 (2d Cir.

1963) (Friendly, J.) (filing of notice of appeal divested district court of jurisdiction

to entertain Fed. R. Civ. P. 60(b) motion to vacate judgment on ground that judge

should have disqualified himself); Exh. G, at G4 n.1 (collecting cases). Also,

§ 455(a) concerns recusal in "proceeding[s]," but there was no "proceeding"

involving the jurors before the district court. See United States v. Bowens, 291

F. App'x 644, 645 (10th Cir. 2008); United States v. Day, 215 F. App'x 975, 976

(11th Cir. 2007) (both holding that district courts lacked jurisdiction to hear recusal

motions absent pending "proceedings"). Before this Court remanded, the issue of

recusal was neither live nor ripe. Tsarnaev's appeal was pending, and it was

speculative that the case would ever return to the district court. Deciding recusal

would therefore have been "premature," Abbott Labs. v. Gardner, 387 U.S. 136,

148 (1967), as return of the case to Judge O'Toole was a "contingent future event[]" that "may not [have] occur[red] at all.'" <u>United States v. Texas</u>, 523 U.S. 296, 300 (1998).  <u>See</u> <u>In re IBM Corp.</u>, 45 F.3d at 643 (recusal motion would have been "both premature and unnecessary in the absence of any matters then pending or likely to be pending" before district judge sought to be recused).

When recusal became live—when this Court remanded for further proceedings concerning the juror misconduct claim—the defense acted promptly. The government does not argue that the timing of the motion was manipulative and spots no edge that we have attained or prejudice that it has suffered.  <u>Contra</u> <u>United States v. Whorley</u>, 550 F.3d 326, 339 (4th Cir. 2008) (cited at Ans. 31) (defendant forwent recusal motion at arraignment, then reversed himself "on the eve of trial" after unfavorable pretrial rulings).  The government cites no case from within this Circuit denying recusal on timeliness grounds.  <u>Compare</u> <u>In re United States</u>, 666 F.2d at 694 (cited at Ans. 10, 24) (holding government recusal motion timely, even though basis for motion was "in large outline obvious long before" filing).

16

## CONCLUSION

This Court should grant mandamus and order recusal.

Dated:  May 19, 2025

David E. Patton, Esq.
Court of Appeals # 1173507
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
Tel.: (212) 763-0883
DPATTON@HECKERFINK.COM

William W. Fick, Esq.
Court of Appeals # 82686
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
WFICK@FICKMARX.COM

Respectfully submitted,

/s/ Daniel Habib, Esq.
Daniel Habib, Esq.
Court of Appeals # 1173462
Deirdre D. von Dornum, Esq.
Court of Appeals # 11713158
Mia Eisner-Grynberg, Esq.
Court of Appeals # 1186916
FEDERAL DEFENDERS OF NEW
    YORK, INC.
52 Duane Street, 10th Floor
New York, NY 10007
(212) 417-8769
DANIEL_HABIB@FD.ORG
DEIRDRE_VONDORNUM@FD.ORG
MIA_EISNER-GRYNBERG@FD.ORG

*Attorneys for Petitioner*

17

**CERTIFICATE OF COMPLIANCE**

1.      This petition complies with this Court's order of May 8, 2025,

because excluding the parts of the document exempted by Fed. R. App. P. 32(f),

this petition contains **3,900** words.

2.      This document complies with the typeface requirements of Fed. R.

App. P. 32(a)(5) and type style requirements of Fed. R. App. P. 32(a)(6) because

this brief has been prepared in a proportionally spaced typeface using **Microsoft**

**Word** in **14-point font** in **Times New Roman** type style.

Dated:  May 19, 2025                    /s/ Daniel Habib, Esq.
                                        Attorney for Petitioner
                                        **Dzhokhar Tsarnaev**

_____

**CERTIFICATE OF SERVICE**

I hereby certify that on May 19, 2025, I electronically filed the foregoing

document with the United States Court of Appeals for the First Circuit by using the

CM/ECF system.  I certify that all parties or their counsel of record are registered

as ECF filers and that they will be served by the CM/ECF system.  I also I served a

copy of the foregoing document by email on the district court, Hon. George A.

O'Toole, via courtroom clerk John Fleming (john_fleming@mad.uscourts.gov)

and docket clerk Flaviana de Oliveira (flaviana_deoliveira@mad.uscourts.gov).

Dated:  May 19, 2025                    /s/ Daniel Habib, Esq.
                                        Attorney for Petitioner
                                        **Dzhokhar Tsarnaev**